IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HOUSTON POLICE OFFICERS' PENSION SYSTEM | § § § § § | MDL No. 1945 |
| V. | § § § | |
| STATE STREET BANK & TRUST COMPANY and STATE STREET GLOBAL ADVISORS | § § § § § | Civil Action No. 08-05442-RJH |

---

**PLAINTIFF HOUSTON POLICE OFFICERS' PENSION SYSTEM'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

**BURFORD MANEY, L.L.P.**
Robert R. Burford
TBA No. 03258500
Andrew Meade
TBA No. 24032854
1221 McKinney, Ste. 3150
Houston, Texas 77010
Telephone: (713) 658-9001
Facsimile: (713) 658-9011

**GIBBS & BRUNS, L.L.P.**
Grant J. Harvey
TBA No. 09177700
Caren S. Sweetland
TBA No. 24001333
Laura Carlock
TBA No. 24027221
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713)650-8805
Facsimile:  (713)750-0903

**ATTORNEYS FOR PLAINTIFF HOUSTON
POLICE OFFICERS' PENSION SYSTEM**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

ISSUES PRESENTED........................................................................................ 4

PROCEDURAL HISTORY................................................................................. 6

SUMMARY JUDGMENT EVIDENCE ............................................................. 7

STATEMENT OF FACTS ................................................................................. 7

I.    HPOPS Is a Governmental Pension System Established by the Texas Legislature ........ 7

II.   HPOPS Sought to Diversify Its Portfolio by Investing in Commodities......................... 8

III.  State Street's Presentation for a "Commingled" Commodities Strategy......................... 9

IV.  HPOPS's Trustees Select State Street to Manage the Commodities Strategy and Reject Having HPOPS Manage the Process Itself........................................................ 10

V.   HPOPS Executes the IMA with State Street to Invest in the TIPS Strategy in December 2005 ................................................................................................... 12

VI.  HPOPS Executes the First Amendment to the IMA in June 2006 Providing State Street with Full Discretion to Manage the Commodities Strategy ............................... 12

VII.  State Street Selected the LDBF As the Cash Collateral Vehicle for HPOPS's Separately Managed Commodities Investment ........................................................... 14

VIII. HPOPS Terminates State Street As Investment Manager in November 2007 ............. 18

STANDARDS OF REVIEW................................................................................ 19

I.    Standard of Review for Partial Summary Judgment..................................................... 19

II.   Choice-of-Law Analysis ............................................................................................. 20

ARGUMENT & AUTHORITIES ....................................................................... 24

I.    As a Matter of Law, State Street Had Full and Absolute Discretionary Power to Oversee the Entire Commodities Strategy, Requiring That State Street Select, Manage, and Move (If Prudent to Do So) the Cash Collateral for the Strategy ............ 24

      A.   The Ambiguity Analysis Under Texas Law ...................................................... 24

i

B.  HPOPS's Plain Language Construction of the IMA Is the Only Reasonable Interpretation ............................................................................ 25

1.  The Plain-Language of the IMA Establishes That State Street Had Full and Absolute Discretionary Power to Manage and Oversee the Entire Commodities Strategy .............................................................. 25

2.  HPOPS's Plain-Language Construction Is Required by the Texas Government Code .......................................................................... 30

C.  State Street's Alternative Construction That HPOPS, Not State Street, Was Required to Oversee and Manage the Commodities Strategy, Including the Cash Collateral Vehicle, Is Unreasonable and Would Vitiate the Texas Government Code ................................................................ 32

1.  State Street's Contention That the IMA Did Not Vest It with Discretion But Instead Mandated the Investment of HPOPS's $54 Million into the LDBF Does Not Find Support Anywhere in the IMA .................................................................................... 33

2.  State Street Relies upon Pre-Contractual Discussions in a Failed Effort to Supplant the Clear Contractual Language That Controls This Issue .............................................................................. 35

II.  Many of State Street's Affirmative Defenses Are Invalid As a Matter of Law ........... 38

A.  Texas Government Code Section 802.203(c) Eviscerates Any Affirmative Defense That Involves Any Alleged Misconduct by the Trustees or HPOPS ...................................................................................... 38

B.  State Street Cannot Reduce Its Liability to HPOPS by Its Affirmative Defenses .................................................................................... 42

III.  State Street's Equitable Affirmative Defenses Are Inapplicable As a Matter of Law Because This Dispute Involves a Governmental Entity That Was Exercising Governmental Functions .......................................................................... 44

IV.  State Street's Mitigation Defense Is Legally Defunct for Additional Reasons ............ 46

A.  HPOPS Had No Duty to Mitigate Because State Street Had an Equal Opportunity to Do So and Failed .................................................... 47

B.  HPOPS Was Not Obligated to Mitigate Damages Resulting from State Street's Fraudulent Conduct ............................................................ 48

V.  None of State Street's Defenses Are Available on HPOPS's Texas Securities Act Claim ............................................................................................ 49

CONCLUSION ............................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**

*Acad. Corp. v. Hansen*, No. 01-93-00299-CV, 1994 WL 64867 (Tex. App.—
Houston [1st Dist.] Mar. 3, 1994, writ denied) .......................................................... 25

*Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694 (5th Cir. 1999) ........................ 21

*Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725 (2d Cir. 1994) ................................................. 19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 19

*Baird v. City of Melissa*, 170 S.W.3d 921 (Tex. App.—Dallas 2005, pet. denied) ...................... 44

*Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998) ................................ 40, 41

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 19

*City of Arlington v. Randall*, 301 S.W.3d 896 (Tex. App.—Fort Worth 2009, pet. filed) ........... 38

*City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770 (Tex. 2006) ............................... 44

*Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983) ......................................................................... 24, 33

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587 (Tex. 1996) ........... 24

*Compton Press, Inc. v. Granada Invs., Inc.*, Civ. A. No. 91-1256, 1992 WL 566329
(D.N.J. Nov. 23, 1992) ................................................................................................ 43

*Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124 (Tex. App.—
Houston [14th Dist.] 2000, pet. dism'd) .................................................................... 25

*Crain v. The Unauthorized Practice of Law Comm. of the Supreme Court of Tex.*,
11 S.W.3d 328 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) .......................... 44

*Dann v. Athens Munic. Water Auth.*, No. 12-07-00087-CV, 2007 WL 2460058
(Tex. App.—Tyler Aug. 31, 2007, no pet.) ................................................................ 45

*DeSantis v. Wackenhut*, 793 S.W.2d 670 (Tex. 1990) .............................................................. 21, 22

*DeWitt v. Harris County*, 904 S.W.2d 650 (Tex. 1995) .............................................................. 38

*Duperier v. Tex. State Bank*, 28 S.W.3d 740 (Tex. App.—Corpus Christi 2000,
pet. dism'd) ............................................................................................................. 48, 49

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp. 2d 986 (S.D. Tex. 2004) ......... 22

*Formosa Plastics Corp. v. Kajima Int'l, Inc.*, 216 S.W.3d 436 (Tex. App.—
Corpus Christi 2006, pet. denied) ............................................................................ 48

*Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ............................................................................................................... 23

*Gutierrez v. Collins*, 583 S.W.2d 312 (Tex. 1979) ....................................................... 22

*Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014 (5th Cir. 1990) ........................... 49

*Harris County v. Ball*, No. 14-97-00135-CV, 1998 WL 724780 (Tex. App.— Houston [14th Dist.] Oct. 8, 1998, no pet.) ............................................................... 38

*Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118 (Tex. 1996) ............................... 34

*IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ................................................................................. 37

