totality of the Commodities Strategy was further confirmed in paragraph 5(p) of the IMA, which provided State Street, as the Investment Manager, the power "[t]o take any other action reasonably deemed necessary to manage the Account in accordance with the Objectives." *Id.* ¶ 5(p).[13]

Moreover, the parties made clear their intention under the First Amendment that HPOPS's $72 million investment was to be in *one strategy* that was comprised of (1) a commodities futures fund tracking the Index, (2) with an "upfront payment" of the cash collateral required by Texas law to be invested with the swap counterparty AIG (25% of the collateral), and (3) the remaining 75% of the cash collateral to be invested in "money market funds or other cash management funds" to be selected by State Street:

> *The strategy* seeks to achieve its objective by *investing primarily in listed futures, swaps, options and other derivative instruments* (the "Investments"). It is expected that an upfront payment will be made in connection with most derivative Investments in order to comply with Texas law. Such *upfront payment will be invested in a money market investment offered by the swap counterparty*.
>
> . . .
>
> *The strategy* may invest in *money market funds and other cash management funds* including, but not limited to, money market mutual funds for which an

---

> For the avoidance of doubt, the Agreement, as amended hereby, shall include both the TIPS Strategy and the Enhanced Dow Jones–AIG Commodities Future Strategy (the "Commodities Strategy"). The parties hereto agree that the Trustees will invest approximately six million dollars ($6,000,000) in the Commodities Strategy each month for a 12-month period commencing on July 1, 2006 for a total aggregate investment (without giving effect to any changes in the investment amount relating to the performance of the Commodities Strategy) in the Commodities Strategy of approximately $72,000,000 at the end of such 12-month period.

Ex. 13, 1st Am. IMA at p. 2.

[13] Donna Watkins, a State Street relationship manager, who at one point was in charge of HPOPS's investment in the Commodities Strategy, cited this catch-all provision in the IMA as the basis for State Street's power to unilaterally send 25% of each $6 million monthly investment to AIG without further instructions from HPOPS. *See* Ex. 15, Email from D. Watkins to P. Franey, 7/24/2006.

> affiliate of the Manager acts as an investment advisor or other funds for which the
> Manager serves as investment advisors.

Ex. 13, 1st Am. IMA ¶ 1 (emphasis added).  State Street's discretion to manage "all assets held

in the Account" therefore expressly encompasses management of the investment of the

remaining 75% cash collateral in "***money market funds and other cash management funds***."

*Id.* (emphasis added).  There is no mention of the LDBF anywhere in the IMA, much less a

requirement that State Street fully invest HPOPS's $54 million cash collateral solely in the

LDBF no matter the risks of loss or consequences.  State Street's interpretation would require

rewriting the IMA to require a mandatory investment of the $54 million cash collateral in highly

leveraged and undiversified subprime securities through the LDBF.

Furthermore, the customary usage of the words "full and absolute discretionary power to

manage" establishes that State Street's authority to direct and control the management of the

assets in the Account should be broadly construed and must include the discretion to select, at all

times, the appropriate "money market funds and other cash management funds" to invest the $54

million in collateral for the Commodities Strategy.  The term "full" is defined by *Black's Law*

*Dictionary* as "abundantly provided, sufficient in quantity and degree, complete, entire, and

detailed."  BLACK'S LAW DICTIONARY 672 (6th ed. 1990).  The term "absolute" is defined as

"complete, perfect, final; without any condition or incumbrance[.]"  *Id.* at 9.  The term "manage"

has the plain and ordinary meaning of "to control and direct, to administer, to take charge of . . .

[and is] [g]enerally applied to affairs that are somewhat complicated and involve skill and

judgment."  *Id.* at 960.  Taken together, it is clear that HPOPS gave State Street abundant and

complete discretion and authority to take charge of, control, and direct all assets and investments

associated with the $72 million deposited in the Commodities Strategy, including, expressly, the

$54 million of cash collateral invested in "money market funds and other cash management

funds." State Street could not "manage" the $54 million in cash it held without the discretion to choose what "money market or other cash management fund" would hold those funds for the Commodities Strategy.

And there can be no doubt that this authority encompasses discretion to select the fund or funds for management of the cash collateral because paragraph 5 goes on to provide examples of what this broad discretionary power to manage entails, including "the authority to purchase, sell, cover open positions, and *generally to deal in* securities, financial and commodity futures contracts, options, short-term investment vehicles and *other property comprising or relating to the Account*." Ex. 11, IMA ¶ 5 (emphasis added). The broad grant of discretion to manage thus includes the authority to "generally deal" with the selection and monitoring of the cash collateral for the Commodities Strategy in unnamed and unspecified money market funds and other cash management funds. The parties thus intended that the discretionary power afforded to State Street to manage all assets subject to the terms and conditions of the IMA and consistent with the Objectives includes by necessity the selection of the cash management fund or funds to hold the cash collateral investment comprising part of and relating to the Commodities Strategy and the responsibility to move the cash collateral investment comprising part of and relating to the Commodities Strategy if prudent.

This plain-language construction—that the Investment Manager's "full and absolute discretionary power to manage" requires that State Street undertake the sole and complete responsibility to move the collateral to a different cash management fund if prudent—is consistent with paragraph 3 of the IMA. Under paragraph 3, HPOPS made explicit that its appointment of State Street to manage the Commodities Strategy included "the power to acquire and dispose of" the assets in the account:

[T]he Trustees are authorized . . . to appoint the Manager as investment manager with authority to manage (***including the power to acquire and dispose of***) the Account Assets under the terms and conditions set forth in this Agreement.

*Id.* ¶ 3 (emphasis added).  Accordingly, the IMA makes plain that State Street's full and absolute discretionary power encompassed the authority to dispose of the units of the LDBF (or any cash management fund) and acquire units of a different cash management fund to hold the $54 million of cash collateral in the Commodities Strategy.

Taking the plain and ordinary meaning of these terms of the IMA together, paragraph 5 of the IMA unambiguously provides that State Street shall have full and absolute discretion and authority to direct and control all assets invested in the Commodities Strategy, which requires that State Street, not HPOPS, oversee the strategy as a whole, select the appropriate cash management fund to hold the cash collateral for the strategy, monitor the suitability of that fund, and change the collateral fund if prudent under the IMA.[14]

## 2. HPOPS's Plain-Language Construction Is Required by the Texas Government Code

HPOPS's plain-language construction is also mandated by the Texas Government Code Section 802.203(c), which provides that "[a] trustee is not liable for the acts or omissions of an investment manager appointed under Section 802.204, ***nor is a trustee obligated to invest or otherwise manage any asset of the system subject to management by the investment manager***."

