IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS
INVESTMENT LITIGATION

MDL No. 1945

HOUSTON POLICE OFFICERS' PENSION
SYSTEM,

     Plaintiff,

v.

No. 08 Civ. 5442 (RJH)

STATE STREET BANK & TRUST
COMPANY and  STATE STREET GLOBAL
ADVISORS, INC.,

     Defendants.

## STATE STREET'S OPPOSITION TO PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT .......................................................................................................................3

**I.**   Plaintiff's Motion For an Advisory Opinion Regarding The Interpretation Of The Investment Management Agreement Fails As A Matter Of Law ........................................3

    **A.**   HPOPS Improperly Seeks an Advisory Opinion  On The Meaning  Of The IMA That Will Not Be Dispositive of Any Claim In The Case ...............................3

    **B.**   HPOPS Misinterprets The Language of the IMA, Which Does Not  Require That State Street Select, Assess the Suitability of, or Move the  Funds for the Enhanced Commodities Strategy ................................................................................5

        1.   The IMA's Plain Language Does Not Obligate State Street To  Select or Change the Cash Vehicle for the "Enhanced" Commodities Strategy ........6

        2.   State Street's Disclosures About the Enhanced Commodities Strategy Stated That LDBF Would be Used as the Cash Vehicle, But That HPOPS Could Choose an Alternative – Which HPOPS Did Not Do............10

        3.   The Parties' Subsequent Conduct Demonstrates That State Street  Did Not Have Discretion To Move HPOPS Out Of LDBF .................................12

**II.**   State Street's Affirmative Defenses Are Valid Under Applicable Texas Law ................15

    **A.**   State Street's Defenses Cannot Be Barred By ERISA Principles That Are Inapplicable To HPOPS And Its Claims .................................................................18

    **B.**   The Texas Proportionate Responsibility Law Authorizes Defenses  Based Upon Plaintiff's Own Culpable Conduct..................................................................20

    **C.**   Texas Government Code Section 802.203 Does Not Absolve HPOPS  of Responsibility For Its Own Conduct Or Bar Affirmative Defenses  Based On That Conduct .................................................................................................22

    **D.**   The "Governmental Function" Doctrine Is Inapplicable To State Street's Affirmative Defenses.................................................................................................24

    **E.**   Texas Law Recognizes a Duty to Mitigate Damages Arising from  Alleged Fraud .............................................................................................................27

    **F.**   State Street Did Not Have An "Equal Opportunity" to Mitigate  HPOPS's Losses ...........................................................................................................29

CONCLUSION...................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

C<span>ASES</span>

*Agway, Inc. Employees 401(k) Thrift Investment Plan v. Magnuson*,
    409 F.Supp.2d 136 (N.D.N.Y. 2005) ..................................................................... 19

*Arado v. Gen. Fire Extinguisher Corp.*,
    626 F. Supp. 506 (N.D. Ill. 1985) ......................................................................... 3

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
    945 S.W.2d 812 (Tex. 1997) .................................................................................. 27

*Aurora Natural Gas L.L.C. v. Continental Natural Gas, Inc.*,
    1999 WL304561 (N.D. Tex. May 10, 1999) ......................................................... 11

*Baird v. City of Melissa*,
    170 S.W.3d 921 (Tex. App. 2005) ......................................................................... 24

*Barry v. Liddle, O'Connor, Finkelstein & Robinson*,
    1997 WL 736725 (S.D.N.Y. Nov. 25, 1997) ....................................................... 3

*Chemung Canal Trust Co. v. Sovran Bank/Maryland*,
    939 F.2d 12 (2nd Cir. 1993) ................................................................................. 19

*City of White Settlement v. Super Wash, Inc.*,
    198 S.W. 3d 770 (Tex. 2006) ................................................................................ 24

*Coker v. Coker*,
    650 S.W.2d 391 (Tex. 1983) ............................................................................. 7, 10

*Cook Composites, Inc. v. Westlake Styrene Corp.*,
    15 S.W.3d 124 (Tex. App. 2000) ....................................................................... 7, 10

*Crain v. Unauthorized Practice of Law Comm. of the Supreme Court of Tex.*,
    11 S.W.3d 328 (Tex. App. 1999) ........................................................................... 24

*Dallas v. Arnett*,
    762 S.W.2d 942 (Tex. App. 1988) ......................................................................... 26

*Duperier v. Tex. State Bank*,
    28 S.W.3d 740 (Tex. App. 2000) ........................................................................... 28

*Evergreen Int'l, S.A. v. Marinex Constr. Co., Inc.*,
    477 F. Supp. 2d 697 (D.S.C. 2007) ....................................................................... 5

*Formosa Plastics Corp., USA v. Kajima Intern., Inc.*,
  216 S.W.3d 436 (Tex. App. 2006) ........................................................................28

*Goodrich v. Gonzalez*,
  451 F. Supp. 747 (E.D.N.Y. 1978) .........................................................................4

*Gunn Infiniti, Inc. v. O'Byrne*,
  996 S.W.2d 854 (Tex. 1999) ................................................................................27

*Haddock v. Nationwide Financial Services Inc.*,
  570 F.Supp.2d 355 (S.D.N.Y. 2008) ....................................................................19

*In re Sunpoint Securities, Inc.*,
  377 B.R. 513 (Bkrtcy.E.D.Tex. 2007) ..................................................................20

*In re Worldcom Inc. ERISA Litigation*,
  339 F.Supp.2d 561 (S.D.N.Y. 2004) ....................................................................19

*Isaacs v. Bishop*,
  249 S.W.3d 100 (Tex.App.-Texarkana 2008) .......................................................21

*JHC Ventures, L.P. v. Fast Trucking*,
  94 S.W.3d 762 (Tex. App. 2002) ..........................................................................21

*Lopez v. Munoz, Hockema & Reed, L.L.P.*,
  22 S.W.3d 857 (Tex. 2000) ..................................................................................18

*Meadolake Foods, Inc. v. Estes*, 218 S.W.2d 862, 868 (Tex. Civ. App.),
  *writ ref'd n.r.e. per curiam*, 219 S.W.2d 441 (Tex. 1949) ...............................27, 28

*Melini v. 71st Lexington Corp.*,
  2009 WL 413608 (S.D.N.Y. Feb. 13, 2009) ...........................................................4

*Openshaw v. Cohen, Klingenstein & Marks, Inc.*,
  320 F. Supp. 2d 357 ............................................................................................19

*Reata Constr. Corp. v. City of Dallas*,
  197 S.W.3d 371 (Tex. 2006) ................................................................................24

*Saboundjian v. Bank Audi (USA)*,
  556 N.Y.S.2d 258 (N.Y.App. Div. 1990) ..............................................................30

*SEC v. Thrasher*,
  152 F. Supp. 2d 291 (S.D.N.Y. 2001) .............................................................3, 4, 5

*St. Barnabas Hosp. v. Amisys, LLC*,
  2007 WL 747805 (S.D.N.Y. Mar. 9, 2007) .............................................................4

*Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*,
    817 S.W.2d 160 (Tex. App. 1991) ................................................................17

*Texas Utilities Fuel Co. v. First Nat'l Bank in Dallas*,
    615 S.W.2d 309 (Tex. App. 1981) ................................................................10

*Thomas v. Callaway*,
    251 S.W.2d 921 (Tex. Civ. App. 1952) .........................................................28

*U.S. v. Am. Int'l Group, Inc.*,
    1997 WL 66786 (S.D.N.Y. Feb. 14, 1997) .....................................................4

*Ulico Cas. Co. v. Allied Pilots Ass'n*,
    262 S.W.3d 773 (Tex. 2008) .......................................................................18

*Underwriters at Lloyds v. Edmond, Deaton & Stephens Ins. Agency, Inc.*,
    2008 WL 5441225 (Tex. App. Dec. 30, 2008) ...............................................21

*Villarreal v. Wells Fargo Brokerage Services, LLC*,
    2010 WL 1053215 (Tex. App. March 10, 2010) ..............................................21

*Walker v. Salt Flat Water Co.*,
    96 S.W.2d 231 (Tex. 1936) ............................................................16, 27, 29

*Warner v. U.S.*,
    698 F. Supp. 877 (S.D. Fla. 1988) ................................................................5

*Werner v. KPMG, L.L.P.*,
    415 F.Supp.2d 688 (S.D.Tex.2006) ..............................................................22

*Williams v. City of Midland*,
    932 S.W. 2d 679 (Tex. App. 1996) ...............................................................16

*Williams v. Houston Firemen's Relief and Retirement Fund*,
    121 S.W.3d 415 (Tex. App. 2003) ................................................................26

*Williams v. Provident Inv. Counsel, Inc.*,
    279 F. Supp. 2d 894 (N.D. Ohio 2003) .........................................................19

*Yale Transp. Corp. v. Yellow Truck & Coach Mfg. Co.*,
    3 F.R.D. 440 (S.D.N.Y. 1944) ......................................................................5