*In re D. Wilson Constr. Co.*, 196 S.W.3d 774 (Tex. 2006) ...................................... 24, 37

*In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001) ....................... 20

*In re Rezulin Prods. Liab. Litig.*, 390 F. Supp. 2d 319 (S.D.N.Y. 2005) ................. 19, 20

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F. Supp. 2d 717 (S.D.N.Y. 2003) ......................................................................................................... 20

*In re State Street Bank and Trust Co. ERISA Litigation*, C.A. No. 1:07-cv-08488-RJH-DFE  6, 20

*In re Sterling Foster & Co., Inc. Secs. Litig.*, 222 F. Supp. 2d 289 (E.D.N.Y 2002) .................. 20

*Ins. Co. of N. Am. v. Morris*, 928 S.W.2d 133 (Tex. App.—Houston [14th Dist.] 1996) ........... 49

*ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711 (Tex. App.— Eastland 2007, pet. denied) ....................................................................................... 37

*J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223 (Tex. 2003) ..................................... 33

*Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518 (5th Cir. 2001) ............................. 22

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996) ................................................. 20

*Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001) ........................................................... 49

*Meadolake Foods, Inc. v. Estes*, 218 S.W.2d 862 (Tex. Civ. App.—El Paso 1948, writ ref'd n.r.e.) ........................................................................................................ 48

*Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242 (5th Cir. 1990) ....................... 22

*Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517 (Tex. 1995) ............... 24

*Nextec Applications v. Brookwood Cos.*, -- F. Supp. 2d --, 2010 WL 1257447 (S.D.N.Y. Mar. 31, 2010) ......................................................................................... 19

iv

*Nueces County v. Ferguson*, 97 S.W.3d 205 (Tex. App.—Corpus Christi 2002, no pet.) ........... 39

*Openshaw v. Cohen, Klingenstein & Marks, Inc.*, 320 F. Supp. 2d 357 (D. Md. 2004) ............. 42

*Riggs v. Riggs*, 322 S.W.2d 571 (Tex. Civ. App.—Dallas 1959, no writ) ................................. 49

*Rosa's Café, Inc. v. Wilkerson*, 183 S.W.3d 482 (Tex. App.—Eastland 2005, no pet.).............. 37

*Samuels v. Mockry*, 77 F.3d 34 (2d Cir. 1996) ........................................................................ 20

*Tex. A&M Univ. v. Bishop*, 105 S.W.3d 646 (Tex. App.—Houston [14th Dist.] 2002) ............. 38

*Tex. Taco Cabana, L.P. v. Taco Cabana of N.M., Inc.*, 304 F. Supp. 2d 903
  (W.D. Tex. 2003)..................................................................................................................... 21

*Thayer v. Houston Munic. Employees Pension Sys.*, 95 S.W.3d 573 (Tex. App.—
  Houston [1st Dist.] 2002, no pet.)........................................................................................... 45

*Trinity Universal Ins. Co. v. Fuller*, 524 S.W.2d 335 (Tex. App.—Dallas 1975,
  writ ref'd n.r.e.)....................................................................................................................... 47

*Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742
  (Tex. 2003).............................................................................................................................. 24

*Walker v. Salt Flat Water Co.*, 96 S.W.2d 231 (Tex. 1936) ......................................................... 47

*Williams v. Houston Firemen's Relief & Retirement Fund*, 121 S.W.3d 415 (Tex. App.—
  Houston [1st Dist.] 2003, no pet.)........................................................................................... 46

*Williams v. Provident Inv. Counsel, Inc.*, 279 F. Supp. 2d 894 (N.D. Ohio 2003)................. 42, 44

**Statutes**

28 U.S.C. § 1407.......................................................................................................................... 6

29 U.S.C. § 1105(d) .......................................................................................................... 39, 41, 42

Tex. Civ. Prac. & Rem. Code Ann. § 101.0215 .................................................................... 45, 46

Tex. Civ. Stat. Ann. art. 6243g-4, §3(b) ............................................................................. passim

Tex. Gov't Code Ann. § 802.203(c)...................................................................................... passim

Tex. Gov't Code Ann. § 802.203(d) ........................................................................................... 11

Tex. Gov't Code Ann. § 802.204 ........................................................................................... 30, 39

Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) ................................................................................ 49

**Other Authorities**

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 ................................................................ 23

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 ................................................................ 21

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 .................................................................... 23

TEX. CONST. art. XVI, § 67(a) ...................................................................................................... 45

*The Public Piggy Bank Goes to Market: Public Pension Fund Investment in Common Stock and*
    *Fund Trustee's Social Agenda*, 29 SAN DIEGO L. REV. 39 (1992) .......................................... 39

**Rules**

FED. R. CIV. P. 56(c) ................................................................................................................... 19

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Houston Police Officers' Pension System (HPOPS or "the System") seeks a partial summary judgment that the unambiguous language of the Investment Management Agreement between HPOPS and Defendants State Street Global Advisors and State Street Bank & Trust Co. (together, "State Street") establishes as a matter of law that State Street (as HPOPS's Investment Manager), and not HPOPS, was contractually vested with the power to manage the entirety of HPOPS's separately managed commodities strategy investment and, thus, undertook the sole responsibility, at all times relevant, to select the appropriate cash management fund for the cash collateral for the strategy, to monitor the cash collateral, and to protect the cash collateral by moving it to a different fund if prudent. Additionally, HPOPS seeks a partial summary judgment that the affirmative defenses State Street has asserted against HPOPS, including State Street's second defense ("plaintiff's own conduct"); third defense (unclean hands and in pari delicto); fourth defense ("plaintiff's own negligence"); fifth defense (proportionate responsibility); eighth defense (assumption of the risk); ninth defense (ratification, waiver, laches, and estoppel); and eleventh defense (failure to mitigate damages), fail as a matter of law.

## INTRODUCTION

HPOPS is a Texas state governmental retirement plan established for the benefit of retired Houston Police Officers and family members of deceased officers (including those who died in the line of duty). HPOPS entrusted State Street to act as HPOPS's fiduciary and investment manager to manage a small piece (2.5%) of the System's assets and to invest this $72 million sum in a commodities strategy designed to provide commodities exposure to the System's assets.

State Street's obligations and responsibilities owed to HPOPS are set forth in a detailed contract referred to as the Investment Management Agreement (which together with the First Amendment is referred to as the IMA). HPOPS contracted with State Street under the IMA to separately manage two strategies: (1) the Treasury Inflation Protection Securities (TIPS) Index, and (2) the Enhanced DJ-AIG Commodities Futures Strategy ("Commodities Strategy"). Only the Commodities Strategy is at issue in the case. The Commodities Strategy, which State Street designed, implemented, and managed as HPOPS's Investment Manager, obtained exposure to commodities through swaps, options, and other derivative instruments chosen by State Street rather than purchasing the commodities outright. In order to ensure that the investment was not leveraged, HPOPS invested $72 million in cash with State Street, and State Street purchased commodities instruments limited to a notional value of $72 million.[1]

Pursuant to the terms of the IMA and as required by Texas law, State Street transferred 25% of the cash collateral ($18 million) to the swap counterparty, AIG Financial Products (AIG), for investment in an AIG money market fund to serve as the margin account for the commodities swaps and other commodities investments chosen by State Street. State Street kept the

---

[1] In a commodities strategy using swaps, the investor enters into an agreement with the swap provider wherein the investor and the swap provider agree to exchange certain amounts on pre-specified settlement dates based upon changes in the commodities markets. As part of the swap agreement, the investor is required to deposit cash or securities into a margin account with the swap provider, generally 5% to 10% of the notional value of the swap. If the investor provides the minimum required margin, then the investment can be significantly leveraged. Alternatively, if the investor does not desire a leveraged strategy, as HPOPS decided to do in this case, then additional funds up to the full notional value of the swap are deposited with an investment manager. In HPOPS's case, all $72 million in cash was deposited with State Street: 75% of the required funds was held by State Street for investment in a cash collateral account that it would select in its discretion, and 25% was held by the swap provider. This arrangement produced two cash accounts both under State Street management: a margin account with the swap provider and a cash collateral account with the investment manager. On each settlement date, the swap provider—whose 25% margin account was required by Texas law to be maintained at 25%—was either to deposit additional funds into the State Street collateral account or else withdraw funds from the State Street collateral account depending on the variation in the commodities markets.

remaining 75% of the cash collateral ($54 million), which under the IMA, State Street, as the Investment Manager, had the authority, responsibility, and discretion to invest in unspecified "money market funds and cash management funds." Ex. 13, 1st Am. IMA ¶ 1.