---

[14]  Also, State Street's own witnesses have admitted that the proper reading of the IMA is that State Street had discretionary authority to move the cash collateral for the Commodities Strategy to a fund other than the LDBF.  *See, e.g.*, Ex. 24, Deposition of John Tucker, 3/11/2009, at 180-81 (acknowledging that the "money could have been moved into a separate fund at State Street"); Ex. 16, Deposition of Lawrence Carlson, 8/14/2009, at 108-09 (acknowledging that there was nothing in the IMA that precluded or prevented SSgA from moving HPOPS's funds into another cash collateral vehicle); Ex. 21, Deposition of Elizabeth Shea, 9/29/2009, at 132-33 (agreeing that "[t]he cash collateral account could be invested not just in the Limited Duration Bond Fund, but could be invested, at the discretion of SSgA, in other cash funds"); Ex. 23, Deposition of James Thorsen, 6/11/2009, at 52-53 (agreeing that the IMA gave State Street flexibility on where to invest the cash collateral for the strategy).

TEX. GOV'T CODE ANN. § 802.203(c) (emphasis added).  State Street expressly agreed to abide by the fiduciary standards imposed under Texas law and specifically those as defined by the Texas Government Code. *See* Ex. 11, IMA ¶ 4 ("Manager acknowledges that it will be acting as a fiduciary with respect to the Account Assets (within the meaning of Chapter 802 of the Government Code and Section 10 of Article 6243g-4) and that it is subject to the applicable fiduciary standards of conduct imposed by federal and Texas state law[.]"); *id.* ¶ 14 ("Manager shall observe the standards of fiduciary responsibility imposed upon it by Chapter 802 of the Government Code, Article 6243g-4, the Code of Ethics of the Houston Police Officers Pension System, the Texas Trust Code (Title 9 of the Tex. Prop. Code Ann.), applicable federal and state law with respect to the functions and authority conferred upon it hereunder."); Ex. 13, 1st Am. IMA ¶ 14 (same).

This express provision, which disclaimed discretion and management oversight by HPOPS so long as State Street managed the Commodities Strategy, was mandated by Texas law. Under Section 802.203(c), the Texas Legislature intended to clarify that "after an investment manager has been hired, no trustee is responsible for the investment of funds under the manager's authority, or for the manager's acts and omissions."  Ex. 45, Bill Analysis for H.B. 1935, Subcomm. on Retirement & Pensions for Acts of the 66th Leg., 1979 (certified of record by Chief Clerk of the House, 3/12/1981).  Under Texas law, once HPOPS hired State Street to act as its Investment Manager to manage the $72 million it invested in the Commodities Strategy, HPOPS no longer had authority, control, or responsibility for the investment or management of those funds under State Street's management. *See also infra* Argument II.A.

**C.     State Street's Alternative Construction That HPOPS, Not State Street, Was Required to Oversee and Manage the Commodities Strategy, Including the Cash Collateral Vehicle, Is Unreasonable and Would Vitiate the Texas Government Code**

State Street argues that the IMA required that the $54 million in cash entrusted to State Street be invested in the LDBF and remain in the LDBF unless and until HPOPS directed otherwise.[15] There is no contractual support for State Street's post-litigation construction of the IMA.   The IMA nowhere references the LDBF or any subprime strategy.   HPOPS only contracted for the management of a unified Commodities Strategy, not separate, independent unrelated investments in multiple strategies, as State Street professes.   Moreover, as discussed *supra*, State Street's proffered reading of the IMA that HPOPS bears ultimate responsibility to oversee the Commodities Strategy as a whole and to continually monitor the suitability of the cash collateral fund for the strategy is untenable because it would violate the purpose of the

---

[15]   Indeed, one of the two State Street "expert" witnesses, Professor Sorin Sorescu, based his opinion primarily upon this "interpretation" of the IMA:

> Q.     So under this—under this investment management agreement, the person who was in charge of managing these account assets was Mr. Franey, that's how you read this agreement?

> A.     No. Each—each manager was responsible for its own specific part of the strategy.  The commodities strategy had a manager; LDBF had another manager; AIG, I haven't looked at, but the—the ultimate responsibility as to making decisions of redemption would have been Mr. Franey.

Ex. 46, Deposition of Sorin Sorescu, 5/17/2010, at 92-93. Curiously, State Street's other expert, Dr. Andrew Carron, president of NERA Consulting, claims in his rebuttal expert report, consistent with State Street's Answer, that the three components of the Commodities Strategy are one "interconnected" investment.  *See* Ex. 47, Excerpt from Rebuttal Report of Dr. Andrew Carron, ¶ 100. Professor Sorescu, in fact, stated several times that State Street did not have responsibility to oversee the strategy as a whole, but rather that responsibility was HPOPS's. *See* Ex. 46, Deposition of Sorin Sorescu at 101-03 (answering that HPOPS had the "primary responsibility" for "determining at various points of time whether the Limited Duration Bond Fund was the suitable vehicle for HPOPS to put its cash in, consistent with the objective" and to "determine over time whether the Limited Duration Bond Fund was the appropriate vehicle to put HPOPS' money in, consistent with the objectives of the agreement").

Texas Government Code's exculpatory provision for the Trustees after they have selected an investment manager to manage part of the fund. *See* TEX. GOV'T CODE ANN. § 802.203(c).

    **1.**    **State Street's Contention That the IMA Did Not Vest It with Discretion But Instead Mandated the Investment of HPOPS's $54 Million into the LDBF Does Not Find Support Anywhere in the IMA**

To put it bluntly, there is nothing in the IMA that can be read as divesting State Street of its discretion and requiring that the cash collateral for the Commodities Strategy be invested into the LDBF until HPOPS decided otherwise. Nowhere does the IMA even reference the LDBF, much less require that the cash collateral be held only in that fund. Rather, the First Amendment provides that the cash collateral for the Commodities Strategy may be invested in a broad range of funds, such as "money market funds and other cash management funds including, but not limited to, money market mutual funds for which an affiliate of the Manager acts as an investment advisor or other funds for which the Manager serves as investment advisors." Ex. 13, 1st Am. IMA ¶ 1.

Additionally, State Street's reading of the provision would totally rewrite paragraph 5 of the IMA to read that State Street has "full and absolute discretionary power to manage, *except for investment of the cash collateral account of the Commodities Strategy, which shall be invested only in the LDBF*." This language (or anything remotely close to it) cannot be found anywhere in the IMA.