**STATUTES**

Act of May 18, 1995, 74th Leg., R.S., ch. 136, §1, sec. 33.002, 1995 Tex. Gen. Laws 971 ........21

TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 ...................................................................17, 21

TEX. CIV. PRAC. & REM. CODE ANN.§ 33.002(a)...................................................................20

TEX. CIV. PRAC. & REM. CODE ANN. §33.004 ......................................................................22

TEX. CIV. PRAC. & REM. CODE. ANN. § 101.0215(a)...................................................................24

TEX. GOV'T CODE ANN. § 802.203(b) ...................................................................22, 23

TEX. GOV'T CODE ANN. § 802.203(c)...................................................................22, 23

Chapter 33 of the Texas Civil Practice and Remedies Code .............................................17, 20, 21

Chapter 802 of the Texas Government Code........................................................................19, 24

Section 802.203 of the Texas Government Code .......................................................................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56......................................................................................................1, 3, 4

Local Civil Rule 56.1 ...........................................................................................................1

Rule 56(a)...........................................................................................................................3

Rule 56(d) ...........................................................................................................................5

Scott A. Sherman, Texas Tort Reform: The Legislative History at II-121 (1995).......................21

Second Restatement of Contracts, § 202(4)...............................................................................12

Defendants State Street Bank and Trust Company and State Street Global Advisors, Inc.[1] (collectively, "State Street") respectfully submit this memorandum in opposition to Plaintiff Houston Police Officers' Pension System's ("HPOPS's") Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1.

## PRELIMINARY STATEMENT

HPOPS's motion seeks (i) an advisory opinion from the Court on how to interpret the parties' Investment Management Agreement executed December 6, 2005, as amended (the "IMA"); and (ii) a ruling that certain of State Street's affirmative defenses fail as a matter of law.

HPOPS's request for the Court's interpretation of the IMA is fatally flawed because it does not seek entry of judgment or a finding of liability against State Street on any claim in this action. Instead, HPOPS's motion asks the Court to define the scope of State Street's obligations under the IMA, while specifically asking the Court *not* to address whether State Street satisfied those obligations. *See* Pl's Br. at 5 & n.2. Because the requested ruling would not resolve any claim – but would merely address one of the several *elements* of one of HPOPS's claims[2] – HPOPS's motion is not proper under Rule 56. This portion of the motion is defective on its face and must be denied on that basis alone.

Moreover, HPOPS's proposed interpretation of the IMA is incorrect as a matter of law, and must be rejected for that reason as well. HPOPS asserts that the IMA imposed on State Street not only the responsibility to manage the Limited Duration Bond Fund ("LDBF") as the cash vehicle for HPOPS's investment in the Enhanced Dow Jones-AIG Commodities Futures

---

[1] Plaintiff has incorrectly named State Street Global Advisors, Inc. as a defendant.

[2] HPOPS nowhere identifies which of its six claims it believes would be furthered by the requested interpretive ruling. However, Count II of the complaint asserts a breach of contract with respect to the IMA, and this is presumably the intended focus of the motion. *See* Compl. ¶¶ 82-85 (attached as Exhibit 1 to HPOPS's Appendix in Support of its Motion for Partial Summary Judgment ("HPOPS Ex.").

Strategy (the "Enhanced Commodities Strategy"), but also the obligations to (a) select LDBF as the cash vehicle, (b) monitor its ongoing suitability for HPOPS's account, and (c) unilaterally move HPOPS's money to a different fund in the event State Street concluded LDBF was no longer suitable for HPOPS.  HPOPS's expansive reading of State Street's responsibilities under the IMA is flatly contrary to the plain language of the IMA, as well as the undisputed evidence of the parties' discussions and course of conduct.  The IMA says nothing at all about any duty of State Street to select a cash vehicle or any discretion to change it without HPOPS's consent. Instead, the IMA simply obligated State Street to manage the Enhanced Commodities Strategy "consistent with the Objectives," which were defined as "attempt[ing] to outperform" a stated benchmark index.  The evidence of record shows that this objective could be achieved only with a fund like LDBF, which targeted excess investment returns large enough to pay the transaction costs of the commodities swaps and thus outperform the index.

Indeed, before HPOPS decided to invest in the Enhanced Commodities Strategy, State Street informed HPOPS that the objective of LDBF was to provide the excess investment returns or "enhancement" to allow the Enhanced Commodities Strategy to beat the index.  State Street then offered HPOPS the choice of selecting an alternative to LDBF as the cash vehicle for the Enhanced Commodities Strategy, which HPOPS declined.  When LDBF experienced significant investment losses in 2007, HPOPS's own chief investment officer and Board exercised complete control over whether and when to liquidate HPOPS's investment.  Nothing in the language of the IMA or the parties' dealings supports HPOPS's interpretation that State Street had the obligation or discretion to select and later change the cash vehicle in HPOPS's account.

HPOPS's arguments regarding State Street's affirmative defenses are equally unavailing. HPOPS asserts various theories as to why the defenses are barred as a matter of law without regard to the evidence in support of the defenses.  HPOPS's arguments are all legally flawed, as

they are based on either a misreading of Texas law or HPOPS's misinterpretation of the IMA.

HPOPS's motion should thus be denied in its entirety.

## ARGUMENT

**I.    PLAINTIFF'S MOTION FOR AN ADVISORY OPINION REGARDING THE INTERPRETATION OF THE INVESTMENT MANAGEMENT AGREEMENT FAILS AS A MATTER OF LAW**

HPOPS's motion for partial summary judgment regarding the scope of State Street's

responsibilities under the IMA fails for two independent reasons.  First, the motion seeks an

advisory opinion on a single element of one of HPOPS's claims, and not a ruling that would be

dispositive of any claim.  This is not a proper use of summary judgment under Rule 56, and for

that reason alone HPOPS's motion for partial summary judgment should be denied.  Second,

even were the Court to reach and decide the issue, HPOPS's interpretation of the IMA is plainly

incorrect:  the contract language does not confer upon State Street the broad discretion outlined

by HPOPS, and the parties' correspondence and conduct clearly demonstrate that only HPOPS

had authority over the selection and retention of LDBF as the cash vehicle for HPOPS's

investment in the Enhanced Commodities Strategy.

**A.    HPOPS Improperly Seeks an Advisory Opinion  On The Meaning Of The IMA That Will Not Be Dispositive of Any Claim In The Case**

It is well settled that "it is not appropriate to use summary judgment as a vehicle for

fragmented adjudication of non-determinative issues."[3]  *SEC v. Thrasher*, 152 F. Supp. 2d 291,

295 (S.D.N.Y. 2001); *Barry v. Liddle, O'Connor, Finkelstein & Robinson*, 1997 WL 736725, at

*1 (S.D.N.Y. Nov. 25, 1997).  Yet in its motion, HPOPS asks the Court to interpret a single

---

[3] Although the language of Rule 56(a) states that "[a] party claiming relief may move . . . for summary judgment on *all or part* of the claim" (emphasis added), courts have consistently held that Rule 56 "do[es] not permit the piecemealing of a single claim."  *Arado v. Gen. Fire Extinguisher Corp.*, 626 F. Supp. 506, 509 (N.D. Ill. 1985) (*cited in Thrasher*, 152 F. Supp. 2d at 296-97) ("[D]espite Rule 56(a)'s reference to 'all or any part' of a claim, the Rule authorizes only the granting of appealable 'judgments' disposing of entire claims.").

contractual provision without seeking judgment on any of the claims in its complaint.  Indeed, HPOPS expressly states that in its "Motion, HPOPS is not asking the Court to rule that State Street failed to prudently exercise its discretion – just that State Street (not HPOPS) was the entity that, under the IMA, was charged with exercising its discretion."  Pl's Br. at 5 n.2.  The requested ruling would not resolve HPOPS's breach of contract claim, or any other claims in its complaint.[4]

Summary judgment may not be used as a vehicle to resolve mere elements of a claim, such as the scope of duties under a contract.  In *SEC v. Thrasher*, 152 F. Supp. 2d at 295-96, the SEC sought partial summary judgment on elements of claims it had asserted – including the scope of the duties of one of the defendants.  Stating that "[t]he plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues," the court held that the motion for partial summary judgment was not proper.  *Id.* at 295-96 (*citing U.S. v. Am. Int'l Group, Inc.*, No. 94 Civ. 7621 (LMM), 1997 WL 66786, at *2-3 (S.D.N.Y. Feb. 14, 1997) (holding that a ruling on a non-dispositive issue would be 'inappropriate')); *see also Melini v. 71st Lexington Corp.*, No. 07 Civ. 701(JCF), 2009 WL 413608, at *3-4 (S.D.N.Y. Feb. 13, 2009) (same).[5]

---

[4] HPOPS's complaint asserts seven causes of action: (1) breach of fiduciary duty; (2) breach of contract; (3) common law fraud – fraudulent misrepresentation and fraudulent inducement; (4) common law fraud – fraud by non-disclosure; (5) negligent and grossly negligent misrepresentation; (6) violation of the Texas Securities Act; and (7) conspiracy.  HPOPS Ex. 1, Compl. ¶¶ 71-116.