In purporting to carry out its authority, responsibility, and discretion, State Street invested the entirety of the 75% (a total of $54 million) directly in a commingled fund created and managed by State Street known as the Limited Duration Bond Fund (LDBF) (which State Street invested entirely in securities backed by subprime mortgages) and kept it there until HPOPS had lost tens of millions of dollars in a so-called cash management fund that State Street claimed would be well diversified so that it would maintain principal.  In total, State Street caused HPOPS to lose over $33 million.

HPOPS has sued State Street, contending, *inter alia*, that State Street should never have invested HPOPS's $54 million in the "subprime" LDBF, let alone kept it there as the subprime meltdown devastated HPOPS's investment.  Unbeknownst to HPOPS, as well as many of State Street's investment professionals, the LDBF was invested almost exclusively in subprime mortgage-backed securities at all relevant times.

State Street's response is predictable.  First, State Street contends that HPOPS—not State Street—(a) chose to invest the entire $54 million in the LDBF, (b) bore responsibility to monitor the market and portfolio holdings of the LDBF, and (c) was obligated to determine if the cash collateral should be moved to a cash vehicle other than the LDBF.  In other words, State Street contends that it had no fiduciary responsibility or discretion with respect to the $54 million cash collateral component of the Commodities Strategy.  State Street has to make this argument because there is no way for State Street to justify its selection of the LDBF as the cash fund to hold the collateral for the Commodities Strategy, let alone its continuing decision to maintain

3

HPOPS's cash in the LDBF (while simultaneously cashing out State Street's own funds' investments in the LDBF) as the market for subprime securities evaporated taking HPOPS's investment along with it.  Second, State Street advances a "grab bag" of affirmative defenses, including contributory negligence, unclean hands, proportionate fault, assumption of the risk, and failure to mitigate, just to name a few.

With respect to State Street's first argument—that it was HPOPS's job to direct the investment of the $54 million of cash collateral for the Commodities Strategy—the argument ignores the plain, unambiguous language of the IMA, which unequivocally placed the management and investment responsibility over HPOPS's funds in the hands of State Street's trusted experts.  With respect to the myriad affirmative defenses that State Street advances, they all fail as a matter of law.  Under governing Texas law (which State Street agreed to follow and which is remarkably similar to ERISA law), a fiduciary cannot shift the responsibility for its bad acts to its client, here, a Texas state retirement fund.  So long as the investment manager serves in that capacity pursuant to the terms of the contract, it bears the sole responsibility for managing the assets that are entrusted to it and for following its fiduciary duties to protect the assets from losses.  There is no "passing the buck."  None of State Street's asserted affirmative defenses can pass through this impenetrable barrier.

### ISSUES PRESENTED

The first issue presented in this Motion is, under the governing IMA between HPOPS and State Street, whether State Street, as the Investment Manager, or HPOPS, as the client, was obligated to manage and oversee all aspects of the $72 million Commodities Strategy (including the cash collateral component).  HPOPS contends that State Street was charged with selecting and monitoring, at all relevant times, the cash management fund (or funds) for HPOPS's cash

4

collateral investment in the Commodities Strategy.  State Street argues that HPOPS was at all times charged with those responsibilities.

The IMA could not be more clear—State Street, as HPOPS's fiduciary and Investment Manager, had full and absolute discretion and power to manage the entirety of HPOPS's investment in the Commodities Strategy (including the cash collateral component) and, thus, undertook the sole responsibility to select an appropriate cash collateral fund for the Commodities Strategy; to manage and monitor that investment to ensure that it remained an appropriate fund for the collateral; and importantly, to move the collateral to a different fund in the event the cash collateral fund State Street previously selected became inappropriate.  The IMA does not exclude from State Street's "full and absolute discretionary power to manage" the $54 million cash collateral component of the Commodities Strategy that was not sent to AIG. HPOPS thus moves for partial summary judgment that State Street, as the Investment Manager over the entirety of HPOPS's Commodities Strategy, and not HPOPS, was vested with the discretion and responsibility to manage and oversee the investment of HPOPS's cash collateral for the Commodities Strategy and move it, if prudent, to a cash management fund other than the LDBF.[2]

The second issue presented by this Motion is whether State Street can assert a basket of affirmative defenses, which seek to shift to HPOPS or its Trustees the responsibility for HPOPS's losses sustained as a result of State Street's management (or mismanagement) of the account assets.  Under the fiduciary standards set forth in Section 802.203 of the Texas Government Code, which were expressly incorporated into the IMA, State Street cannot claim

---

[2]   In this Motion, HPOPS is not asking the Court to rule that State Street failed to prudently exercise its discretion—just that State Street (not HPOPS) was the entity that, under the IMA, was charged with exercising its discretion.

that HPOPS or its Trustees are responsible for the management of assets invested pursuant to the IMA.   Similarly, no act or omission of HPOPS or its Trustees can diminish State Street's obligations as a fiduciary to HPOPS.   Accordingly, HPOPS moves for partial summary judgment that the affirmative defenses State Street has asserted against HPOPS, including State Street's second defense ("plaintiff's own conduct"); third defense (unclean hands and in pari delicto); fourth defense ("plaintiff's own negligence"); fifth defense (proportionate responsibility); eighth defense (assumption of the risk); ninth defense (ratification, waiver, laches, and estoppel); and eleventh defense (failure to mitigate damages), all fail as a matter of law.

## PROCEDURAL HISTORY

On January 29, 2008, HPOPS commenced this action against State Street in the United States District Court for the Southern District of Texas on diversity grounds, alleging that State Street had, *inter alia*, breached its contractual and fiduciary duties to HPOPS; committed fraud, negligent misrepresentation, and conspiracy; and violated the Texas Securities Act.  *See* Ex. 1, HPOPS Orig. Compl.  On February 25, 2008, State Street moved pursuant to 28 U.S.C. § 1407 for coordinated and consolidated pretrial proceedings in the District of Massachusetts.   On June 16, 2008, the Panel for Multi-District Litigation issued a Transfer Order granting State Street's request for consolidated pretrial proceedings and set venue in the Southern District of New York.  *See* Ex. 2, Transfer Order.  This Court coordinated the action with *In re State Street Bank and Trust Co. ERISA Litigation*, C.A. No. 1:07-cv-08488-RJH-DFE.  On May 14, 2010, HPOPS filed in this Court a Motion for Suggestion of Remand and a Memorandum in Support, which remains pending before the Court.