It is well established that a construction that fails to give effect to all provisions of a contract or that ignores or renders meaningless express language of the contract is not a reasonable one. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (holding that the writing must be examined as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be

rendered meaningless); *see also Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (holding that it must be presumed that parties to a contract intend every clause to have some effect). State Street's reading of the contract to restrict the cash collateral investment to an unnamed fund—the LDBF—is not a reasonable alternative because it not only requires reading into the contract language that does not exist (i.e., an express reference to the LDBF), but also because it reads out the express flexibility accorded to State Street with respect to the investment of HPOPS's cash into unspecified "money market funds and other cash management funds."[16]

Further, the Objectives for the Commodities Strategy make clear that it is ***one strategy*** to be managed by State Street, not separate investments in a commodities swap account and an unrelated investment in the LDBF, as State Street claims. *See* Ex. 13, 1st Am. IMA ¶ 1 (describing the Objectives for "the strategy" as a singular strategy, i.e., "The Objective of ***the strategy*** shall be to attempt to outperform the performance of the Dow Jones-AJG Commodities Index (the 'Index'). . . . ***The strategy*** seeks to achieve its objective by investing primarily in listed futures, swaps, options and other derivative instruments (the 'Investments') . . . . ***The strategy*** may invest in money market funds and other cash management funds including, but not limited to, money market mutual funds for which an affiliate of the Manager acts as an investment advisor or other funds for which the Manager serves as investment advisors." (emphasis added)). Indeed, State Street admitted in its Answer that HPOPS's investment was in a single strategy. *See* Ex. 9, State Street's Answer ¶ 1 ("Admitted that the Houston Police

---

[16] *See* Ex.48, Email exchange between State Street's C. Douglass and J. Tucker, 12/19/2005 (SS 008492891-98) (establishing that State Street's plan regarding cash management was "to use the Limited Duration Bond Fund" but if the money is not eligible for the ERISA pool or CTF pool, "we will need to decide which vehicle to use" and, thus, requested the broad language in the IMA). In response, C. Douglass amended the draft of permissible cash collateral investments to add the phrase "or other cash management funds" so that State Street was not limited and could choose an appropriate, but unnamed, cash fund. *Id.*

Officers' Pension System ('HPOPS') decided to invest in a commodities strategy known as the Enhanced Dow Jones-AIG Commodities Strategy."); *see also id.* ¶ 27 ("State Street says that HPOPS invested $72 million in the Commodities Strategy[.]"). In sum, HPOPS invested in a single strategy that provided HPOPS with exposure to commodities futures that would be deleveraged by investing the cash collateral for the commodities swaps in "money market funds or other cash management funds" to be selected by State Street. Because the Commodities Strategy was one strategy, State Street's "full and absolute discretionary power" required that State Street bear full responsibility for overseeing the Commodities Strategy as a whole to ensure that all components work together as a single strategy consistent with the Objectives and the terms of the IMA.[17]

### 2. State Street Relies upon Pre-Contractual Discussions in a Failed Effort to Supplant the Clear Contractual Language That Controls This Issue

State Street has taken the position throughout this case that, despite the plain language of the IMA vesting it with full discretion over the Commodities Strategy as a whole, it did not select, and did not have discretionary power to change, the cash collateral vehicle for the Commodities Strategy. Rather, it asserts that HPOPS selected the LDBF and only HPOPS could move the cash collateral to another fund. It bases this assertion solely on a parenthetical

---

[17]   Even the Fund Declaration for the commingled Commodities Strategy, which expressly references the use of the LDBF for the cash collateral component of the strategy, provides discretion to move the cash to different funds. Ex. 7, Fund Declaration for the Commingled Commodities Strategy, ("The Fund will also hold U.S. Treasury Bills and units of the Limited Duration Bond Common Trust Fund or other Common Trust Funds *at the discretion of the Trustee* [defined as State Street in the Fund Declaration]."(emphasis added)). State Street exercised such discretion to move the cash collateral from the LDBF to the Libor Plus fund in the commingled version of the Commodities Strategy. *See* Ex. 43, Investment Committee Meeting Minutes, 11/14/2007. If State Street had the discretion with respect to the commingled strategy to change funds pursuant to the nondescript and ordinary powers and requirements of the Commingled Fund Declaration, it most certainly had such discretion with respect to HPOPS's separately managed Commodities Strategy.

statement from an email that ***pre-dates*** the signing of the First Amendment ***by more than six months***.  In an email dated November 18, 2005 from Donna Watkins of State Street to Pat Franey, Ms. Watkins described how State Street ***could*** manage HPOPS's commodities investment:

> The fund would hold swaps that gain exposure to the DJ-AIG Index. . . . 100% of the fund is exposed to the commodity index through these swap(s).  The portfolio would retain 100% of its cash until a reset payment.  The cash would be invested in the Limited Duration Bond Fund. (You can choose a different cash vehicle if you wish.)
>
> If you prefer to invest the cash on a separate basis, please let me know.  I understand that the cost of separate cash and separate commodities starts at $150,000, so that's an expensive route. . . .

Ex. 7, Email from D. Watkins to P. Franey, 11/18/2005.

HPOPS did not invest in the Commodities Strategy at the time the email was sent, and Ms. Watkins's email proposal did not find its way into the First Amendment, which was executed more than six months later.  *See generally* Ex. 13, 1st Am. IMA.  For example, under the First Amendment, 75% of the cash collateral (not 100% as described in Ms. Watkins's email) was placed in State Street's custody and care.  And, as noted above, no specific cash fund was mentioned in the contract—not LDBF, not Libor Plus, nor any other fund by name.  Instead, the decision and oversight responsibility regarding where to invest the cash collateral was vested with State Street.  *See id.*[18]

> Importantly, the First Amendment also includes an express merger clause that provides:
>
> 8.    Entire Agreement.  This Amendment, together with the Agreement (the terms of such Agreement are hereby confirmed and ratified except as changed by this Amendment), constitutes the entire understanding and agreement between the

---

[18] *See* Ex. 48, Email exchange between State Street's C. Douglass and J. Tucker, 12/19/2005 (SS 008492891-98) (establishing that John Tucker, the portfolio manager, wanted to leave to the discretion of State Street the selection of which cash management fund or funds in which to invest the cash collateral in the First Amendment).

parties with respect to the subject matter hereof, and **supersedes all other prior understandings and agreements, whether written or oral, between the parties concerning this subject matter**.

*Id.* ¶ 8 (emphasis added).[19]   Under Texas law, a merger clause, such as paragraph 8 of the First Amendment, mandates that "the written terms of the contract may not be varied by prior agreements because all such agreements have been merged into the written document." *See Rosa's Café, Inc. v. Wilkerson*, 183 S.W.3d 482, 487 (Tex. App.—Eastland 2005, no pet.) (citing *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 125 n.6 (Tex. App.—Houston [14th Dist.] 2003, pet. denied), in turn citing *Black's Law Dictionary* 989 (6th ed. 1990)).   Under a merger clause, the terms of an unambiguous written agreement cannot be varied or contradicted by parol evidence. *See ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 719 (Tex. App.—Eastland 2007, pet. denied).   In sum, Donna Watkins's email and any other "evidence" of pre-contractual "understandings" are legally irrelevant and cannot contradict the unambiguous terms of the later-negotiated and executed First Amendment to the IMA.

Given that State Street cannot proffer a reasonable alternative construction of the IMA, there is no ambiguity. *See In re D. Wilson Constr.*, 196 S.W.3d at 781.   The only reasonable construction of the IMA is that State Street had full and absolute discretionary power and responsibility to manage, monitor, and oversee the Commodities Strategy as a whole and thus had the discretion and bore the responsibility, consistent with the Objectives of the strategy and the terms of the IMA, to select an appropriate cash collateral fund for the strategy, monitor the cash collateral fund, and move HPOPS's cash collateral to a different fund if prudent to do so.