[5]   *See also St. Barnabas Hosp. v. Amisys, LLC*, No. 04 Civ. 2778(KMW), 2007 WL 747805, at *8 (S.D.N.Y. Mar. 9, 2007) (rejecting motion for partial summary judgment where third-party plaintiff sought a ruling that would not resolve a claim) (citing *Thrasher*, 152 F. Supp. 2d at 295)); *Goodrich v. Gonzalez*, 451 F. Supp. 747, 749 (E.D.N.Y. 1978) (rejecting plaintiffs' request for "a ruling by the court that the auxiliary police officers acted under color of law" because such a ruling "would not at this time be conclusive of any claim asserted by plaintiffs," and that doing so "would contravene the policy of the courts of this Circuit to refrain from entertaining, under Rule 56, motions which seek the determination of issues 'which are not

HPOPS's invocation of Rule 56(d), which permits a court to specify which facts are genuinely at issue for trial in the event that summary judgment is not rendered on the whole action, is similarly unavailing. Rule 56(d) does not permit a party to single out an issue of fact or law and seek the court's advice without actually moving for judgment on at least one of the particular claims of the case. *See Thrasher*, 152 F. Supp. 2d at 296-97 (Rule 56(d) does not provide a mechanism for litigants to request that the court issue orders narrowing trial issues without also moving for judgment on "an entire claim at a minimum") (citation omitted); *Warner v. U.S.*, 698 F. Supp. 877, 879 (S.D. Fla. 1988) ("Rule 56(d) [may not] be used to single out limited issues on which the court's advice may be obtained.") (citations omitted); *Evergreen Int'l, S.A. v. Marinex Constr. Co., Inc.*, 477 F. Supp. 2d 697, 699 (D.S.C. 2007) (plaintiff may not seek partial summary judgment under Rule 56(d) without attempting to dispose of any particular claim in its entirety). Because HPOPS's motion for partial summary judgment would not resolve any of the claims in the complaint but seeks only a "fragmented adjudication of non-determinative issues," *Thrasher*, 152 F. Supp. 2d at 295, the motion must be denied.

### B.   HPOPS Misinterprets The Language of the IMA, Which Does Not Require That State Street Select, Assess the Suitability of, or Move the Funds for the Enhanced Commodities Strategy

Apart from the fatal defect in its request for an advisory opinion, HPOPS's motion should also be denied because its proposed interpretation of the IMA is incorrect as a matter of law. The plain language of the IMA does not support HPOPS's argument that State Street had a contractual obligation to select the cash vehicle for HPOPS's Enhanced Commodities Strategy, much less to assess or monitor its suitability for HPOPS's goals. Moreover, the evidence of the parties' dealings both before and after execution of the IMA belies HPOPS's assertions that State

---

dispositive of any claim or part thereof'") (quoting *Yale Transp. Corp. v. Yellow Truck & Coach Mfg. Co.*, 3 F.R.D. 440, 441 (S.D.N.Y. 1944) (citing cases))).

Street assumed responsibility for selecting the cash vehicle or determining whether and when to move HPOPS's funds out of LDBF. To the contrary, the evidence of record shows that HPOPS selected LDBF in order to seek to earn excess returns in an "Enhanced" Commodities Strategy, and that it was HPOPS which retained the discretion to determine if and when its investment in LDBF should be changed or liquidated.

       **1.**      **The IMA's Plain Language Does Not Obligate State Street To Select or Change the Cash Vehicle for the "Enhanced" Commodities Strategy**

Contrary to HPOPS's assertions, the IMA says nothing about a duty imposed on State Street to select the cash vehicle to earn excess returns for the "Enhanced" Commodities Strategy, or to change that vehicle at its discretion. Rather, Paragraph 5 of the IMA provides as follows:

> 5. <u>Duties and Powers of Manager</u>: Subject to the terms and conditions of this Agreement, the Code of Ethics, and in accordance with the investment guidelines established by the Trustees (as set forth in the Statement of Policy Guidelines and Investment Objectives of the Fund (the "Policy"), which is attached hereto as <u>Exhibit E</u> and made a part hereof, as may be hereafter amended as herein provided), Manager [State Street] shall have full and absolute discretionary power to manage all assets held in the Account consistent with the Objectives, including the authority to purchase, sell, cover open positions, and generally to deal in securities, financial and commodity futures contracts, options, short-term investment vehicles and other property comprising or relating to the Account.

IMA, attached as Exhibit 11 to HPOPS's Appendix in Support of its Motion for Partial Summary Judgment ("HPOPS Ex."). HPOPS focuses on the phrase "full and absolute discretionary power to manage all assets held in the Account" without considering the remainder of either Paragraph 5 or the IMA. First, Paragraph 5 expressly limits State Street's authority to actions that are "consistent with the Objectives" – yet HPOPS completely glosses over this limitation. The "Objective" of the "Enhanced Dow Jones-AIG Commodities Futures Strategy" is defined in the First Amendment to the IMA (the "Amendment"): "to attempt to outperform the performance of the Dow Jones-AIG Commodities Index (the 'Index')." HPOPS Ex. 13 at 1. Following the definition of the "Objective," the Amendment goes on to say that, "[f]or the avoidance of doubt,"

the IMA is amended to include "the Enhanced Dow Jones-AIG Commodities Futures Strategy (the 'Commodities Strategy.')."  HPOPS Ex. 13 at 2.  State Street's mandate was thus to "attempt to outperform" the Commodities Index by managing an identified "Enhanced . . . Commodities Futures Strategy."  Nowhere was State Street delegated the unfettered discretion for choosing HPOPS's investments or strategies.

By contrast, the IMA language that *does* address selection and monitoring of the investments for suitability maintains these responsibilities within HPOPS, not State Street. HPOPS's Investment Policy, which was explicitly incorporated by reference in the IMA as Exhibit E, provides that HPOPS's Board of Trustees shall "[s]elect appropriate investment options" for HPOPS and "[m]onitor performance to assure that objectives are being met and that policy and guidelines are being followed."  HPOPS Ex. 11 at IMA at Investment Policy, Exhibit E, §§ 400.01(B), (F).  The Investment Policy also states that it is the HPOPS Trustees who bear "ultimate responsibility for [HPOPS] and the appropriateness of its investment policy and its execution."  HPOPS Ex. 11 at IMA Exhibit E § 413.01(A).  Nowhere does the IMA purport to delegate these responsibilities to State Street.  HPOPS's reading of the "full and absolute discretionary power" language in Paragraph 5 would render these other provisions of the contract meaningless – contrary to the most basic tenets of contract construction.  *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) (holding that courts must consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless); *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 132 (Tex. App. 2000) (no single provision of a contract will be controlling) (internal citations omitted).

HPOPS's interpretation of the IMA places undue emphasis on State Street's "discretionary power," ignoring the fact that such discretion is expressly "subject to" the

confines of "attempt[ing] to outperform" the Commodities Index, which effectively required

State Street to utilize LDBF or a bond fund with comparable risk/return characteristics as the

cash vehicle that had to provide the "enhanced" returns.  Indeed, State Street's presentation to

HPOPS in August 2005 explained that the Strategy would incur 50-60 basis points of costs and

fees associated with the swaps and futures transactions used to gain exposure to the Commodities

Index.  *See* HPOPS Ex. 6 at SS007937446.  In order for the Enhanced Commodities Strategy to

be "Enhanced" and "outperform" the benchmark, the cash component of the strategy had to earn

excess returns over LIBOR (the risk-free cash rate) greater than the 50-60 basis points of costs

and fees.  As disclosed in State Street's August 2005 presentation to HPOPS, the role of the cash

vehicle was to attempt to earn excess returns of up to 70 basis points — more than 35% above

LIBOR.[6]  HPOPS Ex. 6 at SS007937446, SS007937437.  It was, therefore, inherent in the design

of the Enhanced Commodities Strategy that the cash vehicle attempt to earn excess or

"enhanced" returns.

Not only did State Street explain that the cash vehicle would need to generate 50-70 basis

points of excess returns in order for the Strategy to be "enhanced" and outperform the

benchmark, but Patrick Franey, HPOPS's Chief Investment Officer, and the HPOPS Board also

clearly understood that concept, as evidenced by Mr. Franey's presentation to the HPOPS Board

in September, 2005.  HPOPS Ex. 3B.[7]  In that presentation, Mr. Franey explained that the asset

manager would attempt to outperform the commodities index through cash management

---

[6] At the time of State Street's presentation to HPOPS in August, 2007, the annual return of the JP Morgan 1-Month US Dollar LIBOR Index was 1.43%; thus, a return of 50 bps over LIBOR represented 35% of excess return over the benchmark.  *See* Expert Witness Report of Dr. Andrew Carron submitted on behalf of State Street at 13 (attached herewith as Exhibit 1 to the Declaration of Harvey J. Wolkoff).