## SUMMARY JUDGMENT EVIDENCE

In support of its Motion for Partial Summary Judgment, HPOPS offers the summary judgment evidence contained in the Appendix attached to this Memorandum of Law (Exhibits "1" to "51"). This evidence is incorporated herein by reference as specifically cited in this Memorandum and is supported by the affidavits of Patrick Franey and Robert Burford. *See* Ex. 3, Affidavit of Patrick Franey; Ex. 4 , Affidavit of Robert Burford.

## STATEMENT OF FACTS

The facts of this case regarding State Street's egregious breaches of fiduciary duty, blatant misrepresentations, intentional withholding of material information from clients, unapologetic self-dealing, and inequitable treatment of clients are, quite frankly, unimaginable. HPOPS looks forward to the opportunity, perhaps in response to a motion for summary judgment that State Street may elect to file, to educate the Court with respect to the actionable breaches and fraudulent acts committed by State Street. This Motion, however, turns only on *legal grounds*—first, the interpretation of an *unambiguous investment management agreement* to determine whether, under the IMA, State Street or HPOPS was responsible for selecting, protecting, and moving to another fund, if prudent, the cash collateral component of the Commodities Strategy managed by State Street; and second, the *application of well-settled law* requiring dismissal of State Street's affirmative defenses as a matter of law. Accordingly, HPOPS sets forth only those facts necessary to frame these issues.

## I.   HPOPS Is a Governmental Pension System Established by the Texas Legislature

HPOPS is a Texas state governmental retirement plan. In 1947, the Texas Legislature established HPOPS to provide retirement, death, and disability benefits to its members—active and retired members of the Houston, Texas Police Department and certain of their surviving

family members.  At all times relevant hereto, HPOPS was governed by a seven-member Board of Trustees ("Trustees")—five current or former police officers with no formal investment training and one representative each from the City of Houston's mayor's and treasurer's office.  *See* TEX. CIV. STAT. ANN. art. 6243g-4, § 3(b); *see also* Ex. 3, Affidavit of Patrick Franey ("Franey Aff.") ¶ 2. Further, at all relevant times hereto, HPOPS had only two investment professionals on its staff, the Chief Investment Officer Patrick Franey and his assistant.  *See* Ex. 3, Franey Aff., ¶ 2.    Not surprisingly, the enabling statute authorizes HPOPS's Trustees to employ professional investment managers and advisors to manage funds or advise the Board of Trustees regarding management of funds.  *See* TEX. REV. CIV. STAT. art. 6243g-4, §§ 5(c), 6(a), & 10.

## II.   HPOPS Sought to Diversify Its Portfolio by Investing in Commodities

In March 2005, the Trustees authorized HPOPS's Chief Investment Officer, Mr. Franey, to consider investments in Treasury Inflation Protected Securities (TIPS) and commodities as part of a plan to diversify the System's holdings, reduce risk, and protect against inflation.  As a March 2005 HPOPS memorandum entitled "Asset Allocation Considerations" explained:

> We performed a deterministic analysis of our return expectations utilizing an arbitrary 5% allocation to each of these additional asset classes [hedge funds, real estate, commodities, TIPS] by reducing the current allocation to U.S. equity (10%) and international equities (5%) as well as fixed income (5%).  The results indicate a modest decrease in expected return accompanied by a dramatic decrease in risk.  This would be expected due to the ***increased diversification*** offered by these additional asset classes and their ***lower expected returns***.

Ex. 3A, Asset Allocation Considerations, March 2005, at HPOPS015888 (emphasis added).[3]

---

[3]    The memorandum further discussed that adding new, uncorrelated investment classes (including commodities investments) had the benefit of diversification and thus reduced risk.  *See* Ex. 3A at HPOPS015891.

Upon authorization from the HPOPS Board of Trustees, Mr. Franey began evaluating presentations made from various investment managers, including State Street, regarding their TIPS and commodities capabilities.

## III.   State Street's Presentation for a "Commingled" Commodities Strategy

State Street is a worldwide investment management firm that specializes in institutional investments.  In contrast to HPOPS's relatively small size and lack of investment sophistication, State Street is massive.  State Street holds itself out as "the world's leading provider of financial services to institutional investors . . .  [w]ith $18.795 trillion in assets under custody and administration and $1.911 trillion in assets under management[.]"  *See* Ex. 5, State Street Corporation's  Investor  Relations,  available  at  http://phx.corporate-ir.net/phoenix.zhtml?c=78261&p=irol-homeProfile&t=&id=& (last visited June 2, 2010).  State Street operates in 25 countries and employs more than 27,000 persons around the world.  *Id.*

On August 30, 2005, State Street sales representative, Eric Roberts, sent a PowerPoint presentation to HPOPS on State Street's TIPS and commodities capabilities.  *See* Ex. 6, State Street Presentation, 8/30/2005.  Regarding commodities, State Street presented to HPOPS two options for commingled commodities strategies[4]—the Goldman Sachs Commodity Index Strategy (GSCI) and the Enhanced DJ-AIG Commodities Futures Strategy.   State Street represented that its commingled DJ-AIG Commodities Strategy was a unified investment

---

[4]  A commingled fund or strategy is a fund consisting of assets invested from several accounts or multiple parties.  State Street's commingled funds were managed in a trust that was governed by an Agreement of Trust and established by a Fund Declaration that set forth the parameters of the fund.  *See* Ex. 7, Fund Declaration for Commingled DJ-AIG Commodities Strategy.  Because HPOPS required that Texas law govern the assets, it could not invest directly into the commingled Commodities Strategies offered by State Street (the commingled strategy was managed in accordance with Massachusetts law) and instead had to have a separately managed investment pursuant to the IMA, which is the governing document for each dollar invested by HPOPS with State Street.  *See infra* at  Statement of Facts, Part IV.

strategy comprised of three indivisible components:  (i) an Enhanced DJ-AIG Total Return Fund with "commodity exposure through index futures, underlying commodity futures and swaps"; (ii) investment of cash collateral for the commodities strategy in the LDBF, which was represented as having an aspirational goal of "seek[ing] to match or exceed the returns of the one-month US Dollar LIBOR Index by 50 bps"; and (iii) a State Street Money Market Fund for "margin variation."    *Id.* at SS007937437.    The presentation also represented that the DJ-AIG Commodities Strategy would be "unleveraged" with its "residual cash invested in high quality money market securities or pooled funds." *Id.*[5]

## IV.    HPOPS's Trustees Select State Street to Manage the Commodities Strategy and Reject Having HPOPS Manage the Process Itself

In a September 2005 memorandum to the HPOPS's Investment Committee (which was comprised of all seven Trustees), HPOPS's staff evaluated available commodities strategies and made a recommendation that HPOPS use the DJ-AIG Index over the other available commodities indices as the index for the selected manager to replicate in a commodities strategy because "[i]t has sufficient liquidity and does not have the significant allocation to Energy as does the GSCI." *See* Ex. 3B, Sept. 2005 Review of Commodities Memo. at HPOPS000898, 904. HPOPS's staff further evaluated various ways to obtain commodities exposure, including "options that would require HPOPS [and not an investment manager] to manage the process by entering into transactions that would provide us with commodities exposure." *Id.* at HPOPS000899. These strategies were not recommended "due to the need for staff time and expertise to manage the process." *Id.* Rather, HPOPS's staff recommended using "third party asset managers," where "[t]he strategy is implemented by the manager by trading in futures or

---

[5]    The three components that make up the Commodities Strategy are also set forth in the Enhanced DJ-AIG Commodities Futures Strategy fact sheet and are described in the same manner. *See* Ex. 8, Fact Sheet for Commingled DJ-AIG Commodities Strategy.

contracts or entering into swaps on our behalf and *by managing the cash on our behalf*." *Id.* (emphasis added).