---

[19]   In fact, HPOPS had requested that the merger clause be included in the First Amendment to the IMA. *See* Ex. 49, Email exchange between P. Franey and C. Douglass, 5/2/2006.

## II.     Many of State Street's Affirmative Defenses Are Invalid As a Matter of Law

State Street has raised several affirmative defenses against HPOPS's claims in an effort

to deflect and/or diminish its liability to the System.   This it cannot do.   For the reasons that

follow, HPOPS respectfully asks this Court to grant summary judgment on State Street's second

defense ("plaintiff's own conduct"); third defense (unclean hands and in pari delicto); fourth

defense ("plaintiff's own negligence"); fifth defense (proportionate responsibility); eighth

defense (assumption of the risk); ninth defense (ratification, waiver, laches, and estoppel); and

eleventh defense (failure to mitigate damages).[20]

### A.     Texas Government Code Section 802.203(c) Eviscerates Any Affirmative Defense That Involves Any Alleged Misconduct by the Trustees or HPOPS

Section 802.203 of the Texas Government Code expressly absolves the Trustees, and thus

the System,[21] from any and all liability stemming from State Street's acts or omissions.   *See* TEX.

GOV'T CODE ANN. § 802.203(c).   Section 802.203 provides:

---

[20]   Several of State Street's remaining affirmative defenses are not defenses at all, but merely assert that certain elements of HPOPS's claims are missing.   *See, e.g.*, State Street's Answer at Sixth Defense ("plaintiff did not rely upon State Street's alleged misrepresentations"); *id.* at Seventh Defense ("lack of causation"); *id.* at Fifteenth Defense ("lack of justifiable reliance"). These are not proper affirmative defenses, and HPOPS is not waiving any objections to these additional, inappropriate defenses.

[21]   State Street cannot avoid liability by placing blame on the Trustees or employees of HPOPS. Because the Trustees could not be found liable if they had been sued personally, neither can the System.   *See DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995) ("Here, official immunity, *like any other affirmative defense the employee may have*, becomes relevant to the governmental entity's liability. . . . [W]ere it a private person, the county would be entitled to assert any affirmative defenses its employee has to liability." (emphasis added)); *Tex. A&M Univ. v. Bishop*, 105 S.W.3d 646, 657 (Tex. App.—Houston [14th Dist.] 2002) ("Because the state entity only acts through its employees, it should benefit from a defense that benefits state employees."), *rev'd on other grounds by* 156 S.W.3d 580 (Tex. 2005); *Harris County v. Ball*, No. 14-97-00135-CV, 1998 WL 724780, at *5 (Tex. App.—Houston [14th Dist.] Oct. 8, 1998, no pet.).   Likewise, Mr. Franey—who was acting within the course and scope of his employment at HPOPS—is entitled to any defense available to HPOPS if he had been sued directly.   *See City of Arlington v. Randall*, 301 S.W.3d 896, 906 (Tex. App.—Fort Worth 2009, pet. filed); *Nueces*

> A trustee is not liable for the acts or omissions of an investment manager appointed under Section 802.204, nor is a trustee obligated to invest or otherwise manage any asset of the system subject to management by the investment manager.

*Id.*[22] The legislative history regarding this provision further explains that the purpose of this subsection is to clarify that "after an investment manager has been hired, no trustee is responsible for the investment of funds under the manager's authority, or for the manager's acts and omissions." Ex. 45, Bill Analysis for H.B. 1935, Subcomm. on Retirement & Pensions for Acts of the 66th Leg., 1979 (certified of record by Chief Clerk of the House, 3/12/81).

As plainly set out in the IMA, HPOPS delegated to State Street as the fiduciary investment manager *"full and absolute discretionary power* to manage *all assets* held in the Account consistent with the Objectives[.]" Ex. 11, IMA ¶ 5 (emphasis added). And as discussed above, this "full" and "absolute" discretion required State Street to manage and exercise *complete control* over the entirety of the $72 million investment in the Commodities Strategy.

---

*County v. Ferguson*, 97 S.W.3d 205, 214 (Tex. App.—Corpus Christi 2002, no pet.) ("Persons sued in their official capacity may raise any defense available to the governmental unit[.]").

[22] This language tracks almost verbatim ERISA's provision exculpating a trustee from co-fiduciary liability when the trustee appoints an investment manager. *Compare* 29 U.S.C. § 1105(d)(1). ERISA's Section 1105(d) provides:

> If an investment manager or managers have been appointed under section 1102(c)(3) of this title, then, notwithstanding subsections (a)(2) and (3) and subsection (b) of this section, no trustee shall be liable for the acts or omissions of such investment manager or managers, or be under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager.

*Id.* Considering this provision is modeled after ERISA, those cases discussing Section 1105(d)(1) are persuasive in analyzing Section 802.203(c) and whether an investment-manager fiduciary should be permitted to raise certain affirmative defenses to fiduciary liability. *See* Deborah J. Martin, *The Public Piggy Bank Goes to Market: Public Pension Fund Investment in Common Stock and Fund Trustee's Social Agenda*, 29 SAN DIEGO L. REV. 39, 53 (1992) ("The fiduciary responsibilities set forth in ERISA are often used as the model for public pension systems. ERISA case law may be analogized to [the laws governing fiduciary duties in public pension fund investments].").

*See supra* Argument Part I.B. Because HPOPS exercised no discretionary authority over the Commodities Strategy once it properly delegated that duty to State Street, HPOPS was no longer subject to any liability based on any act or omission by State Street or "obligated to invest or otherwise manage any asset of the system subject to management by [State Street]." Tex. Gov't Code Ann. § 802.203(c). The obligation to invest and manage the Commodities Strategy lay solely with State Street, and State Street—alone—is responsible to the System for its breaches in managing the funds.

State Street should be familiar with this argument because it has successfully advanced it in its capacity as a plan trustee. In *Beddall v. State Street Bank & Trust Co.*, pilots who were once employed by a failed airline sued State Street under ERISA. *See* 137 F.3d 12, 15 (1st Cir. 1998). State Street had been retained by the committee overseeing the pilot's retirement plan as a "directed trustee" to "hold the Plan's assets in trust, manage them as directed, and periodically report their value[.]" *Id.* The plan also had appointed an investment manager upon which State Street relied in managing the plan's assets. *See id.* The plan invested heavily in real estate, and in reporting the value of these investments, State Street relied upon the appraisals issued by the investment manager. *See id.* Ultimately, these high valuations were revealed to be fabricated, and the real estate market declined. *See id.* Those plan participants who opted for lump-sum retirement benefits when the inflated values were carried on the books "received a windfall," while the remaining plan participants "were left holding an unduly depleted bag." *Id.* at 16. After the airline filed bankruptcy, the pilot-plaintiffs sued State Street for its breaches of fiduciary duty. *See id.* State Street moved to dismiss, and the trial court granted the motion because, among other reasons, under Section 1105(d), "even if [State Street] knew or should have known of [the investment manager]'s indiscretions, co-fiduciary liability did not attach in

the absence of an allegation that [State Street] had participated actively in, or concealed, the breach." *Id.*

> State Street embraced this very argument in its brief on appeal:

> Under 29 U.S.C. § 1105(d), if an investment manager has been appointed to manage the Plan's assets, the trustee is exempt from any liability under § 1105(a)(2) or (3) for fiduciary breaches by the investment manager with regard to those assets . . . . Consequently, if an investment manager was responsible for managing the assets that plaintiffs allege were overvalued, State Street cannot be held liable under either § 1105(a)(2) or (3) for the investment manager's breach.