[7] HPOPS Exs. 3A, 3B, 3C and 3D are also attached as exhibits to the Affidavit of Patrick Franey, which appears as HPOPS Ex. 3 to Plaintiff Houston Police Officers' Pension System's Appendix in Support of Memorandum in Support of Its Motion for Partial Summary Judgment.

techniques, and "provide excess return above the index to cover the futures or swap fees."

HPOPS Ex. 3B at 3-4.  In November 2007, following the losses in LDBF, Mr. Franey again

explained to the HPOPS Board that the use of an enhanced cash vehicle had been necessary to

"outperform" the Commodities Index, recognizing that "[w]ithout the enhanced cash component

of the strategy, the structure of the strategy would consistently underperform the commodities

index by an amount approximating the total of the annual fees and expenses."  *See* Exhibit 2 to

the Declaration of Harvey J. Wolkoff, attached herewith ("Wolkoff Decl."), at 1.

The IMA's mandate that State Street "attempt to outperform" the Commodities Index

required State Street to invest the cash in an "enhanced cash" fund that would earn at least 50-70

basis points over LIBOR.  During the period between 2005 and 2007, the fixed-income market

provided extremely limited opportunities to achieve such a return, which represented a

significant premium (35%) over the prevailing LIBOR rate at the time.  In fact, HPOPS's own

expert, Lawrence Weiner, acknowledged that, given the market conditions in 2007, an asset

manager desiring to achieve 50 basis points over LIBOR in a fixed-income fund with an average

rating of AA or higher (like LDBF's) had no option other than to concentrate heavily in

subprime mortgage-backed securities, or to use other potentially risk-increasing methods like

leverage, to generate the necessary returns.  *See* Wolkoff Decl. Ex. 3, Weiner Depo. Tr. at

224:24–225:20.

The "full and absolute discretionary power" in Paragraph 5 of the IMA was thus limited

by the "Objective" to provide "enhanced" returns and thus attempt to beat the benchmark, and

cannot be interpreted to delegate to State Street unilateral discretion to, as HPOPS contends,

move HPOPs' funds into a money market fund that would not have met the "Objective."

2. **State Street's Disclosures About the Enhanced Commodities Strategy Stated That LDBF Would be Used as the Cash Vehicle, But That HPOPS Could Choose an Alternative – Which HPOPS Did Not Do**

HPOPS's interpretation of State Street's obligations under the IMA is also directly contradicted by State Street's disclosures to HPOPS prior to the execution of the IMA.  In particular, State Street's pre-contractual disclosures indicate that State Street told HPOPS that it intended to invest the cash in LDBF, a fund heavily concentrated in ABS, but that HPOPS – not State Street – had the choice to select a different cash vehicle if it wanted.  Such pre-investment disclosures may be considered by the Court where the parties' prior communications will aid the Court in interpreting particular terms or how they should be applied to a specific situation.[8] *Texas Utilities Fuel Co. v. First Nat'l Bank in Dallas*, 615 S.W.2d 309, 312 (Tex. App. 1981) ("[I]t is well settled that extrinsic evidence is admissible for the purpose of applying the contract to its subject matter even though the contract is unambiguous.") (citing *Murphy v. Dilworth*, 151 S.W.2d 1004, 1005 (Tex. 1941); *Cook Composites,* 15 S.W.3d at 132 (courts are "free to examine prior negotiations and all other relevant incidents bearing on the intent of the parties" and may consider surrounding circumstances "to assist [the court] in understanding the object and purpose of the contractual language the parties chose.")).  In order to determine the parties' objective intent, the "court may utilize extrinsic evidence of the facts and circumstances surrounding the making of the agreement to interpret the contract in light of the parties' true

---

[8] Extrinsic evidence may also be considered by the court in determining whether or not a contract is ambiguous, regardless of what the court ultimately concludes.  The determination of whether the terms of a contract are ambiguous is a "question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker*, 650 S.W.2d at 394.  To the extent the Court determines that any portion of the IMA is ambiguous on its face, therefore, extrinsic evidence would be admissible to prove the intentions of the parties with respect to the meaning of certain terms and provisions.  *Cook Composites*, 15 S.W.3d at 131.

intentions." *Aurora Natural Gas L.L.C. v. Continental Natural Gas, Inc.*, 98-cv-1348, 1999 WL304561 at \*19 (N.D. Tex. May 10, 1999).

State Street's August 2005 presentation disclosed that LDBF was 76% concentrated in asset-backed securities ("ABS"), and would be used as the cash vehicle to make the commodities strategy "enhanced" by attempting to earn excess returns of up to 70 basis points.  HPOPS Ex. 6 at SS007937440, SS007937446.  In November 2005, Donna Watkins, a Relationship Manager at State Street, emailed HPOPS's Chief Investment Officer, Patrick Franey, with the subject line "HPOPS: Investment Guideline Review Requested,"  explaining that "[t]he cash would be invested in the Limited Duration Bond Fund.  (*You can choose a different cash vehicle if you wish*.)."  HPOPS Ex. 7 at 1 (emphasis added).  The fact sheet for the Enhanced Commodities Strategy, which HPOPS references in its brief at p. 10 n.5, confirms that "[t]he cash collateral is invested in the Limited Duration Bond Strategy," but also highlights as a "Key Feature" that the Strategy offers a "[c]hoice of cash collateral vehicle."  HPOPS Ex. 8 at SS006334562.  Mr. Franey was, therefore, explicitly told that State Street would use LDBF as the cash vehicle for HPOPS's separately managed Enhanced Commodities Strategy account, and HPOPS was also given the option of choosing a different cash vehicle if it wanted one.  Mr. Franey never exercised that option.

Furthermore, § 407.02 of HPOPS's Investment Policy provides that investment managers "must adhere to their professed investment styles at all times."  HPOPS Ex. 11 at IMA Exhibit E § 407.02.  State Street's "professed investment style" from the outset was that the Enhanced Commodities Strategy would invest its cash in LDBF, HPOPS Ex. 6, State Street's August 2005 Presentation, at SS007937437, and that the "investment style" of LDBF was to concentrate heavily in a single sector, ABS (76% as of June 30, 2005).  *Id.* at SS007937440.  Mr. Franey testified during his deposition that he understood before investing that LDBF would be the cash

vehicle.  He also testified that he was aware that the "ABS" category included securities backed by subprime mortgages and other forms of consumer debt such as bonds collateralized by credit card receivables and student loans.[9]

State Streets' pre-investment disclosures, therefore, indicated that LDBF would be used as the cash vehicle for the Enhanced Commodities Strategy, but that HPOPS could choose otherwise – which HPOPS indisputably did not do.

### 3. The Parties' Subsequent Conduct Demonstrates That State Street Did Not Have Discretion To Move HPOPS Out Of LDBF

The parties' conduct following execution of the IMA further illustrates that neither side believed State Street had discretion to unilaterally redeem HPOPS out of LDBF.  *See* Second Restatement of Contracts, § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").  The record contains no evidence that HPOPS objected or complained during the relevant time frame that State Street had not redeemed HPOPS out of LDBF in 2007.  To the contrary, State Street repeatedly provided HPOPS's Chief Investment Officer, Mr. Franey, with information about LDBF's poor performance due to subprime exposure, and made suggestions that HPOPS redeem.  In response,

---

[9] Wolkoff Decl. Ex. 4, Franey Depo. Tr. at 154:2–5 ("Q: Mr. Franey, you knew that asset-backed securities included residential mortgage loans, subprime, home equity loans?
A: They can include that, yes, sir."); *Id.* at 36:12-21 (" Q: And you -- you've known for sometime that asset-backed securities include first lien mortgages, subprime borrowers, second lien mortgages to prime and subprime borrowers, home equity lines of credit; isn't that right, sir?

A: My understanding is that asset-backed securities would include credit cards -- for example, credit card receivables, student loans, floor plans, et cetera. And while -- mortgage-backed securities generically could be called asset-backed securities.").  None of HPOPS's putative expert witnesses, however, have offered an opinion in their reports that LDBF would have performed any better had it invested proportionally among such other ABS subsectors as credit cards, or student or auto loans.

Mr. Franey repeatedly asked for additional material in an effort "to obtain enough information to make [a] decision" about whether to remain invested in LDBF.[10]  Nothing in Mr. Franey's actions even begins to suggest that the decision was State Street's to make.

In its brief, HPOPS highlights an e-mail exchange between Craig DeGiacomo and John Tucker (both State Street employees) on August 3, 2007, suggesting internal discussion at State Street about whether it would be possible to move HPOPS out of LDBF.  Pl's Br. at 17-18; HPOPS Ex. 39.  HPOPS uses this document to suggest that State Street had unilateral authority to redeem HPOPS out of LDBF.  What HPOPS omits is that, on the same day as that e-mail exchange – August 3, 2007 –  Mr. DeGiacomo called Mr. Franey of HPOPS and left him a voice message asking whether HPOPS wished to move its cash out of LDBF.  Wolkoff Decl. Ex. 5, email attaching transcription of voicemail ("[I]f you wish to move out of the limited duration bond fund, we can talk to you about moving into another cash vehicle, Libor Plus.").  The clear inference is that Mr. DeGiacomo and State Street believed that only HPOPS could make a decision to redeem from LDBF.