At the September 8, 2005 HPOPS Board of Trustees meeting, the Trustees adopted the staff's recommendation and voted to "use the DJ-AIG index" for a commodities strategy and to use a third-party asset manager. In addition, the Board elected to "select State Street Global Advisors as the asset manager." Ex. 3C, Minutes of HPOPS Board Meeting, 9/6/2005, at HPOPS031820. The Trustees also selected State Street as the asset manager for the TIPS strategy. *Id.*

As noted above, the PowerPoint presentation State Street provided to HPOPS in August 2005 presented only State Street's commingled commodities strategies. *See* Ex. 6, State Street Presentation, 8/30/2005. Texas law requires that any contractual relationship between HPOPS and State Street, as its Investment Manager, be governed by Texas law. *See* Ex. 3D, Email from P. Franey to C. Douglass, 10/28/2005. HPOPS therefore could not agree to the terms of the boilerplate documents generally governing the commingled version of the Enhanced DJ-AIG Commodities Strategy because management of the commingled strategy was governed by Massachusetts law rather than Texas law. *Id.* The Texas Government Code also requires that State Street expressly accept its role as HPOPS's fiduciary. TEX. GOV'T CODE ANN. § 802.203(d). The parties, therefore, began negotiating an investment management agreement for a separately managed commodities strategy and TIPS strategy that met these requirements. *See* Ex. 9, State Street's Answer ¶ 16 (admitting that HPOPS's investment in the Commodities Strategy "was a separately managed strategy, and not part of the fund utilized by other institutional investors").

**V.     HPOPS Executes the IMA with State Street to Invest in the TIPS Strategy in December 2005**

HPOPS did not immediately elect to have State Street to manage a commodities investment for the System.  HPOPS instead elected initially only to proceed with the TIPS Strategy and to wait before investing in commodities.  *See* Ex. 10, Email from D. Watkins to G. Kelly, 4/4/2006.  On or about December 6, 2005, the Trustees for HPOPS and State Street executed the IMA, pursuant to which the Trustees appointed and retained State Street as Investment Manager for HPOPS with respect to the investment and management of account assets to be directed in accordance with the TIPS strategy.  *See* Ex. 11, IMA.

**VI.    HPOPS Executes the First Amendment to the IMA in June 2006 Providing State Street with Full Discretion to Manage the Commodities Strategy**

On or about April 24, 2006, Mr. Franey of HPOPS notified Christopher Douglass and Donna Watkins of State Street that HPOPS had decided that it would begin investing in the Commodities Strategy.  *See* Ex. 12, Email from P. Franey to C. Douglass, 4/24/2006.  HPOPS agreed it would invest 1/12 of the $72 million commodities allocation ($6 million per month in cash) on the first trading day of every month for twelve consecutive months for a total unleveraged exposure of $72 million in commodities.  *See* Ex. 13, 1st Am. IMA ¶ 1; Ex. 14, Email from P. Franey to D. Watkins, 6/6/2006 (notifying State Street of the Board vote).

On or about June 16, 2006, more than six months after the Original IMA had been executed, HPOPS and State Street executed the First Amendment to the IMA in order to add the Objective for HPOPS's separately managed Commodities Strategy.  *See* Ex. 13, 1st Am. IMA.  Thus, as of June 16, 2006, and pursuant to the IMA and the First Amendment to the IMA, HPOPS and State Street had agreed, *inter alia*:

- State Street would act as the Investment Manager for HPOPS's separately managed Commodities Account [Ex. 13, 1st Am. IMA at 1];

- "Subject to the terms and conditions of this Agreement, the Code of Ethics, and in accordance with the investment guidelines established by the Trustees (as set forth in the Statement of Policy Guidelines and Investment Objectives of the Fund (the 'Policy'), which is attached hereto as Exhibit E and made a part hereof, as may be hereafter amended as herein provided), [State Street] shall have full and absolute discretionary power to manage all assets held in the Account consistent with the Objectives, including the authority to purchase, sell, cover open positions, and generally to deal in securities, financial and commodity futures contracts, options, short-term investment vehicles and other property comprising or relating to the Account" [Ex. 11, IMA ¶ 5];

- Pursuant to the terms and conditions of the IMA, HPOPS's Code of Ethics, and HPOPS's Investment Guidelines, State Street agreed it "will be acting as a fiduciary . . . (within the meaning of Chapter 802 of the Government Code and Section 10 of Article 6243g-4)" and that it would be "subject to the applicable fiduciary standards of conduct imposed by federal and Texas state law, and the Code of Ethics of the Houston Police Officers' Pension System" [Ex. 11, IMA ¶ 4];

- Consistent with these same terms and conditions, State Street would exercise the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with matters of the same type would use in the conduct of an enterprise with a like character and with like aims" [Ex. 11, IMA ¶ 5(c); Code of Ethics § 602.02];

- Similarly, State Street would "diversify the investment of the Account Assets so as to minimize the risk of losses with respect to the Account Assets" [Ex. 11, IMA ¶ 5(g)]; and

- The IMA constituted the parties' entire agreement:

    8.    Entire Agreement.  This Amendment, together with the Agreement (the terms of such Agreement are hereby confirmed and ratified except as changed by this Amendment), constitutes the entire understanding and agreement between the parties with respect to the subject matter hereof, and supersedes all other prior understandings and agreements, whether written or oral, between the parties concerning this subject matter.

Ex. 13, 1st Am. IMA ¶ 8.

Under the IMA, each month from June 2006 through May 2007, and pursuant to a simple one-line letter of direction drafted by State Street,[6] HPOPS instructed State Street to invest $6 million in its separately managed Enhanced DJ-AIG Commodities Futures Strategy for a total of $72 million in cash.  No other instructions were provided from HPOPS or requested by State Street.  Upon receipt of the $6 million, State Street immediately sent 25% of the cash collateral to the commodities swap counterparty, AIG, as required under Texas law as margin for the commodities swaps to be invested in an AIG money market account.  *See* Ex. 9, State Street's Answer ¶ 27, 4/22/2008.  Pursuant to the terms of the IMA, in the section describing the Commodities Strategy, State Street agreed and was required to manage the remaining 75% of the cash collateral by investing in unspecified "money market funds and other cash management funds."  Ex. 13, 1st Am. IMA ¶ 1; Ex. 11, IMA ¶ 5.  State Street cannot seriously dispute its power and obligation to select an appropriate cash collateral investment for the Commodities Strategy because the IMA does not even name a particular fund, but rather describes a broad category of alternatives from which State Street can select appropriate investments in its full discretion.

**VII.**   **State Street Selected the LDBF As the Cash Collateral Vehicle for HPOPS's Separately Managed Commodities Investment**

In the exercise of its discretionary power over the assets in the Commodities Strategy, State Street invested all of HPOPS's cash collateral for the strategy (other than the $18 million that was sent to AIG) in its own LDBF, which, unbeknownst to HPOPS (as well as a shocking

---

[6] *See* Ex. 15, Email from D. Watkins to P. Franey, 7/24/2006, at SS 004761707 (providing HPOPS with form Letter of Direction to provide to State Street to invest all $6 million each month into the Commodities Strategy and clarifying that State Street would transfer the 25% to AIG pursuant to the IMA).