> . . .

> Since plaintiffs cannot now deny that an investment manager had been designated to manage the plan's real estate assets, § 1105(d) insulates State Street, as trustee, from any liability for any claim concerning the investment manager's valuation of the assets under its control.

Ex. 50, Brief for Appellee, *Beddall v. State Street Bank & Trust Co.*, On Appeal from the U.S. District Court for the District of Massachusetts (Civil Action No. 95-10029-MLW), 1997 WL 33768952, at *22-25 (Oct. 30, 1997) (emphasis omitted). The Court of Appeals for the First Circuit agreed, declaring: "Given its literal meaning, section 1105(d) defenestrates the plaintiffs' claim that [State Street] is subject to co-fiduciary liability in this instance." *Beddall*, 137 F.3d at 23.

Likewise here, under nearly verbatim language to that provided in ERISA Section 1105(d), Texas Government Code Section 802.203 plainly states that, because they appointed State Street as the Investment Manager, the Trustees cannot be liable for State Street's acts or omissions with respect to the Commodities Strategy.[23] Thus, State Street's application of its

---

[23] Moreover, there is no allegation or evidence that HPOPS actively participated in or concealed State Street's breaches, and in any event, unlike ERISA, the Texas Government Code does not provide that a trustee is otherwise liable for "any act of such trustee." *Compare* 29 U.S.C. § 1105(d)(2) ("Nothing in this subsection shall relieve any trustee of any liability under this part for any act of such trustee."), *with* TEX. GOV'T CODE ANN. § 802.203(c) (providing that a trustee is not liable for the acts or omissions of an investment manager without exception for the trustee's own acts).

affirmative defenses to the investment manager arena would eviscerate Section 802.203(c) and would permit State Street to escape liability for its own acts and omissions by claiming that the purported misconduct of the trustees (*who cannot be liable*) somehow diminished State Street's culpability to HPOPS's Plan.  In essence, State Street seeks to eliminate its fiduciary obligations to HPOPS simply because HPOPS allegedly eventually discovered State Street's misconduct and purportedly delayed in taking affirmative steps to stop State Street from continuing to manage the Commodities Strategy, even though State Street itself took no action to terminate the IMA and its associated fiduciary responsibilities or change the cash collateral account.  Similar to ERISA 29 U.S.C. § 1105(d), this result would be antithetical to the express language of Section 802.203(c) of the Texas Government Code and should not be countenanced.  Summary judgment is, therefore, appropriate on State Street's second, third, fourth, fifth, eighth, ninth, and eleventh affirmative defenses.

**B.   State Street Cannot Reduce Its Liability to HPOPS by Its Affirmative Defenses**

Furthermore, and similarly, any alleged acts or omissions by HPOPS do not absolve State Street of liability or bar HPOPS from recovering in a breach of fiduciary duty action.  *See Openshaw v. Cohen, Klingenstein & Marks, Inc.*, 320 F. Supp. 2d 357, 364-65 (D. Md. 2004) (striking affirmative defenses of estoppel, waiver, ratification, assumption of the risk, and contributory negligence in a fiduciary duty breach case because a fiduciary cannot insulate itself from liability by alleging another fiduciary's negligence or misconduct); *Williams v. Provident Inv. Counsel, Inc.*, 279 F. Supp. 2d 894, 909 (N.D. Ohio 2003) (considering defendant's affirmative defenses of failure to mitigate damages, unclean hands, contributory negligence, laches, and assumption of the risk and acknowledging "any recovery under § 409 goes to the Plan, not the trustees, and the Plan's participants should not be punished for acts of the trustees.

Thus, Provident is not allowed to reduce or eliminate its liability to the plan on the defense that other fiduciaries breached their fiduciary duties."); *Compton Press, Inc. v. Granada Invs., Inc.*, Civ. A. No. 91-1256, 1992 WL 566329, at *9 (D.N.J. Nov. 23, 1992) (striking defendants' affirmative defenses of contributory negligence and breach of fiduciary duty because acts or omissions of plan's trustees did not absolve defendants' liability to the plan for their fiduciary breaches).

In *Compton Press, Inc. v. Granada Investments, Inc.*, the defendants attempted to avoid liability to the plaintiff benefit plans by arguing that the plans were negligent in entering into certain transactions and that such negligence barred relief to the plans. *See* 1992 WL 566329, at *9. As for the defendants' legally defunct defenses, the court explained:

> In short, defendants argue that in making these loans, the plan trustees violated their fiduciary obligations under ERISA, and that their conduct must be imputed to the plaintiff benefit plans because the trustees are the plan's agents. This alleged misconduct by the trustees, in defendants' view, would bar the plaintiff plans from recovering.
>
> Defendants ignore the fact that, at bottom, their claim is one for the breach of fiduciary duties under ERISA. Indeed, any duty of care[,] which the trustees may have owed in making and supervising these transactions, was owed to the plan, its participants and it beneficiaries. Most significantly, suit against a benefit plan fiduciary for breach of fiduciary duties may only be brought for the benefit of the plan. . . . The obligations imposed upon plan trustees by ERISA's fiduciary provisions simply do not create any duty of care to defendants and do not exist for their benefit. If any cause of action exists to recover from the derelict trustee, it is in favor of either the plan itself or its representative. Thus, defendants simply have no claim which can be asserted against the plan based upon the trustees' negligence or misconduct in entering into these transactions.

*Id.* (citations & footnote omitted).

Similarly, here, any fiduciary duties the Trustees may have owed with respect to the management and investment of the Plan's assets were owed to HPOPS and its beneficiaries—***not*** to State Street. *See id.* Any recovery for State Street's breaches of fiduciary duty goes to the

System, and "the Plan's participants should not be punished for the [purported] acts of the trustees." *Williams*, 279 F. Supp. 2d at 909. Accordingly, State Street "is not allowed to reduce or eliminate its liability to the [System] on the defense that other fiduciaries [allegedly] breached their fiduciary duties." *Id.* As such, whether HPOPS, acting through its Trustees or other agents, was negligent, assumed the risk, failed to mitigate damages, or engaged in any conduct that would somehow support an affirmative defense has no bearing on State Street's fiduciary obligations to HPOPS or HPOPS's right to recover on behalf of its beneficiaries for State Street's breach of fiduciary duties.