---

[10]  Mr. Franey's deposition testimony makes clear that he understood in the summer of 2007 that the decision regarding liquidating the LDBF investment was HPOPS's to make.  Wolkoff Decl. Ex. 4, Franey Depo. Tr. at 379:3–7:

> Q  So I take it that you were still debating [as of August 28, 2007] whether to stay in the Limited Duration Bond Fund; is that right?
>
> A  We were trying to obtain enough information to make that decision.

Wolkoff Decl. Ex. 4, Franey Depo. Tr. at 327:1–10:

> Q  Did you, sir, on behalf of HPOPS ask to redeem out of LDBF after you had learned about the subprime and the 3.3 times leverage?
>
> A  I did not have authority to do that by myself,  sir.
>
> Q  Did you -- did you ask anybody for authority to do that?
>
> A  We did not ask for authority to do so because we still had insufficient information to make the judgment that we needed to make.

Indeed, on August 2, 8 and 9, 2007, State Street provided Mr. Franey additional information about client redemptions from LDBF, the amount of subprime exposure in LDBF, and the sale of certain bonds from the fund.[11]  The record indicates not only that Mr. Franey received and read these messages, but that he immediately began contacting third parties for advice about whether and how to effect a redemption out of LDBF.  For example, on August 8, 2007, Mr. Franey emailed Rick Ballsrud, an investment advisor at Northern Trust, informing him that: "Apparently a significant number of clients are liquidating [from LDBF].  I cannot say I understand the options they are offering.  Sounds like he who moves last gets hurt the most."  Wolkoff Decl. Ex. 6.  A few days later, Mr. Franey again wrote to Mr. Ballsrud, informing him: "I have shopped the [State Street] bond portfolio around [to other asset managers] and have consistent advice.  Sell all and invest the proceeds with us."  Wolkoff Decl. Ex. 7.

In a communication with another asset manager on August 9, 2007, Mr. Franey asked a representative of Shenkman Capital for "assistance in getting out of this investment as quickly as possible."  Wolkoff Depo. Ex. 8.  Handwritten notes from another HPOPS investment advisor, Jerry Woodham of Hammond Associates, also indicate that on August 9, Mr. Franey stated that John Lawson, the Executive Director of HPOPS, wanted the assets taken in-kind from State Street and transferred to another manager.  Wolkoff Decl. Ex. 9 at HAMMOND00003; *see also* Wolkoff Decl. Ex. 10, Woodham Depo. Tr. at 86:11–14 ("Q: Is that what Mr. Franey told you; that John Lawson wanted to take the assets out of the State Street fund and go to another manager?  A: Yes.").  And in an e-mail to yet another third-party asset manager, Blackrock, on August 13, 2007, Mr. Franey sought advice on how to best manage HPOPS's position in LDBF, explaining: "I want a proposal on how to salvage this (i.e. hold to maturity, dump it, manage it,

---

[11] For a full description of the information Franey received from State Street on August 2, 8 and 9, 2010, *See* State Street's R. 56.1 Stmt. in Support of Defendant's Motion for Summary Judgment ¶¶ 50-56.

and if so, why, and what you plan to do)." Wolkoff Decl. Ex. 11. HPOPS obviously would not have "shopped" the LDBF bond portfolio to other asset managers or sought advice on whether to sell it if it believed that State Street, in its "absolute discretionary power," could redeem HPOPS out of LDBF at any moment. In fact, there is no contemporaneous reference anywhere to State Street's purportedly having that power.

Finally, in a memorandum to the HPOPS Board that Mr. Franey forwarded to his superior, John Lawson, on August 28, 2007, Mr. Franey explained that HPOPS had three options: (1) stay in the Strategy under its current structure, (2) stay in the strategy but alter its current structure, or (3) liquidation. Wolkoff Decl. Ex. 12 at 2. Under the heading "Liquidation," Mr. Franey wrote: "We could instruct SSGA to terminate the swaps and distribute the cash to us that is derived from the sale of the remaining securities in the bond fund." *Id*. Mr. Franey's memo confirms that it was HPOPS's responsibility to instruct State Street to terminate its holdings in LDBF.

Indeed, HPOPS's current theory that State Street had the discretion and obligation to move HPOPS out of LDBF only surfaced in the complaint in this action – and if the Court reaches this issue, the Court should reject this newfound theory as contrary to the plain meaning of the contract and the undisputed evidence reflecting the meaning of its terms.

## II.   STATE STREET'S AFFIRMATIVE DEFENSES ARE VALID UNDER APPLICABLE TEXAS LAW

HPOPS moves the Court to dismiss seven of State Street's affirmative defenses, which are based on the following theories: plaintiff's own conduct (second); unclean hands and *in pari delicto* (third); plaintiff's own negligence (fourth); proportionate responsibility (fifth); assumption of the risk (eighth); ratification, waiver, laches and estoppel (ninth); and failure to mitigate damages (eleventh). Before responding to the legal theories asserted by HPOPS for

their dismissal, State Street will summarize the bases for these defenses under the law of Texas and the record facts of this case.

As set forth in more detail in State Street's motion for summary judgment, both prior to and during the course of its investment with State Street, HPOPS took several actions that render it at least in part legally responsible for its investment losses.  HPOPS itself selected the Enhanced Commodities Strategy in 2005, including its cash investment in a fund, LDBF, that sought excess returns by concentrating heavily in asset backed securities, declining State Street's invitation to select a separate cash fund if it so desired.  In the summer of 2007, when State Street warned HPOPS that the fund was facing the prospect of a dire market downturn due to its substantial exposure to asset backed securities collateralized by subprime mortgages, HPOPS evaluated whether it should redeem, but instead consciously decided to remain in the fund.  Prior to making that decision, however, HPOPS expressed a desire to redeem immediately, made preliminary redemption plans with several advisors, sought estimates of the value of its holdings, and even marketed its portfolio to a number of other managers.  Ultimately, HPOPS rebuffed State Street's warnings and recommendations that it redeem from the fund and that others were redeeming, and in so doing substantially magnified its investment losses.

This record supports State Street's <u>mitigation</u> defense, as "[t]he rule has ever been in Texas that no recovery may be had for losses or damages, whether from tort or breach of contract, which might have been prevented, or the consequences avoided by reasonable efforts or expenditures by the person damaged." *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231, 232 (Tex. 1936) (internal quotation omitted).  These facts also support State Street's defense of <u>ratification</u>, which requires: "(1) the full knowledge of a fraudulent act; and (2) the intentional waiver or ratification of the act."  *Williams v. City of Midland*, 932 S.W. 2d 679, 685 (Tex. App. 1996). While State Street denies making any fraudulent misrepresentations to HPOPS, HPOPS

indisputably was fully apprised of LDBF's characteristics by mid-August 2007, but elected not to redeem out of the fund, thereby ratifying State Street's conduct that it now attacks.

State Street's defenses of plaintiff's own conduct (second); plaintiff's own negligence (fourth), proportionate responsibility (fifth), and assumption of the risk (eighth) are all authorized by the Texas Proportionate Responsibility Statute, codified as Chapter 33 of the Texas Civil Practice and Remedies Code ("Chapter 33").  TEX. CIV. PRAC. & REM. CODE ANN. § 33.001. Under the Texas proportionate responsibility statute, in "any cause of action based on tort," *Id.* § 33.002(a)(1), "the court shall reduce the amount of damages to be recovered . . . by a percentage equal to the claimant's percentage of responsibility," *Id.* at § 33.012(a), for "causing or contributing to cause in any way, whether by negligent act or omission, . . . the personal injury, property damage, death, or other harm for which recovery of damages is sought." *Id.* at § 33.011(4).  The factual record here supports State Street's position that HPOPS's own decision to accept the risks inherent in maintaining its LDBF investment by no later than mid-August, 2007 was a substantial contributing cause to its losses.

State Street's defenses of waiver and estoppel (ninth) are also supported by the record, as HPOPS's current contention that State Street alone had the discretion to redeem its LDBF investment is inconsistent with its conduct during the summer of 2007.  State Street asked HPOPS on a number of occasions whether it wanted to redeem its LDBF investment.  In sharp contradiction to its newly conceived notion that it was up to State Street to make a redemption decision, HPOPS took several steps toward liquidating its LDBF investment, such as soliciting quotes for selling HPOPS's proportionate share of the LDBF bonds, and asking a third party advisor for assistance in liquidating the portfolio.  The affirmative defense of "quasi-estoppel," implicated by pleading the affirmative defense of "estoppel," *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App. 1991), "precludes a party from asserting, to

- 17 -

another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (citations omitted). The Texas Supreme Court has defined the elements of waiver as: "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). By taking the steps to redeem its LDBF holdings in August, 2007, HPOPS waived any theoretical right to rely on State Street to make unilateral redemption decisions, and is now estopped from claiming that it did not have the ability to redeem the portfolio itself.