14

number of State Street's own investment professionals),[7] was from its inception a cash fund that was deliberately invested almost exclusively in securities backed by subprime mortgages. *See* Ex. 26, Memorandum Regarding "The U.S. Subprime Market and Limited Duration Bond Fund in 2007," 8/3/2007 ("Virtually since its inception, Limited Duration Bond [Fund] (LDBF) has been heavily concentrated in bonds backed by first lien mortgages to 'sub prime' borrowers. The funds' focus here was deliberate . . . ."); *see also* Ex. 27, Absolute Return Analytics (printed from SS002146217) (reflecting that the LDBF was invested 92.9% in subprime, residential mortgage-backed securities (RMBS) as of January 2007 and 100% RMBS as of August 2007); *see also* Ex. 28, Limited Duration Portfolio Statistics, July 31, 2007   (reflecting that as of 7/31/2007 the LDBF was not diversified, but was 94% in subprime RMBS).   Further, by the summer of 2007, the LDBF was highly leveraged, exposing HPOPS to the risks of up to 3.5 times the notional value of its $54 million investment. *See* Ex. 29, Email from C. DeGiacomo to P. Franey, 9/28/2007 (stating that the LDBF was leveraged 3.5 times in June 2007 and 3.3 times

---

[7] *See, e.g.*, Ex. 16, Deposition of Lawrence Carlson (Co-Head of Relationship Management), 8/14/2009, at 61 (unaware in spring 2007 that the LDBF was almost all subprime); Ex. 17, Deposition of Craig DeGiacomo (HPOPS's relationship manager), 2/23/2009, at 245 (first aware that the LDBF was 95% subprime in summer 2007);   Ex. 18, Deposition of Mary Guy (relationship manager), 11/3/2009, at 38 (does not remember ever learning that the LDBF was 95% subprime); Ex. 19, Deposition of Shawn Johnson (Head of the State Street Investment Committee), 8/31/2009, at 87, 90 (does not remember being aware that the LDBF was 95% subprime); Ex. 20, Deposition of Staci Reardon (Co-Head of Relationship Management), 8/13/2009, at 73 (never knew LDBF all subprime until July/August 2007); Ex. 21, Deposition of Elizabeth Shea (Compliance Department), 9/29/2009, at 294-95 (not aware in August 2007 that LDBF was 90%+ subprime); Ex. 22, Deposition of Andrew Tenczar (Fixed Income Trader), 9/17/2009, at 62 (not aware in summer 2007 that LDBF was 95% subprime);   Ex. 23, Deposition of James Thorsen (Team Leader for Public Funds, Relationship Management), 6/11/2009, at 227 (surprised to see that LDBF was 95% subprime); Ex. 24, Deposition of John Tucker (HPOPS's portfolio manager for Commodities Strategy), 3/11/2009, at 113-15 (first time he was aware LDBF was predominantly exposed to subprime was summer 2007); Ex. 25, Deposition of Donna Watkins (HPOPS's relationship manager), 6/16/2009, at 37, 42-45, 53-56 (did not know LDBF was primarily subprime).

in July 2007); Ex. 30, Email from P. Armstrong regarding Summary Fund Risk Through Time, 9/15/2007 ("In the middle of 2007, leverage increased mainly due to increased used of the TRS[.]"). The end result was a Commodities Strategy that provided $72 million of commodities exposure plus an ***undisclosed $189 million of subprime exposure*** ($54 million investment times 3.5 leverage). HPOPS did not ask for this enormous subprime exposure and did not contract for such exposure in its Commodities Strategy; nor did State Street disclose to HPOPS that its commodities investment would be collateralized by risky subprime investments.

John Tucker was the portfolio manager for both the commingled Enhanced DJ-AIG Commodities Strategy and for HPOPS's separately managed Commodities Strategy and, thus, was responsible for overseeing HPOPS's $54 million cash collateral component. *See* Ex. 24, Deposition of John Tucker, 3/11/2009, at 26-27. Mr. Tucker consistently elected to place HPOPS's cash collateral and any interest or swap gain from the commodities swaps in the ERISA version of LDBF (noted internally at State Street by the fund code CMY1), even doing so when he was aware of significant underperformance in the LDBF.[8] *See, e.g.,* Ex. 31, Email string from R. Trifone to Shareholder Services - SSgA, 8/2/2006 (placing swap gain for HPOPS in LDBF on 8/2/2006); Ex. 32, Email from J. Tucker to P. Brakke & L. Blake, 2/28/2007 (Tucker Ex. 29) (writing "DJ-AIG took a huge hit" from its exposure to the LDBF); Ex. 33, Email string from J. Tucker to R. Trifone, 3/29/2007 (buying $4.5M of LDBF for HPOPS); Ex. 34, Email string from J. Hopkins to F. Lightenberg, 4/2/2007 (noting that the LDBF as the cash

---

[8] The evidence establishing State Street's mismanagement of the cash collateral fund component of HPOPS's separately managed Commodities Strategy is overwhelming. The few paragraphs offered here are presented only to give the Court a flavor of HPOPS's complaint regarding State Street's failure to prudently manage HPOPS's investment. The issue on summary judgment, however, is not whether State Street failed to prudently exercise its discretion. Instead, the issue is whether, under the IMA, State Street, rather than HPOPS, was obligated to exercise its discretion in the management and oversight of the Commodities Strategy, including the $54 million cash collateral component.

vehicle for the Commodities Strategy has underperformed due to its exposure to subprime); Ex. 35, Email string from R. Trifone to Shareholder Services - SSgA, 4/10/2007 (reinvesting swap gains of $1.19 million in CMY1 on 4/10/2007); Ex. 36, Email from J. Tucker to K. Deren, 5/13/2007 (directing that HPOPS's interest from AIG would be "reinvest[ed] . . . in CMY1 each month").[9]  State Street's decision to keep investing HPOPS's cash collateral in a subprime fund is directly contrary to its own cash management department's decision to make no further investments in subprime securities as early as 2005.  *See* Ex. 37, Deposition of Steven Meier, 11/23/2009, at 69-70.

Tucker's "mis" management continued on through the summer of 2007.  For example, Mr. Tucker attended a meeting of the State Street Impaired Asset Committee on July 27, 2007, where the committee discussed that "liquidity for a large number of home equity backed bonds was virtually nonexistent" and "finding accurate pricing for these securities was becoming more and more challenging."   Ex. 38, Impaired Asset Valuation Committee Meeting Minutes, 7/27/2007.  In other words, on July 27, 2007, State Street (and, specifically, HPOPS's portfolio manager, John Tucker) were internally discussing the fact that the subprime collapse was so extreme that it was impossible to price or sell the subprime securities held in the LDBF, and yet, State Street still did not move HPOPS's cash collateral out of the LDBF.  *See* Ex. 36, Email from J. Tucker to K. Deren, 5/3/2007.  Yet in an email dated August 3, 2007, entitled "Proposed New DJ-AIG Commodity Index Fund," which was circulated to all sales and marketing, State Street announced that a new commingled Enhanced DJ-AIG Commodity Strategy was being proposed that would replace the LDBF as the cash collateral vehicle.  *See* Ex. 39, Email string from C.

---

[9]  Mr. Tucker, the portfolio manager for HPOPS's separately managed Commodities Strategy, testified that he could not recall when he first learned the fund was predominantly exposed to subprime.  He could only state that it was sometime in 2007.  Ex. 24, Deposition of John Tucker, 3/11/2009, at 114-15.