**III. State Street's Equitable Affirmative Defenses Are Inapplicable As a Matter of Law Because This Dispute Involves a Governmental Entity That Was Exercising Governmental Functions**

It is longstanding and uniform Texas law that equitable affirmative defenses do not apply against a governmental entity in a case involving governmental functions. *See City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 773 (Tex. 2006) ("We have long held that a city cannot be estopped from exercising its governmental functions."); *Baird v. City of Melissa*, 170 S.W.3d 921, 927 (Tex. App.—Dallas 2005, pet. denied) ("Affirmative defenses based in equity have been consistently held not to apply when the activity complained of is a governmental function."); *Crain v. The Unauthorized Practice of Law Comm. of the Supreme Court of Tex.*, 11 S.W.3d 328, 334 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("The courts of this state have uniformly held that laches is not imputable to a government entity while the entity is performing a governmental function.").[24] It is indisputable that HPOPS is a governmental entity

---

[24] There is one limited exception to this rule. That exception is that a ***municipality*** may be estopped in those cases where justice requires its application, and there is no interference with the exercise of its governmental functions. *See City of White Settlement*, 198 S.W.3d at 774. The supreme court has "cautioned that this exception is available 'only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice.'" *Id.*

that was exercising governmental functions when it hired State Street as its fiduciary Investment Manager.

As noted above, HPOPS is a governmental pension system established in 1947 by the Texas Legislature to provide retirement, death, and disability benefits to its members. *See supra* Statement of Facts, Part 1. HPOPS's enabling statute, Article 6243g-4 of the Texas Revised Civil Statutes, was promulgated pursuant to the Texas Constitution. *See* Tex. Const. art. XVI, § 67(a) (providing for the enactment of "general laws establishing systems and programs of retirement and related disability and death benefits for public employees and officers."). Article 6243g-4 mandates that HPOPS's Board of Trustees is "responsible for the general administration, management, and operation of the pension system, including the direction of investment and oversight of the funds assets." Tex. Rev. Civ. Stat. art. 6243g-4, § 3(a). These are governmental functions. *See Thayer v. Houston Munic. Employees Pension Sys.*, 95 S.W.3d 573, 577 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (disagreeing that the pension system and board in that case were "not a state-created governmental entities but [were] municipalities entitled only to 'the limited immunity afforded municipalities'" and holding that "[t]he legislation creating the [pension system] plainly did not enable the [pension system] or its Board to carry out any municipal functions or provide any municipal services"); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215 (concerning the liability for a ***municipality*** for

---

(citation omitted). State Street cannot demonstrate that it would be manifestly unjust for this Court to grant summary judgment on State Street's equitable affirmative defenses. Furthermore, "[t]he legislation creating [HPOPS] did not enable the Pension System or its Board to carry out any municipal functions or provide any municipal services." *Thayer v. Houston Munic. Employees Pension Sys.*, 95 S.W.3d 573, 577 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also* Tex. Rev. Civ. Stat. art. 6243g-4, §§ 1-28. Accordingly, "the exceptions holding municipalities subject to estoppel are not applicable to the instant case." *Dann v. Athens Munic. Water Auth.*, No. 12-07-00087-CV, 2007 WL 2460058, at *5 (Tex. App.—Tyler Aug. 31, 2007, no pet.).

governmental versus proprietary functions).  *Cf. Williams v. Houston Firemen's Relief & Retirement Fund*, 121 S.W.3d 415, 438 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("The administration of the Fund and the promulgation and interpretation of the guidelines for its administration are thus expressly 'enjoined' on the City by statute; and these powers are given to the Fund as part of the sovereignty of the state, by legislative authority, to be exercised by the board . . . for the general benefit of all who fall within the scope of the statute.  They are thus governmental functions." (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215)).

HPOPS was certainly performing a governmental function when it contracted with State Street to be a fiduciary Investment Manager over the Commodities Strategy because HPOPS's appointment of State Street falls within the "direction of investment and oversight of the funds assets" and HPOPS (through its Trustees) was contracting, and administering its relationship, with State Street.  As such, based upon the longstanding Texas authority cited above, summary judgment is proper on State Street's third defense (unclean hands and in pari delicto) and ninth defense (ratification, waiver, laches, and estoppel).

## IV.   State Street's Mitigation Defense Is Legally Defunct for Additional Reasons

Summary judgment is also proper on State Street's mitigation affirmative defense for at least two additional reasons.  First, HPOPS was under no duty to mitigate its damages because the IMA was still in effect, and State Street had a more than equal opportunity—and, indeed, was the only one with the opportunity—to prevent or reduce HPOPS's damages.  Second, the defense of mitigation is inapplicable to reduce State Street's liability for damages caused by its fraudulent conduct against HPOPS.  Accordingly, for these additional reasons, HPOPS respectfully asks this Court to grant summary judgment in favor of HPOPS on State Street's mitigation defense.

### A.   HPOPS Had No Duty to Mitigate Because State Street Had an Equal Opportunity to Do So and Failed

It is longstanding Texas law that where a contract is ongoing and the defendant has an equal opportunity as the plaintiff to reduce the plaintiff's damages and failed to do so, the defendant cannot claim that the plaintiff should have mitigated its damages.  In *Walker v. Salt Flat Water Co.*, the Texas Supreme Court stated the rule as follows:

> Where a party is entitled to the benefits of a contract and can save himself from damages resulting from its breach at a trifling expense or with reasonable exertions, it is his duty to incur such expense and make such exertions; and in such instances he can only charge the party in default with such damages as he could not have prevented with reasonable exertions and expense; but where the party in default was in duty bound to prevent damages, and had equal opportunity with the person injured for performance, and equal knowledge of the consequences of nonperformance, he cannot, while the contract is in force and effect, be heard to say that the plaintiff might have performed for him, and thus avoided such damages.

96 S.W.2d 231, 232 (Tex. 1936); *see also Trinity Universal Ins. Co. v. Fuller*, 524 S.W.2d 335, 338 (Tex. App.—Dallas 1975, writ ref'd n.r.e.).  Here, the IMA remained in effect between HPOPS and State Street, and it was not until November 13, 2007 that HPOPS terminated State Street as its Investment Manager under the contract.   *See* Ex. 42 (Termination Letter, 11/13/2007).  Even then, State Street remained under contract as HPOPS's Investment Manager until it liquidated HPOPS's investment on December 14, 2007.  *See* Ex. 44, Houston Police In-Kind Detail, 12/14/2007.   As long as the IMA remained in effect, State Street had full and absolute discretion over the Commodities Strategy and was solely responsible for properly investing and managing the cash collateral funds in the strategy.  Thus, State Street, and State Street alone, had the responsibility and opportunity to prevent or reduce HPOPS's damages caused from State Street's breaches.  *See supra* Argument, Part 1.B; *see also Trinity Universal Ins. Co.*, 524 S.W.2d at 338.  State Street therefore cannot assert a mitigation defense against

HPOPS for allegedly failing to reduce damages that State Street could have—and should have—reduced pursuant to the IMA.