HPOPS's motion does not assert a lack of record evidence to establish the elements of State Street's affirmative defenses. Instead, HPOPS argues that these defenses are barred under principles of Texas law and Federal ERISA law. Each of these arguments misconstrues the applicable legal standards and/or ignores the factual record, and should be rejected by the Court.

### A.   State Street's Defenses Cannot Be Barred By ERISA Principles That Are Inapplicable To HPOPS And Its Claims

HPOPS asserts that "any alleged acts or omissions by HPOPS do not absolve State Street of liability or bar HPOPS from recovering in a breach of fiduciary action," and supports this argument with citations to federal cases arising under the Employee Retirement Income Security Act ("ERISA"). Pl's Br. at 42-44. But HPOPS is concededly not governed by ERISA, which expressly excludes from its coverage state and local government employee benefit plans. *See* Pl's Br. at 7-8. Instead, HPOPS's breach of fiduciary duty claims arise exclusively under Texas common law. HPOPS Ex. 1, Compl. ¶¶ 71-81. While ERISA case law can serve as guidance in some analogous state law contexts, such case law is wholly inapposite where, as here, it is based upon an ERISA-specific principle that has no application to state law claims.

HPOPS seeks to incorporate ERISA principles into this case by asserting that "many of the state law provisions governing HPOPS are analogous to ERISA's statutory provisions," relying primarily on Chapter 802 of the Texas Government Code ("Chapter 802").  Chapter 802 contains certain provisions governing the administration of public pension funds.  HPOPS Ex. 1, Compl. ¶ 12.  But Chapter 802 takes an *opposite* approach from ERISA with respect to the only statutory provision that matters here:  § 409 of ERISA provides a statutory cause of action allowing claims of breach of fiduciary duty to be brought against plan fiduciaries, while no such cause of action exists under Chapter 802 or elsewhere in Texas statutes – requiring HPOPS to bring only common law breach of fiduciary duty claims.  This glaring difference defeats HPOPS's reliance on the ERISA cases in its brief, which base their rulings on ERISA's "integrated" and "comprehensive" remedial provisions.  *See Williams v. Provident Inv. Counsel, Inc.*, 279 F. Supp. 2d 894, 900 (N.D. Ohio 2003) (in context of § 409 ERISA claim); *see also Openshaw v. Cohen, Klingenstein & Marks, Inc.,* 320 F. Supp. 2d 357, 365 (relying on congressional intent and the "language, structure, and purpose of ERISA" in striking affirmative defenses).  This reasoning has no application to Chapter 802, which provides no remedies of any kind, much less a "comprehensive system of procedures for enforcement."  *Provident*, 279 F. Supp. 2d at 900.[12]  In stark contrast to the ERISA cases cited by HPOPS, Texas courts have expressly held that traditional affirmative defenses, including failure to mitigate, may be raised

---

[12] Even if this were an ERISA case, the applicable precedent does not bar defenses or claims based upon the culpable conduct of the plaintiff, as HPOPS asserts.  For example, the Second Circuit recognizes a right of contribution against a breaching fellow fiduciary.  *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16 (2nd Cir. 1993) (concluding that "traditional trust law right to contribution must also be recognized as part of ERISA"); *Haddock v. Nationwide Fin. Svcs. Inc*., 570 F.Supp.2d 355, 360 (D. Conn. 2008) (holding that defendant in ERISA action is not precluded as a matter of law from asserting contribution claim and rejecting plaintiff's arguments Chemung has been overruled); *Agway, Inc. Employees 401(k) Thrift Investment Plan v. Magnuson*, 409 F.Supp.2d 136, 143 n.6 (N.D.N.Y. 2005) ("Indemnity and contribution can be sought in an ERISA action"); *In re Worldcom Inc. ERISA Litigation*, 339 F.Supp.2d 561 (S.D.N.Y. 2004) (noting that right to contribution exists under ERISA).

to defend common law claims for breach of fiduciary duty.  *See First Fed. Sav. & Loan Assoc. of Beaumont v. Stewart Title Co.*, 732 S.W.2d 98, 106 (Tex. App. 1987) (plaintiff claiming breach of fiduciary duty had "duty to use reasonable, customary care and practices in the ordinary course of its business to either mitigate their damages or avoid later damages"); *Fed. Deposit Ins. Corp. v. Niblo*, 821 F. Supp. 441, 452-54 (N.D. Tex.) (denying plaintiff's motion to strike affirmative defenses of failure to mitigate damages and estoppel with respect to plaintiff's claim for breach of fiduciary duty under Texas law).  The ERISA cases relied upon by HPOPS have no bearing here.

> **B.**     **The Texas Proportionate Responsibility Law Authorizes Defenses Based Upon Plaintiff's Own Culpable Conduct**

HPOPS's assertion that State Street may not raise affirmative defenses based on HPOPS's own culpable conduct flies directly in the face of the Texas proportionate responsibility law, codified in Chapter 33 of the Texas Civil Practice and Remedies Code.  "In virtually any cause of action based upon tort asserted under Texas law, Chapter 33 . . . requires the trier of fact to engage in a comparative fault analysis and to determine the 'percentage of responsibility' among various persons who could be held liable for the damages which have been sustained by the plaintiff in the tort action." *In re Sunpoint Securities, Inc.*, 377 B.R. 513, 568 (Bkrtcy.E.D.Tex. 2007).  Chapter 33 applies to "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." TEX. CIV. PRAC. & REM. CODE ANN.§ 33.002(a).  "Unless the claims fall within an express statutory exemption . . . Chapter 33 applies generally to all common-law tort claims and to statutory tort claims that do not include a separate and conflicting

legislative fault-allocation scheme." *Underwriters at Lloyds v. Edmond, Deaton & Stephens Ins. Agency, Inc.*, No. 14-07-00352, 2008 WL 5441225 at *3 (Tex. App. Dec. 30, 2008).[13]

HPOPS asserts six causes of action that are clearly "claims based on tort" that are not expressly exempted from the scope of Chapter 33: breach of fiduciary duty, fraud, fraud by omission, negligent misrepresentation, conspiracy, and violations of the Texas Securities Act. These claims are governed by Chapter 33 and therefore subject to proportionate responsibility defenses. *See JHC Ventures, L.P. v. Fast Trucking*, 94 S.W.3d 762, 773 (Tex. App. 2002) ("As fraud is clearly a claim based on tort, the Texas Proportionate Responsibility Statute applies to [a] fraud claim."); *Isaacs v. Bishop*, 249 S.W.3d 100, 116 -117 (Tex.App.-Texarkana 2008) (rejecting plaintiff's argument "that the trial court erred in reducing his fraud-based damage award by the percentage of his negligence," despite case law that a defendant cannot defeat a fraud claim by asserting that the plaintiff might have discovered the fraud by exercising due care, because such cases "do not address the issue of proportional responsibility, a statutory matter"); *see also* Act of May 18, 1995, 74th Leg., R.S., ch. 136, §1, sec. 33.002, 1995 Tex. Gen. Laws 971 (deleting the intentional torts exception in the 1995 version of Chapter 33) (current version at TEX. CIV. PRAC. REM. CODE ANN. § 33.001); *Underwriters at Lloyds, Inc.*, 2008 WL 5441225 at *3 (holding that Chapter 33 applies to common law tort claims for negligent misrepresentation and breach of fiduciary duty); *Villarreal v. Wells Fargo Brokerage Services, LLC,* 08-258, 2010

---

[13] *See also* III Scott A. Sherman, Texas Tort Reform: The Legislative History at II-121 (1995) ("[W]hat we're trying to do [in section 33.003] is make sure that nobody continues to read this law as being limited to cases of either negligence or product [liability] that cause personal injury, property damage or death. And that as a matter of fact, it applies to all sorts of causes of action other than those specifically excepted.") (quoting witness Shannon Ratcliff before House State Affairs Committee, April 4, 1995)).