DeGiacomo to J. Tucker, 8/3/2007.   HPOPS's relationship manager Craig DeGiacomo even suggested to John Tucker, "Should we change HPOP[S]?"   *Id.*   Tucker never responded and HPOPS's cash collateral was not moved out of the LDBF.[10]

State Street planned and executed a mass exodus of all of its internal funds from the LDBF (approximately 86% of the value of CMY1) without moving HPOPS's cash collateral out of the LDBF.   *See* Ex. 40, Email from M. Wands to J. Flannery, et al., 7/24/2007.   State Street cannot contest that redeeming units at inflated net asset values harms the remaining participants. While State Street quietly protected its own funds by liquidating out of the LDBF at inflated prices, it left HPOPS alone in an illiquid fund with only one other investor.   *See* Ex. 41, Email from J. Thorsen to P. Franey, 8/28/2007.

## VIII.   HPOPS Terminates State Street As Investment Manager in November 2007

State Street continued to leave HPOPS's cash collateral fully invested in the LDBF, even as the LDBF, and through it the Commodities Strategy, cratered.   On November 13, 2007, HPOPS terminated State Street as its Investment Manager for the Commodities Strategy.   *See* Ex. 42, Termination Letter, 11/13/2007.   State Street responded by claiming it could not immediately give HPOPS its liquidation value because the LDBF was now in a "controlled redemption" in which all the securities had to be sold for cash so as to not prejudice the sole other remaining participant, Alaska Electrical Pension Fund.   *See* Ex. 43, Investment Committee Minutes, 11/14/2007.   State Street held HPOPS's money for over a month as it struggled to sell the few remaining securities in the LDBF.   On December 14, 2007, HPOPS received a mere $14,270,970 in cash from State Street from its liquidation of the Commodities Strategy and was

---

[10]   The replacement fund was not even available until September 2007, after all the investors in CMY1 but for HPOPS and one other remaining participant had exited the LDBF.   *See* Ex. 51, Email from G. Parker to Consultant Liaisons, 7/27/2007; *see also* Ex. 41, Email from J. Thorsen to P. Franey, 3/28/2007.

distributed in kind certain securities backed by subprime mortgages that were too illiquid for State Street to sell and which HPOPS was ultimately able to sell for only approximately $6.6 million. *See* Ex. 44, Houston Police In-Kind Detail, 12/14/2007. The total loss to HPOPS as a result of the LDBF subprime debacle exceeded $33 million.

### STANDARDS OF REVIEW

**I.   Standard of Review for Partial Summary Judgment**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also In re Rezulin Prods. Liab. Litig.*, 390 F. Supp. 2d 319, 329 (S.D.N.Y. 2005). Partial summary judgment is permitted under Rule 56(d) and is governed by the same standards as a motion for summary judgment under Rule 56(c). *See Nextec Applications v. Brookwood Cos.*, -- F. Supp. 2d --, 2010 WL 1257447, at * 5 (S.D.N.Y. Mar. 31, 2010). In reviewing the record on a summary judgment motion, the district court must assess the evidence in "the light most favorable to the non-moving party" and resolve all ambiguities and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party must demonstrate that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *In re Rezulin*, 390 F. Supp. 2d at 329.

As to an issue on which the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. "[I]t ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier

of fact on an essential element of the nonmovant's claim." *In re Rezulin*, 390 F. Supp. 2d at 329.

Summary judgment will be granted if the nonmovant cannot meet its burden of coming forward

with admissible evidence showing a genuine issue of material fact. *See id.*; *see also Samuels v.*

*Mockry*, 77 F.3d 34, 36 (2d Cir. 1996). The nonmoving party cannot meet its burden by relying

on mere allegations, denials, conjectures, or conclusory statements, but must present affirmative

and specific evidence showing that there is a genuine issue for trial. *See Kulak v. City of New*

*York*, 88 F.3d 63, 71 (2d Cir. 1996).

## II.     Choice-of-Law Analysis

It is well settled that in an MDL proceeding, the Transferee Court sitting in diversity must

apply the choice-of-law rules of the forum state of the Transferor Court. *See In re Rezulin*

*Prods. Liab. Litig.*, 390 F. Supp. 2d 319, 329 (S.D.N.Y. 2005) ("When an action is transferred as

part of an MDL, the transferee court applies the choice of law rules of the state in which the

action first was filed.").[11] Here, the Panel transferred the case from the Southern District of

Texas to the Southern District of New York for consolidated pretrial proceedings and

coordinated the action with *In re State Street Bank and Trust Co. ERISA Litigation*, C.A. No.

1:07-cv-08488-RJH-DFE. *See* Ex. 2, Transfer Order. This Court, therefore, must apply the

choice of law rules of the state of Texas—the forum state where the Transferor Court sits.

---

[11] *See also In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F. Supp. 2d 717, 723
(S.D.N.Y. 2003) ("A district court sitting in diversity applies the law of the forum state. In an
MDL proceeding, the forum state is the district court where the action was originally filed, and
therefore that state's law must be applied." (citations omitted)); *In re Sterling Foster & Co., Inc.*
*Secs. Litig.*, 222 F. Supp. 2d 289, 300 (E.D.N.Y 2002) ("In a multi-district litigation, the
transferee court must apply the law of the transferor forum[.]"); *In re MTBE Prods. Liab. Litig.*,
175 F. Supp. 2d 593, 606 n.20 (S.D.N.Y. 2001) ("When considering questions of state law the
transferee court must apply the state law that would have applied to the individual cases had they
not been transferred for consolidation.").

The IMA governing the parties' relationship includes a contractual choice-of-law provision that expressly provides:

> This Agreement shall be governed by the laws of the State of Texas, and venue for any questions or disputes as to the meaning or intent of this Agreement shall be exclusively in the state or federal courts located in Houston, Harris County, Texas.

Ex. 11, IMA ¶ 13. Further, the IMA includes several additional provisions establishing the parties' understanding that Texas law would apply to the IMA and to State Street's acts thereunder. *See, e.g.*, Ex. 11, IMA at 1 ("WHEREAS, the Manager acknowledges the applicability of the Texas Statutes to this Agreement and that the Manager is familiar with its obligations under such statutes."); *id.* ¶ 4 ("Manager acknowledges that it will be acting as a fiduciary with respect to the Account Assets (within the meaning of Chapter 802 of the Government Code and Section 10 of Article 6243g-4) and that it is subject to the applicable fiduciary standards of conduct imposed by federal and Texas state law[.]").

Under Texas law, "contractual choice-of-law provisions are ordinarily enforced if the chosen forum has a substantial relationship to the parties and the transaction." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 705 (5th Cir. 1999) (citing *DeSantis v. Wackenhunt*, 793 S.W.2d 670, 677-78 (Tex. 1990)); *see also Tex. Taco Cabana, L.P. v. Taco Cabana of N.M., Inc.*, 304 F. Supp. 2d 903, 908 (W.D. Tex. 2003) ("Under Texas law, the parties' choice-of-law will be enforced unless the chosen law has no substantial relationship to the parties or the transaction or the application of the law chosen would be contrary to a fundamental policy of a state that has a materially greater interest than the chosen state in the determination of a particular issue."); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971). "This principle derives from the most basic policy of contract law, which is the protection of the justified expectations of the parties." *DeSantis v. Wackenhunt*, 793 S.W.2d

670, 677 (Tex. 1990).  Given that HPOPS is a Texas state governmental pension plan created under Texas law and headquartered and administered in Texas and that State Street agreed under the IMA to comply with Texas law, it is indisputable that Texas law has a substantial relationship to the case and the parties' contractual choice-of-law provision should be given effect.  *See* Ex.11, IMA at 1 ("WHEREAS, the Trustees represent and the Manager hereby acknowledges that the Fund is a 'governmental plan' (created under Article 6243g-4) singularly headquartered, situated, and administered in Houston, Harris County, Texas[.]").