### B. HPOPS Was Not Obligated to Mitigate Damages Resulting from State Street's Fraudulent Conduct

HPOPS was also under no duty to mitigate its damages resulting from State Street's fraudulent conduct. HPOPS has alleged that State Street committed fraud by making numerous material misrepresentations that the investment of HPOPS's cash collateral would be in high-quality, well-diversified, fixed-income securities and would not be leveraged. *See* Ex. 1, Orig. Compl. To the extent HPOPS proves at trial that State Street is accountable to HPOPS for the damages caused to it by its fraudulent conduct, under well-settled Texas law, HPOPS had absolutely no obligation to mitigate those damages. *See Formosa Plastics Corp. v. Kajima Int'l, Inc.*, 216 S.W.3d 436, 459 (Tex. App.—Corpus Christi 2006, pet. denied) (holding trial court correctly refused mitigation jury instruction because, *inter alia*, "there is authority for the proposition that an injured party is not required to minimize damages resulting from fraud"); *Duperier v. Tex. State Bank*, 28 S.W.3d 740, 754 (Tex. App.—Corpus Christi 2000, pet. dism'd) (holding mitigation is not consistent with "anti-fraud intent" of the statute at issue); *Meadolake Foods, Inc. v. Estes*, 218 S.W.2d 862, 868, 872 (Tex. Civ. App.—El Paso 1948, writ ref'd n.r.e.) (citing cases) ("In such cases [in which the defendant practices fraud upon the plaintiff] the injured party owes no duty to the perpetrator of the fraud to exercise ordinary care to prevent or minimize damages resulting from the fraud."). Accordingly, HPOPS respectfully asks this Court to grant summary judgment in its favor on State Street's mitigation defense to the extent HPOPS proves its damages stem from State Street's fraudulent conduct.

**V.     None of State Street's Defenses Are Available on HPOPS's Texas Securities Act Claim**

Texas courts interpret the Texas Securities Act (the "Act") as severely limiting which defenses can be brought against a claim made pursuant to the Act:

> The statute excludes from liability any defendant who can prove the plaintiff knew the misrepresentations or the omissions or that the defendant did not and could not with reasonable care know the information. Once proven, the defendant is entitled to absolute relief from liability. *Because the statute provides no other defenses*, and a comparative fault defense would abrogate the effect of the statute, we hold that the trial court did not err in refusing to submit a jury question on this issue.

*Duperier v. Tex. State Bank*, 28 S.W.3d 740, 753 (Tex. App.—Corpus Christi 2000, pet. dism'd) (emphasis added) (discussing TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2) and applying this argument also to the defense of ratification).  Thus, the court in *Duperier v. Texas State Bank* explicitly clarified that aside from the defense expressly set out in the Act, no other defense to such a claim is available as a matter of law.  Indeed, Texas courts consistently hold that the common-law defenses of ratification, laches, waiver, and estoppel are absolutely not proper defenses to a Texas Securities Act claim.  *See Duperier*, 28 S.W.3d at 753 ("The common law defense of ratification will not save a transaction that violates a statute," and "article 581-33 contains a provision voiding waivers."); *Ins. Co. of N. Am. v. Morris*, 928 S.W.2d 133, 154 (Tex. App.—Houston [14th Dist.] 1996) ("The common law defenses of estoppel and ratification are not available in . . . TSA actions."), *rev'd in part on other grounds*, 981 S.W.2d 667 (1998); *Riggs v. Riggs*, 322 S.W.2d 571, 574 (Tex. Civ. App.—Dallas 1959, no writ) ("Appellant was seeking to enforce a statutory legal right.  The defense of laches is not available to the defendant in such a suit."); *see also Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1034 (5th Cir. 1990) ("The[] anti-waiver provision[ in Article 581-33] void[s] waivers of rights by subsequent conduct."), *abrogated on other grounds by Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001).

For this additional reason, HPOPS respectfully asks this Court to grant summary judgment on State Street's second defense ("plaintiff's own conduct"); third defense (unclean hands and in pari delicto); fourth defense ("plaintiff's own negligence"); fifth defense (proportionate responsibility); eighth defense (assumption of the risk); ninth defense (ratification, waiver, laches, and estoppel); and eleventh defense (failure to mitigate damages).

## CONCLUSION

For all these reasons, Plaintiff Houston Police Officers' Pension System respectfully moves for partial summary judgment that (i) the unambiguous language of the Investment Management Agreement establishes as a matter of law that State Street, as HPOPS's Investment Manager, had "full and absolute discretionary power to manage" the entirety of HPOPS's separately managed commodities strategy investment and, thus, undertook the sole responsibility, at all times relevant, to select the cash management fund for the cash collateral for the strategy, to monitor the cash collateral fund, and to move the cash collateral to a different fund if prudent to do so; and (ii) the affirmative defenses State Street has asserted against HPOPS, including State Street's second defense ("plaintiff's own conduct"); third defense (unclean hands and in pari delicto); fourth defense ("plaintiff's own negligence"); fifth defense (proportionate responsibility); eighth defense (assumption of the risk); ninth defense (ratification, waiver, laches, and estoppel); and eleventh defense (failure to mitigate damages), fail as a matter of law.

BURFORD MANEY, L.L.P.

By:    /s/ Robert R. Burford
       Robert R. Burford
       TBA No. 03258500
       Andrew Meade
       TBA No. 24032854
       1221 McKinney, Ste. 3150

Houston, Texas 77010
Telephone: (713) 658-9001
Facsimile: (713) 658-9011

**GIBBS & BRUNS, L.L.P.**

By:     /s/ Grant J. Harvey
        Grant J. Harvey
        TBA No. 09177700
        Caren S. Sweetland
        TBA No. 24001333
        1100 Louisiana, Suite 5300
        Houston, Texas 77002
        Telephone: (713)650-8805
        Facsimile:  (713)750-0903

        ATTORNEYS FOR PLAINTIFF HOUSTON
        POLICE OFFICERS' PENSION SYSTEM

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record via electronic mail on this 2nd day of June 2010, as set forth below.

Harvey J. Wolkoff
Robert A. Skinner
Olivia S. Choe
Lila A. Palmer
**Ropes & Gray LLP**
One International Place
Boston, MA 02110
Tel: 617.951.7000
Fax: 617.951.7050
Harvey.Wolkoff@ropesgray.com
Robert.Skinner@ropesgray.com
Olivia.Choe@ropesgray.com
lila.palmer@ropesgray.com

Jerome C. Katz
**Ropes & Gray LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Tel: 212.841.5700
Fax: 212.841.5725
Jerome.Katz@ropesgray.com

*Attorneys for Defendant State Street Bank and Trust Company*

John D. Donovan, Jr.
**Ropes & Gray LLP**
One International Place
Boston, MA 02110
Tel: 617.951.7000
Fax: 617.951.7050
jdonovan@ropesgray.com

*Attorneys for Defendant SSGA Funds*

Edwin G. Schallert
Steven Klugman
Matthew D. Siegel
**DeBevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
Tel: 212.909.6000
Fax: 212.909.6836
egschall@debevoise.com
sklugman@debevoise.com
mdsiegel@debevoise.com

*Counsel for Plaintiff Prudential Retirement
Insurance and Annuity Company*

William C. Fredericks
Jerald D. Bien-Willner
Avi Josefson
**Bernstein Litowitz Berger &
Grossman LLP**
1285 Avenue of the Americas
New York, NY 1019
Tel: 212.554.1400
Fax: 212.554.1444
avi@blbglaw.com
Wfredericks@blbglaw.com
JerryB@blbglaw.com

*Counsel for Lead Plaintiff Warren Cohen,
Trustee of the Unisystems Plan, and
Interim Lead Counsel for the Class*

George M. Gowen III
**Cozen O'Connor**
1900 Market Street, Fourth Floor
Philadelphia, PA 19103
Tel: 215.665.2000
Fax: 215.665.2013
ggowen@cozen.com

*Counsel for Defendants Cambridge
Financial Services, Inc. and Ernest A.
Liebre*

Jeffrey C. Block
Patrick T. Egan
Kristen D. Tremble
Abigail A. Romero
**Berman Devalerio Pease Tabacco
Burt & Pucillo**
One Liberty Square
Boston, MA 02109
Tel: 617.542.3800
Fax: 617.542.1194
jblock@bermanesq.com
pegan@bermanesq.com
ktremble@bermanesq.com
aromeo@bermanesq.com

*Counsel for Plaintiffs Nashua Corporation
Plan Committee, John L. Patenaude,
Margaret Callan, and Karen Adams*

Anne F. O'Berry
**Berman Devalerio Pease Tabacco
Burt & Pucillo**
Esperante Building
222 Lakeview Avenue, Ste. 900
West Palm Beach, FL 33401
Tel: 561.835.9400
Fax: 561.835.0322
aoberry@bermanesq.com

*Counsel for Lead Plaintiffs John L.
Patenaude and Margaret Callan,
Fiduciaries of the Nashua Plan and Interim
Lead Counsel for the Class*

Clinton Krislov
Jeffrey Salas
Krislov & Associates, Ltd.
20 North Wacker Drive
Chicago, IL 60606
Tel: 312.606.0500
Fax: 312.606.0207
clint@krislovlaw.com
jeff@krislovlaw.com

*Counsel for Sisters of Charity of the
Blessed Virgin Mary*

William F. Lee
John J. Butts
Felicia H. Ellsworth
Kevin S. Prussia
**Wilmer Cutler Pickering Hale and Dorr LLP**
60 State Street
Boston, MA 02109
617.526.6000
william.lee@wilmerhale.com
john.butts@wilmerhale.com
felicia.ellsworth@wilmerhale.com
kevin.prussia@wilmerhale.com

Steven F. Cherry
**Wilmer Cutler Pickering Hale and Dorr LLP**
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
202.663.6000
steven.cherry@wilmerhale.com

*Counsel for ING Institutional Plan Services LLC f/k/a CitiStreet, LLC*

David E. Lurie
Thomas E. Lent
Sara A. Laroche
**Lurie & Krupp, LLP**
One McKinley Square
Boston, MA 02109
Telephone: 617.367.1970
Facsimile: 617.367.1971
dlurie@luriekrupp.com
tlent@luriekrupp.com
slaroche@luriekrupp.com

*Counsel for Plaintiffs F.W. Webb, Robert A. Mucciaarone, Charles Slattery III and Edward Welch, as Members of the F.W. Webb Company Savings & Profit Sharing Plan Committee, and the F.W. Webb Company Savings and Profit Sharing Plan, on Behalf of the Plan and the Participants Thereof*

Leif T. Simonson
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Tel: 612.766.7000
Fax: 612.766.160
lsimonson@faegre.com

*Counsel for Apogee Enterprises, Inc.*

Michele Bryant
Thomas J. Kimpel
**Bamberger, Foreman, Oswald & Hahn LLP**
20 N.W. 4th Street, Seventh Floor
P.O. Box 657
Evansville, IN 47707-0657
Tel: 812.425.1591
Fax: 812.421.4936
mbryant@bamberger.com
tkimpel@bamberger.com

Richard B. Walsh, Jr.
David B. Helms
R. Bradley Ziegler
**Lewis, Rice, Fingersh, L.C.**
500 N. Broadway, Suite 2000
St. Louis, MO 63102
Tel: 314.444.7600
rwalsh@lewisrice.com
dhelms@lewisrice.com
bziegler@lewisrice.com

*Counsel for Plaintiff Welborn Baptist Foundation, Inc.*

Lynn Sarko
Derek W. Loeser
Karin B. Swope
Gretchen Freeman Cappio
Laura R. Gerber
**Keller Rohrback LLP**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: 206.623.1900
Fax: 206.623.3384
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
kswope@kellerrohrback.com
gcappio@kellerrohrback.com
lgerber@kellerrohrback.com

*Counsel for Lead Plaintiff Alan Kober, Trustee of the Andover Plan, and Interim Lead Counsel for the Class*

David Avi Rosenfeld
Evan Jay Kaufman
Samuel Howard Rudman
**Coughlin, Stoia, Geller, Rudman & Robbins, LLP**
58 South Service Road, Suite 200
Melville, NY 11747
drosenfeld@csgrr.com
ekaufman@csgrr.com
srudman@csgrr.com

*Counsel for Plumbers and Steamfitters Union Local No. 10 Health & Welfare Fund*

Jeffrey A. Berens
Darby Kennedy
**Dyer & Berens LLP**
303 East 17th Avenue, Suite 300
Denver, CO 80203
Tel: 303.861.1764
Fax: 303.395.0393
Jeff@dyerberens.com
darby@dyerberens.com

*Counsel for Securities Class Plaintiffs*
Geoff Gannaway
**Beck, Redden & Secrest**
One Houston Center
1221 McKinney Street, Suite 5400
Houston, TX 77010-2010
Tel: 713.951.3700
Fax: 713.951.3720
ggannaway@brsfirm.com

Charles R. Parker
**Locke Lord Bissel & Liddell LLP**
600 Travis, Suite 3400
Houston, TX 77002-2095
Tel: 713.226.1200
Fax: 713.223.3717
cparker@lockelord.com

John R. Nelson
**Locke Lord Bissel & Liddell LLP**
100 Congress Avenue, Suite 300
Austin, TX 78701
Tel: 512.305.4700
Fax: 512.305.4800
jnelson@lockelord.com

*Counsel for Plaintiffs Memorial Hermann Healthcare System and the Health Professionals Insurance Co., Ltd.*

Douglas Spaulding
**Reed Smith LLP**
1301 K Street NW
Suite 1100 - East Tower
Washington, D.C. 20005
Tel: 202.414.9200
Fax: 202.414.9299
dspaulding@reedsmith.com

*Counsel for Defendant Yanni Partners, Inc.*


*/s/ Caren Sweetland*
 Caren Sweetland