WL 1053215 at *9-13, 15 (Tex. App. March 11, 2010) (applying §33.004 to claims for breach of fiduciary duty, common law fraud, and claims under the Texas Securities Act).[14]

### C. Texas Government Code Section 802.203 Does Not Absolve HPOPS of Responsibility For Its Own Conduct Or Bar Affirmative Defenses Based On That Conduct

HPOPS further contends that "Section 802.203 of the Texas Government Code expressly absolves the Trustees, and thus the System, from any and all liability stemming from State Street's acts or omissions."  Pl's Br. at 38.  In particular, HPOPS relies on § 802.203(c), which provides that "[a] trustee is not liable for the acts or omission of an investment manager appointed under Section 802.204, nor is a trustee obligated to invest or otherwise manage any asset of the system subject to management by the investment manager."  *Id.* (citing TEX. GOV'T CODE ANN. § 802.203(c)).  But State Street does not seek to hold HPOPS liable for *State Street's* alleged acts or omissions – rather, HPOPS remains liable for *its own* acts and omissions that contributed to the investment losses.  Indeed, § 802.203 also provides that HPOPS retained fiduciary obligations with respect to the assets managed by State Street:  "In choosing and contracting for professional investment management services *and in continuing the use of an investment manager*, the governing body must act prudently and in the interest of the participants and beneficiaries of the public retirement system."  TEX. GOV'T CODE ANN. § 802.203(b) (emphasis added).  Section 802.206 separately provides that "[t]he governing body of a public

---

[14] Alternatively, State Street may elect at least 60 days prior to trial to designate the HPOPS Trustees or investment professionals as "responsible third parties" whose percentage responsibility should be determined by the trier of fact.  §33.004.  A person designated as a "responsible third party" does not become an actual party to the action, but the defendant's damages may be reduced by the proportional amount of liability assigned to the third party by the jury.  A defendant may designate any alleged joint tortfeasor as a responsible third party, even where the tortfeasor is unknown or outside the court's jurisdiction. *Werner v. KPMG, L.L.P.,* 415 F.Supp.2d 688, 702-04 (S.D.Tex.2006) (citing TEX. CIV. PRAC. & REM. CODE ANN. §33.004).   A defendant may then submit evidence about an RTP's role in the alleged harm and "ask the factfinder to include the RTP in allocating responsibility."  *Id.*

retirement system may at any time and *shall at frequent intervals monitor the investments made by any investment manager for the system. Id.* at § 802.206(a) (emphasis added).  The meaning of these provisions, read together, is clear:  HPOPS is not responsible for an investment manager's actions on a *respondeat superior* or derivative liability theory, but is nonetheless obligated to monitor the investment manager's performance and prudently determine whether the selected investment strategy remains suitable for the plan.  If HPOPS were correct that § 802.203(c) absolved HPOPS of all responsibility, Sections 802.203(b) and 802.206 would be rendered meaningless – an inappropriate reading of the statute.

HPOPS tries to buttress its reading of § 802.203(c) by yet again pointing to the IMA's purported delegation of "full and absolute discretionary power" to State Street.  Pl's Br. at 39.  But HPOPS ignores the other language in the IMA that reserves to HPOPS (as it must by statute) the responsibilities required by §§ 802.203(b) and 802.206(a).  HPOPS's governing Investment Policy, which was expressly incorporated into the IMA, prohibited HPOPS from giving an investment manager broader discretion than management of a specific investment mandate, and made clear that HPOPS itself maintained responsibility for investment policy and asset class decisions.  Thus, under the IMA's Investment Policy, HPOPS is authorized only to grant discretion "with respect to the selection of securities and the timing of investments," HPOPS Ex. 11 at IMA Exhibit E § 407.01, and its Investment Manager only serves as a "fiduciar[y] responsible for specific securities decisions."  *Id.* at IMA Exhibit E § 413.03(B).  The HPOPS Board of Trustees bears "ultimate responsibility for [HPOPS] and the appropriateness of its investment policy and its execution."  HPOPS Ex. 11 at IMA Exhibit E § 413.01(A).  HPOPS's Investment Policy further required HPOPS to review "the manager's investment philosophy and process to identify possible deviations from the stated philosophy to ensure a continuous fit with the System's overall strategy."  HPOPS Ex. 11 at IMA Exhibit E § 408.02.

HPOPS cannot now rely on a selective reading of both Chapter 802 of the Government Code and the IMA to evade the responsibilities that were expressly reserved to it in connection with the LDBF investment.

**D.    The "Governmental Function" Doctrine Is Inapplicable To State Street's Affirmative Defenses**

HPOPS next asserts that because HPOPS performs "governmental functions," State Street may not raise "equitable affirmative defenses" such as ratification, estoppel, waiver, laches, and unclean hands.[15]  Pl's Br. at 44-46.  This argument fails for two independent reasons.  First, the doctrine does not apply to defenses that only diminish the amount of monetary damages recovered by a governmental litigant.  Rather, as is clear from the cases relied upon by HPOPS, the doctrine merely prevents application of equitable defenses that would have a negative effect on how the government carries out its functions.  *See City of White Settlement v. Super Wash, Inc.*, 198 S.W. 3d 770, 775 (Tex. 2006) (rejecting plaintiff's attempt to prevent a city from enforcing its zoning laws, explaining that "a city cannot be estopped from performing its governmental functions"); *Baird v. City of Melissa*, 170 S.W.3d 921, 927 (Tex. App. 2005) (same); *Crain v. Unauthorized Practice of Law Comm. of the Supreme Court of Tex.*, 11 S.W.3d 328, 334 (Tex. App. 1999) (rebuffing a debt collector's resort to a laches defense in response to a State Bar committee's proceedings against him for the unauthorized practice of law).  State Street's affirmative defenses are raised merely to limit HPOPS's recovery of monetary damages, which is not barred by the governmental function doctrine.  *Cf. Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 376-77 (Tex. 2006) ("[W]here the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief, we see no ill befalling the governmental entity or hampering of its governmental functions by allowing

---

[15] HPOPS does not contend that this doctrine bars State Street from arguing that HPOPS failed to mitigate its damages.

adverse parties to assert, as an offset, claims germane to, connected with, and properly defensive to those asserted by the governmental entity.").

Second, the governmental function doctrine does not apply here because HPOPS was not engaged in a "governmental function" with respect to State Street.  Whether an activity constitutes a "governmental function" turns on whether the governmental entity was performing a task expressly "enjoined" upon it by statute.  TEX. CIV. PRAC. & REM. CODE. ANN. § 101.0215(a).[16]  That means an activity is a "governmental function" only where an entity is acting in a manner that is explicitly required by statute.  In contrast, Texas law does not confer immunity on "proprietary functions," or those performed at the discretion of a governmental entity.  *Id.* at 101.0215(b) (defining a "proprietary function" as one that an entity "*may, in its discretion*, perform in the interest of the inhabitants of the municipality") (emphasis added).

HPOPS claims that it "was exercising governmental functions when it hired State Street as its fiduciary Investment Manager." Pl's Br. at 45.  But HPOPS's selection of State Street to manage the Enhanced Commodities Strategy was a proprietary function, because that was an investment decision made within the exercise of its discretion.  The enabling statute for HPOPS does not *require* it to hire investment managers.  Rather, the statute provides that HPOPS "*may employ professional investment managers and advisors to manage, or advise the board regarding the management and investment of, the fund.*" TEX. REV. CIV. STAT. ANN. art. 6243g-4, § 5(c) (emphasis added).  While the HPOPS Board is required by statute to administer the pension fund, the enabling statute expressly confers discretion on the Board with respect to hiring

---

[16] TEX. CIV. PRAC. & REM. CODE. ANN. § 101.0215(a) defines "governmental functions" for purposes of immunity as "those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public . . . .").

investment managers.  HPOPS, therefore, was not "enjoined" by statute to retain State Street or any other investment manager to manage the plan's portfolio.

Other courts have recognized that not all aspects of administering a pension fund can be considered governmental functions.  In *Dallas v. Arnett*, the "governmental function" defense was rejected in a suit involving a Texas public pension fund and the related municipality, with the court holding that "the provision of pension benefits is a proprietary function."  762 S.W.2d 942, 953 (Tex. App. 1988) ("The mere fact that the pension benefits are provided to employees who are carrying out governmental functions is not, however, sufficient to require a finding that provision of these benefits is a governmental function.").  *See also Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 731 (Tex. App. 1994) (City's exercise of "optional" provision of pension fund deemed a non-governmental function); *Muzquiz v. City of San Antonio*, 520 F.2d 993, 998 (5th Cir. 1975) ("[T]he view of the Texas court is that pension funds serve an essentially private function.")

In support of its argument that it was engaged in a "governmental function," HPOPS cites *Williams v. Houston Firemen's Relief and Retirement Fund*, 121 S.W.3d 415, 439 (Tex. App. 2003).  Pl's Br. at 46.  *Williams*, however, is distinguishable from *Arnett* because the statute at issue in *Williams*, which involved credit to a fireman for prior service in another city's fire department, required the plan to perform the task at issue.  *See* 121 S.W.3d at 423, 439.  Here, as in *Arnett*, HPOPS was clearly granted discretion in the selection of asset managers.  Pursuant to TEX. CIV. PRAC. & REM. CODE. ANN. § 101.0215(b), a discretionary task is a "proprietary function" and not subject to immunity.  Thus, the governmental function doctrine that HPOPS relies upon is inapplicable to the proprietary conduct at issue here.

E.     **Texas Law Recognizes a Duty to Mitigate Damages Arising from Alleged Fraud**

HPOPS argues that it was "under no duty to mitigate its damages resulting from State Street's fraudulent conduct."  Pl's Br. at 48.  This is a misstatement of Texas law.  As discussed in State Street's motion for summary judgment, "[t]he rule has ever been in Texas that no recovery may be had for losses or damages, whether from tort or breach of contract, which might have been prevented, or the consequences avoided by reasonable efforts or expenditures by the person damaged." *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231, 232 (Tex. 1936) (internal quotation marks omitted).  The Texas Supreme Court has consistently applied the common law duty to mitigate damages in cases involving claims of fraud.  *See, e.g., Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (holding in a case involving fraud and misrepresentation that a plaintiff's "recovery of damages is limited not only by his own evidence, but also by the defendant's evidence of the plaintiff's failure to reasonably mitigate losses or evidence of intervening causes"); *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 856-57 (Tex. 1999) (same).

In support of its contention that it had no duty to mitigate fraud-related damages "under well-settled Texas law," HPOPS relies primarily upon irrelevant dicta and vacated holdings. Pl's Br. at 48.  For example, HPOPS relies on the Texas Court of Civil Appeals' statement in *Meadolake Foods, Inc. v. Estes*, 218 S.W.2d 862, 868 (Tex. Civ. App.) ("*Meadolake I*"), that there was no duty to mitigate damages in a fraud case, but the Texas Supreme Court vacated that reasoning in a *per curium* opinion, 219 S.W.2d 441 (Tex. 1949) ("*Meadolake II*"), noting that the defendant's mitigation defense failed not because there was no duty to mitigate fraud damages, but rather because the defendant failed to submit a jury issue regarding the amount of damages

attributable to plaintiff's failure to mitigate.[17]  *Id.* at 441.  In fact, other Texas courts have relied upon the Texas Supreme Court's *Meadolake* opinion to support the proposition that a defendant *can* prove failure to mitigate so as to reduce its damages.  *See, e.g.*, *Thomas v. Callaway*, 251 S.W.2d 921, 926 (Tex. Civ. App. 1952) (citing *Meadolake II)*.

HPOPS also relies upon dicta from *Formosa Plastics Corp., USA v. Kajima Intern., Inc.*, 216 S.W.3d 436 (Tex. App. 2006), which in turn cited the Court of Civil Appeals opinion in *Meadolake I* – the reasoning of which was later vacated in *Meadolake II* – in stating that there "is authority for the proposition that an injured party is not required to minimize damages resulting from fraud." *Formosa,* 216 S.W.3d at 458-59 (internal quotation marks omitted).  *Formosa's* ultimate holding, however, was based on the defendant's "fail[ure] to meet its burden." *Id.*  The passing comment that HPOPS relies upon from *Formosa* is not only contrary to Texas Supreme Court precedent and derived from a vacated opinion, but is inconsistent with the actual holding of the case, indicating that it is not an actual statement of the law.

The third case cited by HPOPS, *Duperier v. Tex. State Bank*, 28 S.W.3d 740, 754 (Tex. App. 2000), states the limited proposition that Texas courts have not found a duty to mitigate claims arising under the Texas Securities Act.  But it has no bearing on HPOPS's common law fraud claims.  Instead, as the Texas Supreme Court has made clear, the long-standing duty to mitigate damages applies to such claims, as it does to all common law torts.

---

[17] Although the Texas Supreme Court in *Meadolake II* upheld the lower court's decision, it did so because the defendant had failed to meet its burden of proof with respect to its affirmative defense of mitigation and expressly based its holding on the correct rule that a defendant may offer evidence to prove that the plaintiff "enhanced the amount of the damage or failed to prevent the injury, as well as the extent to which such damages were enhanced, or to which they might have been lessened by the use of ordinary care on the part of the plaintiff." (internal quotation and citation omitted).  *Meadolake II*, 219 S.W.2d at 441.

**F.   State Street Did Not Have An "Equal Opportunity" to Mitigate HPOPS's Losses**

HPOPS's argument that State Street had an "equal opportunity" to mitigate HPOPS's losses is based primarily on HPOPS's misinterpretation of the parties' IMA.  As discussed above in Section I, the IMA did not give State Street the ability to simply change HPOPS's investment without HPOPS's permission.  Indeed, HPOPS has nowhere identified another cash vehicle that would have met the IMA's proscribed mandate of beating the index.  In any event, State Street gave HPOPS warnings about LDBF's downward spiral, and at least two suggestions that it move its assets from LDBF.   But because only HPOPS could make the decision to redeem, these warnings and suggestions were as much as State Street could offer, and only HPOPS had an opportunity to mitigate its losses by making the actual decision to redeem.

HPOPS relies primarily on *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231 (Tex. 1936) in making its "equal opportunity to mitigate" argument.  Pl's Br. at 47.  *Walker* involved a plaintiff farm manager with no engineering experience, who relied upon the advice of the defendant's expert engineer that the defendant's failure to bury a pipe would not cause any damage. Consistent with the purpose of the mitigation doctrine, *Walker*'s analysis focused on the fact that plaintiff's decision not to mitigate was reasonable in light of the defendant's relative expertise and opinion that no mitigation was necessary.  *Id.* at 232-33.  The opposite scenario is presented in this case, where State Street warned HPOPS about LDBF's composition and dramatic underperformance, and HPOPS ignored the warnings.  Unlike in *Walker*, State Street did what it could to cause HPOPS to prevent additional losses through its recommendations to HPOPS, but only HPOPS was capable of mitigating its losses, which it failed to do.  Where, as here, a sophisticated investor[18] makes the knowing decision to remain in a particular investment, the

---

[18] Mr. Franey is a chartered financial analyst charged with managing a $3.5 billion portfolio for HPOPS.  Wolkoff Decl. Ex. 4, Franey Depo. Tr. at 19:11–13; 38:24–39:3.

investor cannot refuse to take actions to avoid preventable losses, and "thereby speculate on the market entirely at the risk of the [defendant]."  *Saboundijan v. Bank Audi (USA)*, 556 N.Y.S.2d 258, 261 (N.Y.App. Div. 1990).  In *Saboundijan*, the plaintiff was a sophisticated investor in foreign currency exchanges.  *Id.* at 259.  He requested that his broker execute a trade for him, which it failed to do, but offered him an alternative trade that would have still made several thousand dollars in profit.  *Id.* at 260.  Stating that he felt "bullish" and did not want to execute at that price, the investor took no action for a month and the investment lost hundreds of thousands of dollars.  *Id.*  Notwithstanding the court's recognition that the broker owed the plaintiff a fiduciary duty, the court held that the investor  "had a duty to act reasonably and to mitigate any damages" because he had been immediately informed of the broker's failure to execute the transaction and offered an opportunity to cover.  *Id.* at 262.

There is no basis to conclude that State Street had an "equal opportunity" to mitigate HPOPS's losses, nor any basis to bar State Street's mitigation defense as a matter of law.

## **CONCLUSION**

For all the foregoing reasons, State Street respectfully requests that the Court deny

Plaintiff's motion for partial summary judgment.


Dated:  July 2, 2010                              ROPES & GRAY LLP


                                                  By: /s/ Harvey J. Wolkoff
                                                  Harvey J. Wolkoff
                                                  Robert A. Skinner
                                                  Daniel J. Maher
                                                  One International Place
                                                  Boston, MA  02110
                                                  Tel: (617) 951-7000
                                                  Fax: (617) 951-7050
                                                  harvey.wolkoff@ropesgray.com
                                                  robert.skinner@ropesgray.com
                                                  daniel.maher@ropesgray.com

                                                  *Attorneys for Defendant State Street Bank and*
                                                  *Trust Company*

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2010, I caused a true and correct copy of State Street's Opposition to Plaintiff's Motion for Partial Summary Judgment, State Street's Response to Plaintiffs' Local Rule 56.1 Statement of Material Facts in Support of Motion for Partial Summary Judgment, Declaration of Harvey J. Wolkff dated July 2, 2010, and Exhibits to the Declaration of Harvey J. Wolkoff to be served upon the following counsel of record by e-mail.

/s/ Allison M. Boscarine
Allison M. Boscarine

Edwin G. Schallert
Jeremy Klatell
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

Caren S. Sweetland
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

John J. Butts, Esq.
Steven Cherry
Felicia Ellsworth
Kevin Prussia
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109

Lewis R. Clayton
Jonathan Hurwitz
Aliza Balog
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON
1285 Avenue of the Americas
New York, NY  10019-6064

David E. Lurie
Thomas Lent
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109

John R. Nelson
LOCKE LORD BISSELL & LIDDELL LLP
100 Congress, Suite 300
Austin, TX 78701

Robert Burford
BURFORD & MANEY PC
700 Louisiana, Suite 4600
Houston, TX 77002

Thomas J. Dougherty
Peter Simshauser
Michael S. Hines
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts  02108

Steven L. Severson
Justin Krypel
Debbie Ellingboe
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Carolina Torres
Mark Reich
ROBBINS GELLER RUDMAN & DOWD
LLP
58 S. Service Road, Ste. 200
Melville, NY 11747