Because the parties have acknowledged that Texas law applies in several other provisions of the IMA, this choice-of-law provision should be construed broadly to govern the entire relationship between the parties and all claims in the case, both contractual and tort.  But even if the choice-of-law provision applies only to the construction of the IMA itself, Texas law would nonetheless apply to the tort claims and any affirmative defenses asserted against them under applicable Texas choice-of-law rules.  Texas courts apply the "most-significant-relationship" test under the *Restatement (Second) of Conflict of Laws* when determining what law to apply to a tort claim.  *See Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979); *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp. 2d 986, 989-90 (S.D. Tex. 2004); *see also Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518, 523 (5th Cir. 2001); *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 249 (5th Cir. 1990).

The *Restatement*'s most-significant-relationship test identifies several principles underlying a choice-of-law determination: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law;

(f) certainty, predictability, and uniformity of result; and (g) ease in the determination and application of the law to be applied. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6.  In order to adhere to these principles, the courts consider four factual factors to determine choice of law in a tort case: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties centered. *See id.* § 145.  Furthermore, Texas courts also consider the parties' contractual choice-of-law provision in determining which jurisdiction has the most significant relationship to the dispute. *See, e.g., Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 74 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("The individuals investing in IFT had a reasonable expectation that New York law would govern any transaction because the draft prospectus on which the Investors rely to support their fraud allegations states that New York law would govern."). *See also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. b.

Applying these factors, it is clear that Texas law must be applied.  First and foremost, HPOPS is a statutory Texas-state-created governmental entity; thus, Texas has great governmental interest in the resolution of the parties' claims.  Second, because the HPOPS Fund is singularly administered and headquartered solely in Harris County, Texas, the place of injury occurred in Texas.  Further, State Street acknowledged (for jurisdictional purposes) that State Street does business in Texas and has been engaged by the HPOPS Trustees and the System in Houston, Texas and, as discussed above, agreed to a contractual choice-of-law provision requiring application of Texas law.  Thus, the relationship between the parties centered in Texas, and the conduct of the parties (although partially occurring in Massachusetts) primarily took

place in Texas where the misrepresentations, omissions, and breaches of fiduciary duties occurred. Accordingly, Texas law applies under the most-significant-relationship test.

## ARGUMENT & AUTHORITIES

I. **As a Matter of Law, State Street Had Full and Absolute Discretionary Power to Oversee the Entire Commodities Strategy, Requiring That State Street Select, Manage, and Move (If Prudent to Do So) the Cash Collateral for the Strategy**

### A.   The Ambiguity Analysis Under Texas Law

"Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Only a contract that is capable of two or more ***reasonable*** yet different interpretations can be deemed ambiguous. *See In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006); *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589. Just because a party can proffer a different interpretation is not enough to render the agreement ambiguous. *See In re D. Wilson Constr. Co.*, 196 S.W.3d at 781; *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589. The interpretation must itself be reasonable and give effect to all provisions of the contract. *See id.*

A contract that can be given a certain and definite meaning or interpretation, such as the IMA at issue here, is not ambiguous and may therefore be construed by the Court as a matter of law. *See Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The rules of contract construction for an ambiguity analysis have been succinctly set forth as follows:

> In the first step of the ambiguity analysis, our primary concern is to determine and give effect to the intentions of the parties as expressed in the instrument. In determining the intention of the parties, we look only within the four corners of the agreement to see what is actually stated, and not at what was allegedly meant.

We must consider all of the provisions with reference to the entire contract; no single provision will be controlling.

*Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 131-32 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) (internal citations omitted).  Where "the language of the contract appears to be capable of only a single meaning, the court can [] confine itself to the writing." *Acad. Corp. v. Hansen*, No. 01-93-00299-CV, 1994 WL 64867, at \*5 (Tex. App.—Houston [1st Dist.] Mar. 3, 1994, writ denied) (citation omitted).

### B.  HPOPS's Plain Language Construction of the IMA Is the Only Reasonable Interpretation

#### 1.  The Plain-Language of the IMA Establishes That State Street Had Full and Absolute Discretionary Power to Manage and Oversee the Entire Commodities Strategy

At issue is the interpretation of Paragraph 5 of the IMA, which provides:

> 5. <u>Duties and Powers of Manager</u>: ***Subject to the terms and conditions of this Agreement, the Code of Ethics, and in accordance with the investment guidelines established by the Trustees*** (as set forth in the Statement of Policy Guidelines and Investment Objectives of the Fund (the "Policy"), which is attached hereto as Exhibit E and made a part hereof, as may be hereafter amended as herein provided), ***Manager shall have full and absolute discretionary power to manage all assets held in the Account consistent with the Objectives***, including the authority to purchase, sell, cover open positions, and generally to deal in securities, financial and commodity futures contracts, options, short-term investment vehicles and other property comprising or relating to the Account.

Ex.11, IMA ¶ 5 (emphasis added).  The plain meaning of this provision is that State Street was vested with "full and absolute discretionary power" to manage the entirety of the $72 million that HPOPS invested in the Commodities Strategy, including by definition (i) the commodities swaps, (ii) the 25% sent to AIG's margin account, and (iii) the 75% cash collateral component not sent to AIG.  In exercising its discretion, State Street was required to manage HPOPS's investment consistent with the Objectives of the Strategy and at all times subject to and in accordance with the terms and conditions of the IMA, the Code of Ethics, and the Investment

Guidelines established by the Trustees.  As discussed *supra,* these terms and conditions included, *inter alia*, the requirement that State Street act as a fiduciary under Texas and federal law, including the Texas Government Code; that State Street abide by the prudent expert standard; and that it "diversify the assets so as to minimize the risk of losses."  Ex. 11, IMA ¶¶ 4, 5(c), & 5(g).  Thus, State Street, not HPOPS, had both the discretion and the obligation to oversee the entire strategy, select an appropriate cash collateral vehicle, monitor the cash collateral vehicle, and move the collateral to a different vehicle if prudent to do so.   This plain language construction is evident when the provision is broken down by its terms.

First, the "full and absolute discretionary power to manage" applies to "***all assets held in the Account*.***"  *Id.* ¶ 5 (emphasis added).  It is plain from the IMA that "all assets held in the Account" includes the $54 million cash collateral component of the separately managed Commodities Strategy.  "Account" is a defined term in the IMA meaning "the account in which such portion of the [HPOPS] Fund is so held under this Agreement." *Id.* at 1.  Exhibit A to the Original IMA defines that "portion of the Fund so subject to [State Street]'s investment management" to include:

> . . . . approximately 2.5% of the total plan assets in a separately managed Enhanced Dow Jones-AIG Commodities Futures Strategy.

*Id.* at Ex. A.  Thus, State Street was vested with "full and absolute discretionary power" to manage the entirety of the 2.5% of the total plan assets (or $72 million) that HPOPS intended to invest with, and later did invest with, State Street in the Commodities Strategy as described in the First Amendment to the IMA.[12]  State Street's wide-ranging powers with respect to the

---

[12]   Under the First Amendment, the parties made clear their intention that State Street's discretionary power to manage would extend to HPOPS's $72 million investment in the separately managed Commodities Strategy: