IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS
INVESTMENT LITIGATION

MDL No. 1945

HOUSTON POLICE OFFICERS' PENSION
SYSTEM,

        Plaintiffs,

v.

No. 08 Civ. 5442 (RJH)

STATE STREET BANK & TRUST
COMPANY and STATE STREET GLOBAL
ADVISORS, INC.,

        Defendants.

# Houston Police Officers' Pension System's Response in Opposition to State Street's Motion for Summary Judgment

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

PRELIMINARY STATEMENT............................................................................................1

STATEMENT OF FACTS...................................................................................................2

I.   The Parties...........................................................................................................2

     A.   HPOPS – A Small Texas Governmental Pension System for the Houston
          Police.........................................................................................................2

     B.   State Street – The World's Leading Manager of Global Indexed Assets. .................3

II.  The Inducement Presentation ...........................................................................4

     A.   In 2005, HPOPS sought to diversify its portfolio by investing in additional
          asset classes such as commodities...........................................................4

     B.   State Street's August 30, 2005 presentation for a "commingled"
          commodities strategy, and State Street's material misrepresentations and
          omissions about the Commodities Strategy and the LDBF from August 30,
          2005 to June 16, 2006 (the "Inducement Facts"). ....................................4

     C.   In September 2005, HPOPS's trustees approved a yet to be negotiated,
          separately managed TIPS and commodity strategy, using the DJ-AIG Index
          and selecting State Street as the asset manager.........................................6

     D.   HPOPS executes the IMA with State Street to invest in the TIPS Strategy in
          December 2005 but does not include commodities in the contract. ........................6

III. HPOPS did not invest in the Commingled Strategy presented in the August 2005
     Inducement Presentation.   Instead, nine months later—and after negotiating an
     amendment to the IMA that described and implemented the Commodities
     Strategy—HPOPS started investing in a separately managed Commodities
     Strategy that gave State Street complete discretion with respect to the selection of
     the cash collateral vehicle..................................................................................7

IV.  As HPOPS's money was being invested in a subprime bond fund (a fact not known
     to HPOPS), the subprime sector deteriorated....................................................9

V.   As the subprime sector completely collapsed (taking the LDBF with it), State
     Street got its own funds and those of its favored clients out of the LDBF and left
     HPOPS's cash in it. .............................................................................................13

VI.  By the time HPOPS learned that its cash had been invested in a subprime bond
     fund, the damage had already been done. And while HPOPS struggled to make the
     best of a horrible situation, State Street—which kept serving as Investment
     Manager—continued breaching fiduciary duties it owed to HPOPS. .................15

i

STANDARDS OF REVIEW .................................................................................................19

I.      Summary Judgment...........................................................................................19

II.     Substantive Law ...............................................................................................20

ARGUMENT .................................................................................................................20

I.      HPOPS has presented sufficient evidence of State Street's fraudulent inducement
        of the First Amendment of the IMA executed June 14, 2006 to at least create a fact
        question. ..........................................................................................................20

        A.      Legal Standard .......................................................................................21

                1.      Fraudulent Inducement by Misrepresentation of Material Fact.................21

                2.      State Street's Fraudulent Omissions and Duties to Disclose ...................21

                3.      HPOPS had no duty to take actions to discover State Street's
                        misrepresentations or discover its omissions...............................22

        B.      The truth regarding HPOPS's investments in the LDBF and Commodities
                Strategy..................................................................................................22

        C.      HPOPS alleges and presents substantial evidence of affirmative material
                misrepresentations to support its fraudulent inducement claims. ..........................23

                1.      The Inducement Presentation was misleading because it failed to
                        disclose material information regarding subprime exposure. .....................23

                2.      The Inducement Presentation is misleading even if subprime
                        securities can only be categorized in the ABS sector.................................26

                3.      The Inducement Presentation misrepresented that the Commodities
                        Strategy and LDBF was not leveraged. ....................................................26

                4.      The Inducement Presentation and other communications falsely
                        portray the aspirational "target" of the LDBF as seeking 50 basis
                        points (bps)..........................................................................27

                5.      State Street made omissions of material fact about the Commodities
                        Strategy and the LDBF during the Inducement Period..............................28

II.     HPOPS has sufficient evidence of State Street's violations of the Texas Securities
        Act........................................................................................................29

        A.      State Street is a "seller" under the TSA....................................................29

        B.      State Street's misrepresentations and omissions were material. ............................30

        C.      State Street sold its Commodities Strategy to HPOPS by means of material
                misrepresentations and omissions. .........................................................31

        D.      State Street is liable for violations of the TSA while acting as HPOPS's
                investment advisor....................................................................................33

III.   State Street is not entitled to summary judgment on its mitigation defense. .....................34

    A.   For the reasons set forth in HPOPS's June 2, 2010 summary judgment motion, State Street's mitigation defense is without merit. ...................................34

    B.   State Street's failure to repudiate the IMA bars it from prevailing on its mitigation defense. ...............................................................................................35

    C.   There is ample evidence in the record to raise a fact issue as to whether HPOPS took reasonable steps to mitigate its damages...........................................36

        1.   Under Texas law, mitigation is inherently fact specific and is focused on the reasonableness of the actions taken in light of what was known at the time. ............................................................................36

        2.   State Street's recitation of the facts concerning what HPOPS allegedly knew is disputed. .........................................................................38

        3.   There is a large volume of evidence proving that in light of what HPOPS in fact knew, it took reasonable steps to mitigate its losses...........38

            a.   State Street's management of the commingled commodities strategy is strong evidence that HPOPS acted reasonably..............39

            b.   The early to middle August time period. ........................................39

            c.   The mitigation window was closed by August 10-13.....................42

            d.   The end-of-August to September time period. ................................42

            e.   The October-to-November time period...............................45

    D.   Assuming, arguendo, that HPOPS had a duty to mitigate and that it failed to do so, there is ample evidence in the record to raise a fact issue regarding the quantum of damages HPOPS allegedly could have avoided by mitigating. ...............................................................................................................47

IV.   State Street is not entitled to summary judgment on its superseding cause defense...........49

    A.   Under Texas law, a plaintiff's own conduct cannot be a superseding cause...........49

    B.   Superseding cause is not a defense to State Street's breaches of its fiduciary duties. .................................................................................................................50

CONCLUSION.............................................................................................................................50

CERTIFICATE OF SERVICE.............................................................................................................52

## TABLE OF AUTHORITIES

**Cases**

*Am. Cas. Co. v. Nordic Leasing, Inc.*,
  42 F.3d 725 (2d Cir. 1994) ................................................................................. 19

*Am. W. Airlines, Inc. v. Tope*,
  935 S.W.2d 908 (Tex. App.—El Paso 1996, no writ)............................................. 37

*Am. Sur. Co. v. Franciscus*,
  127 F.2d 810 (8th Cir. 1942) .............................................................................. 35

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986) ......................................................................................... 38

*Anheuser-Busch Co. v. Summit Coffee Co.*,
  858 S.W.2d 928 (Tex. App.—Dallas 1993, writ denied)............................... 29, 30, 32

*Azar Nut Co. v. Caille*,
  720 S.W.2d 685 (Tex. App.—El Paso 1986), *aff'd*, 734 S.W.2d 667 (Tex. 1987)..................... 37

*Bass v. Janney Montgomery Scott, Inc.*,
  210 F.3d 577 (6th Cir. 2000) .............................................................................. 49

*Benitz v. Gould Group*,
  27 S.W.3d 109 (Tex. App.—San Antonio 2000, no pet.)........................................ 49

*Biaggi v. Patrizio Rest., Inc.*,
  149 S.W.3d 300 (Tex. App.—Dallas 2004, pet. denied)......................................... 50

*Bodovsky v. Texoma Nat'l Bank*,
  584 S.W.2d 868 (Tex. Civ. App.—Dallas 1979, writ ref'd n.r.e.) ........................... 30

*Boston Sea Party Restaurants, Inc. v. Luiggi's of Schaumburg, Inc.*,
  No. 90 C 269, 1990 WL 207442 (N.D. Ill. Dec. 1, 1990) ....................................... 45

*Carruth v. Alien*,
  368 S.W.2d 672 (Tex. Civ. App.—Austin 1963, no writ)........................................ 37

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................... 19

*City of San Antonio v. Guidry*,
  801 S.W.2d 142 (Tex. App.—San Antonio 1990, no writ) ...................................... 37

*City of White Settlement v. Super Wash, Inc.*,
  198 S.W.3d 770 (Tex. 2006)................................................................................ 34

*Cole Chem. & Distrib., Inc. v. Gowing*,
  228 S.W.3d 684 (Tex. App.—Houston [14th Dist.] 2005, no pet.)............................. 37

iv

*Compton Press, Inc. v. Granada Invs., Inc.*,
  Civ. A. No. 91-1256, 1992 WL 566329 (D. N.J. Nov. 23, 1992) .............................................. 50

*Cruthirds v. RCI, Inc.*,
  624 F.2d 632 (5th Cir. 1980) .......................................................................................... 49

*Dallas Ry. & Terminal Co. v. Bailey*,
  250 S.W.2d 379 (Tex. 1952)........................................................................................... 49

*Duperier v. Tex. State Bank*,
  28 S.W.3d at 740 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) ................... 29, 30, 49

*Flowers v. Dempsey-Tegeler & Co.*,
  472 S.W.2d 112 (Tex. 1971)........................................................................................... 32

*Geodyne Energy Income Prod. I-E v. Newton Corp.*,
  97 S.W.3d at 779 (Tex. App.—Dallas 2003), *rev'd in part by* 161 S.W.3d 482 (Tex. 2005)..... 31

*Geotech Energy Corp. v. Gulf States Telecomms. & Info. Sys., Inc.*,
  788 S.W.2d 386 (Tex. App.—Houston [14th Dist.] 1990, no writ) ............................... 36, 37, 47

*Goodman v. Epstein*,
  582 F.2d 388 (7th Cir. 1978) ......................................................................................... 33

*Hall v. Huff*,
  957 S.W.2d 90 (Tex.App.—Texarkana 1997, pet. denied) ...................................................... 36

*Hardison v. Beard*,
  430 S.W.2d 53 (Tex. Civ. App.—Dallas 1968, writ ref'd n.r.e.) ............................................... 36

*Harleson v. E.F. Hutton Group, Inc.*,
  919 F.2d 1014 (5th Cir. 1990) ........................................................................................ 30

*Hasse v. Glazner*,
  62 SW 3d 795 (Tex. 2001) ............................................................................................. 21

*Hill v. Equitable Bank*,
  655 F. Supp. 631, *aff'd*, 851 F.2d 691 (3d Cir. 1988)............................................................. 33

*Hoggett v. Brown*,
  971 S.W.2d 472 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ...................................... 22

*Hygeia Dairy Co. v. Gonzalez*,
  994 S.W.2d 220 (Tex. App.—San Antonio 1999, no pet.)........................................................ 37

*In re Int'l Profit Assocs.*,
  274 S.W.2d 672 (Tex. 2009)........................................................................................... 21

*In re Kellett Aircraft Corp.*,
  186 F.2d 197 (3d Cir. 1950) ........................................................................................... 36

*In re Rezulin Prods. Liab. Litig.*,
  390 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................................ 20

v

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000,*
   257 F. Supp. 2d 717 (S.D.N.Y. 2003) ............................................................................... 20

*Ins. Co. of N.A. v. Morris,*
   981 S.W.2d 667 (Tex. 1986) ............................................................................................ 21

*Ketchikan Pulp Co. v. United States,*
   20 Cl. Ct. 164 (1990) ...................................................................................................... 37

*Knoll Indus. v. Sec. Comm. Life Ins. Co.,*
   802 S.W.2d 650 (Tex. 1990) ............................................................................................ 22

*Moulton v. Alamo Ambulance Serv.,*
   414 S.W.2d 444 (Tex. 1967) ............................................................................................ 36

*Novelty Textile Mills, Inc. v. C.T. E., Inc.,*
   743 F. Supp. 212 (S.D.N.Y. 1990) ................................................................................... 36

*Nye v. Blyth Eastman Dillon & Co., Inc.,*
   588 F.2d 1189 (8th Cir. 1978) ........................................................................................ 38

*Openshaw v. Cohen, Klingenstein & Marks, Inc.,*
   320 F. Supp. 2d 357 (D. Md. 2004) ................................................................................. 50

*Pacesetter Corp. v. Barrickman,*
   885 S.W.2d 256 (Tex. App.—Tyler 1994, no writ) ......................................................... 37

*Pinson v. Red Arrow Freight Lines, Inc.,*
   801 S.W.2d 14 (Tex. App.—Austin 1990, no writ) ......................................................... 36

*Plains Cotton Coop. Assoc. v. Wolf,*
   553 S.W.2d 800 (Tex. App.—Amarillo 1977, writ ref'd n.r.e.) ...................................... 22

*Plotkin v. IP Axess Inc.,*
   407 F.3d 690 (5th Cir. 2005) .......................................................................................... 22

*Pulaski Bank & Trust Co. v. Tex. Am. Bank/Fort Worth,*
   759 S.W.2d 723 (Tex. App.—Dallas 1988, writ denied) .......................................... 37, 43

*R.A. Corbett Transp., Inc. v. Oden,*
   678 S.W.2d 172 (Tex. App.—Tyler 1984, no writ) .................................................. 36, 47

*Riggs v. Riggs,*
   322 S.W.2d 571 (Tex. Civ. App.—Dallas 1959, no writ) ............................................... 49

*Rodriguez v. Moerbe,*
   963 S.W.2d 808 (Tex. App.—San Antonio 1998, pet. denied) ....................................... 49

*Sorbus, Inc. v. UHW Corp.,*
   855 S.W.2d 771 (Tex. App.—El Paso 1993, writ denied) .............................................. 37

*Spoljaric v. Percivol Tours,*
   708 S.W.2d 432 (Tex. 1986) ............................................................................................ 21

*Tex. Capital Secs., Inc. v. Sandefer,*
   58 S.W.2d 760 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) ........................................ 32

*Town E. Ford Sales, Inc. v. Gray,*
   730 S.W.2d 796 (Tex. App.—Dallas 1987, no writ)............................................................ 36, 47

*Trenholm v. Ratcliff,*
   646 S.W.2d 927 (Tex. 1983)......................................................................................................... 22

*United States v. Russell Elec. Co.,*
   250 F. Supp. 2 (S.D.N.Y. 1965).................................................................................................. 35

*Urico v. Parnell Oil Co.,*
   708 F.2d 852 (1st Cir.1983).......................................................................................................... 45

*Valencia v. Shell Oil Co.,*
   147 P.2d 558 (Cal. App. 1944) .................................................................................................... 45

*Van Syckle v. C.L. King & Assoc., Inc.,*
   822 F. Supp. 98 (N.D.N.Y. 1993) ............................................................................................... 38

*Walker v. Salt Flat Water Co.,*
   140 S.W.2d 231 (Tex. 1936)........................................................................................................ 37

*Watts v. Camors,*
   115 U.S. 353, 6 S.Ct. 91 L.Ed. 406 (1885)................................................................................. 35

*Weatherly v. Deloitte & Touche,*
   905 S.W.2d 642 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.) ........................ 35

*Williams v. Provident Inv. Counsel, Inc.,*
   279 F. Supp. 2d 894 (N.D. Ohio 2003) ...................................................................................... 50

*Wilson v. Snider,*
   274 S.W.2d 569 (Tex. Civ. App.—San Antonio 1954, writ ref'd n.r.e.).................................. 38

**Statutes**

TEX. CIV. STAT. ANN. art. 6243g-4, § 3(b)......................................................................................... 2

TEX. REV. CIV. STAT. art. 581-4(A) ................................................................................................... 29

TEX. REV. CIV. STAT. ANN. art. 581-10-1(B) .................................................................................... 32

TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2), (B)

TEX. REV. CIV. STAT. art. 581-33(A)(2)............................................................................................ 29

TEX. REV. CIV. STAT. art. 581-33(B)................................................................................................. 29

TEX. REV. CIV. STAT. art. 581-4(E).................................................................................................... 32

TEX. REV. CIV. STAT. art. 6243g-4 §§ 5(c), 6(a), & 10 .................................................................... 3

**Rules**

FED. R. CIV. P. 56(c).................................................................................................................... 19

**Codes**

TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001, *et seq.* ............................................................... 49

TEX. CIV. PRAC. & REM. CODE §§ 33.003 .................................................................................. 47

TEX. GOV'T CODE ANN. § 802.203(c) ................................................................................... 3, 34

PRELIMINARY STATEMENT[1]

This lawsuit presents unique facts that differentiate it from the remaining cases in the MDL. Unlike the other plaintiffs, HPOPS did not invest directly in State Street's Limited Duration Bond Fund (LDBF), nor did HPOPS invest in a State Street commingled fund that in turn invested in the LDBF. Instead, HPOPS invested in a separately managed strategy to gain exposure to commodities, the "Enhanced DJ-AIG Commodities Strategy" ("Commodities Strategy"). State Street, as HPOPS's fiduciary, agreed to separately manage the Commodities Strategy solely for HPOPS's benefit pursuant to the terms of the Investment Management Agreement as amended on June 16, 2006 (IMA). State Street, as HPOPS's fiduciary, chose the LDBF as a suitable cash collateral fund for the Commodities Strategy, selected the investments that comprised the LDBF, and kept HPOPS invested in the LDBF throughout the 2007 "subprime meltdown," although, unbeknownst to HPOPS, the LDBF was invested almost 100% in subprime residential mortgage backed securities.

State Street tries to conceal its malfeasance by moving for summary judgment on issues where the relevant facts allegedly are limited to the edges of the relevant timeline[2]:

1. First, State Street blames the victim, claiming that, as a matter of law and based on "undisputed" facts, HPOPS failed to take reasonable steps to mitigate damages by mid-August 2007 when State Street allegedly told it of "the nature of the danger of holding the securities" in the LDBF. *See* State Street's Memorandum in Support of Its Motion for Summary Judgment (MSJ) at 2, 13-17.

2. Again, State Street blames HPOPS: State Street claims that, as a matter of law and based upon the same "undisputed facts," HPOPS's failure to move out of the LDBF by mid-August 2007 somehow was a superseding cause of HPOPS's damages because, in effect, it created a "new investment decision," thus breaking the causal link with HPOPS's damages.[3] *See* MSJ at 2, 17-20.

---

[1] Pursuant to Local Rule 56.1, HPOPS submits herewith a Counter-Statement to State Street's Rule 56.1 Statement ("R. 56.1 Opp."). Documents cited in the R. 56.1 Opp. or herein as "Ex. __" are contained in a separately submitted volume of exhibits and are authenticated by the accompanying declaration of Robert R. Burford, dated July 2, 2010.

[2] HPOPS drops its conspiracy claims against State Street Global Advisors, Inc., but continues to assert that State Street is responsible for the acts of State Street Global Advisors, its unincorporated division.

[3] While State Street offers alternative calculations of damages by its expert Dr. Andrew Carron ("Carron"), which purportedly calculate HPOPS's alleged damages for the period through

3. Finally, State Street claims it did no wrong, but only for two claims: State Street claims there is "no evidence" of any fraud to support HPOPS's claim of fraud in the inducement, focusing solely on the period prior to September 15, 2005 (when the HPOPS Trustees allegedly made an "investment decision" to select State Street as an Investment Manager) and claiming that certain alleged misrepresentations were, in fact, true. *See* MSJ at 3, 21-24. State Street glosses over the remaining nine months before the First Amendment to the IMA (concerning the Commodities Strategy) was executed by stating there were no other substantive misrepresentations alleged prior to the execution of the Amendment on June 16, 2006. State Street also fails to recognize that each of the twelve monthly $6 million payments from June 30, 2006 to May 31, 2007 was an actionable sale under the Texas Securities Act.

Numerous legal principles bar application of State Street's affirmative defenses of mitigation and superseding cause. Alternatively, HPOPS has more than raised a fact issue as to whether these fact-intensive defenses have any merit. Likewise, a wealth of evidence in the record proves that State Street fraudulently induced HPOPS.

**STATEMENT OF FACTS**

**I.      The Parties**

*A.      HPOPS – A Small Texas Governmental Pension System for the Houston Police.*

HPOPS is a Texas governmental retirement plan established to provide retirement, death, and disability benefits to active and retired members of the Houston, Texas Police Department and certain of their surviving family members. At all relevant times, HPOPS was governed by a seven-member Board of Trustee ("Trustees")—five current or former police officers (with *no* formal investment training) and one representative from each of the offices of Houston's mayor and treasurer. *See* TEX. CIV. STAT. ANN. art. 6243g-4, § 3(b); *see also* Ex. 2 (Franey Aff. ¶ 2). HPOPS had only two investment professionals on its staff, the Chief Investment Officer Patrick Franey ("Franey") and his assistant. *See* Ex. 2 (Franey Aff. ¶ 2). Before late 2007 and early 2008, when HPOPS was forced to try and sell the illiquid subprime securities that State Street

December 14, 2007, when HPOPS received cash of $14,270,970 and securities allegedly valued at $13,647,974, State Street claims that these calculations prove as a matter of law that HPOPS was fully compensated by a payment of $21.6 million from an SEC-ordered fair settlement fund (1/6 of which was a non-offsetting penalty). There is most certainly a fact issue as to damages because HPOPS offers evidence of damages of more than $35 million, inclusive of interest, attorney's fees, and exemplary damages. *See* Ex. 73 (Bayley Affidavit attaching his January 15, 2007 Report as Exhibit 9 at Sch. H-1) hereinafter cited as "Bay Rpt at ___."

could not sell upon its termination, neither Mr. Franey nor any of HPOPS's small staff had any experience in evaluating, trading, pricing, or managing subprime securities.[4]  Given the small staff of governmental pension systems like HPOPS, the Texas enabling statute authorizes the Trustees to employ professional investment managers to manage fund assets and assume the Trustee's fiduciary obligation to manage such assets.  In turn, the statute expressly relieves the Trustees of their fiduciary liability for that portion of the fund's assets managed by the Investment Manager. *See* TEX. REV. CIV. STAT. art. 6243g-4 §§ 5(c), 6(a), & 10; TEX. GOV'T CODE ANN. § 802.203(c).

**B.      State Street – The World's Leading Manager of Global Indexed Assets.**

State Street, in contrast, is a massive, worldwide investment management firm specializing in institutional investments.  Wolkoff Decl. Ex. 7.[5]  From the outset, State Street represented to HPOPS that it had substantial experience in fixed-income investments globally, with a large, qualified team of professionals devoted to credit research, risk management, cash management, bond credit research, securitized assets, and alternative fixed income. *Id.*  State Street represented that it was the leading manager of Global Indexed Assets in the world with $518.1 billion in Global Fixed Income assets under management. *Id.* at 3.  State Street described itself as having very sophisticated portfolio construction techniques, controlling risks by strict adherence to the characteristics of the Index and continually monitoring holdings for sources of deviation from the Index with a very small predicted tracking error. *Id.* at 5.  HPOPS was impressed by State Street's representations and trusted State Street as having the expertise, people, and systems to assume fiduciary management of HPOPS's assets if it ultimately invested with State Street.[6]

---

[4] Ex. 2 (Franey Aff.) ¶¶ 2, 6.

[5] State Street attached its summary judgment evidence as exhibits to the declaration of Harvey Wolkoff.  HPOPS cites to some of this evidence herein as "Wolkoff Decl. Ex. __."

[6] The reality was far different.  As of February 2006, before the First Amendment to the IMA was executed, State Street was significantly understaffed and lacked the personnel to properly update presentations and Requests for Proposals.  Ex. 122 (Global Fixed Income Business Plan) at SS005078559.  In addition, State Street lacked talent at its portfolio management level, particularly in Boston managed-active products. *Id.*  Many of its systems were completely outdated and insufficient, including *portfolio analytics, accounting, compliance, and operational support. Id.* at

## II.   The Inducement Presentation

### A.   *In 2005, HPOPS sought to diversify its portfolio by investing in additional asset classes such as commodities.*

In March 2005, HPOPS evaluated various asset-allocation scenarios, including an option "to take on more risks" to obtain higher returns.   Wolkoff Decl. Ex. 2.   Contrary to State Street's arguments, this option was expressly rejected.[7]   Instead, another option was selected as part of a plan to diversify the System's holdings, reduce risk, and protect against inflation by adding asset classes even though the expected returns would be *lower*.   *See* HPOPS's Counter-Statement to State Street's Rule 56.1 Statement ("R. 56.1 Opp.") ¶¶ 6, 7.[8]   As the March 2005 HPOPS memorandum entitled "Asset Allocation Considerations" explained:

> We performed a deterministic analysis of our return expectations utilizing an arbitrary 5% allocation to each of these additional asset classes [hedge funds, real estate, commodities, TIPS] by reducing the current allocation to U.S. equity (10%) and international equities (5%) as well as fixed income (5%). The results indicate a modest decrease in expected return accompanied by a dramatic decrease in risk. This would be expected due to the *increased diversification* offered by these additional asset classes and their *lower expected returns*.

Wolkoff Decl. Ex. 2 at HPOPS015888 (emphasis added).[9]

### B.   *State Street's August 30, 2005 presentation for a "commingled" commodities strategy and State Street's material misrepresentations and omissions about the Commodities Strategy and the LDBF from August 30, 2005 to June 16, 2006 (the "Inducement Facts").*

On August 30, 2005, State Street sales representative Eric Roberts sent a presentation to

---

SS005078562. Mike Wands, the head of Fixed Income for North America, admitted that managing even State Street's <u>current</u> business on the platform, much less its plan to triple its assets under management, was extremely risky.  *Id.* at SS005078563.   State Street's Fixed Income showcase product—*the LDBF*—contrary to representations, lacked State-of-the-Art Portfolio Analytics and was manually managed on Excel spreadsheets. *Id.* at SS005078562.

[7] Ex. 123 at 5; Wolkoff Decl. Ex. 2 at 13-15. Also contrary to State Street's MSJ (at 3), HPOPS discussed, and had other ways to achieve, fully funded status, including seeking additional contributions from the City of Houston under the terms of its *current* agreement. Ex. 123 at 4. HPOPS, therefore, was not motivated to take on imprudent risks to achieve fully funded status as claimed by State Street's MSJ. *See also* Rule 56.1 Opp. ¶¶ 6-7.

[8] *See supra* note 1.

[9] The memorandum also discussed that adding new, uncorrelated investment classes (including commodities investments) had the benefit of diversification and thus reduced risk. *See* Wolkoff Decl. Ex. 2 at HPOPS015891.

HPOPS on State Street's TIPS and commodities capabilities ("Inducement Presentation").[10]  State Street presented two options for commingled commodities strategies—the Goldman Sachs Commodity Index Strategy (GSCI) and the Enhanced DJ-AIG Commodities Futures Strategy.[11] State Street represented that its commingled DJ-AIG Commodities Strategy was a unified investment strategy with three indivisible components:  (1) an Enhanced DJ-AIG Total Return Fund with "commodity exposure through index futures, underlying commodity futures and swaps"; (2) investment of cash collateral for the commodities strategy in the Limited Duration Bond Fund (LDBF), which was represented as having a modest aspirational goal of "*seek[ing]* to *match* or exceed the returns of the one-month US Dollar LIBOR Index by 50 bps"; and (3) a State Street Money Market Fund for "margin variation." Wolkoff Decl. Ex. 7 (State Street Presentation, 8/30/2005) at HPOPS004248 (emphasis added).  The Inducement Presentation also represented that the DJ-AIG Commodities Strategy would be an "unleveraged" strategy with all of its "residual cash invested in high quality money market securities or pooled funds." *Id.*

As set forth below, the Inducement Presentation was fraudulently misleading and contained numerous material misrepresentations and omissions.  The presentation failed to reveal, for example, that the LDBF was in reality a subprime mortgage bond fund and had been so since inception and that the LDBF could and would employ leverage.[12] *See* R. 56.1 Opp. ¶¶ 12-19.

---

[10] *See* Wolkoff Decl. Ex. 7 (State Street Presentation, 8/30/2005).

[11] A commingled fund or strategy is a fund consisting of assets invested from several accounts or multiple parties. State Street's commingled funds were managed in a trust that was governed by an Agreement of Trust and established by a Fund Declaration that set forth the parameters of the fund. *See* Wolkoff Decl. Ex. 9.  Conversely, as Texas law requires, HPOPS invested with State Street on a separately managed basis, which required State Street to manage the Commodities Strategy, including its cash collateral component, as a fiduciary solely in HPOPS's interest.  Ex. 10 (IMA) ¶¶ 4-5; Ex. 11 (State Street's Answer) ¶ 16; Wolkoff Decl. Ex. 5.

[12] A complete description of the material misrepresentations and omissions in the Inducement Presentation, as well as subsequent misrepresentations and omissions predating the execution of the First Amendment, are covered *infra* in Part I of the Argument.

**C.     *In September 2005, HPOPS's trustees approved a yet-to-be negotiated, separately managed TIPS and commodities strategy, using the DJ-AIG Index and selecting State Street as the asset manager.***

In a September 2005 memorandum to the HPOPS's Investment Committee, HPOPS's staff evaluated available commodities strategies and made a recommendation that HPOPS use the DJ-AIG Index over the other available commodities indices as the index for the selected manager to replicate in a commodities strategy, not because of the purported difference between cash collateral accounts, but because "[the DJ-AIG Index] has sufficient liquidity and does not have the significant allocation to Energy as does the GSCI." *See* Ex. 6 at HPOPS000898-904. HPOPS's staff recommended using "third party asset managers," like State Street, where "[t]he strategy is implemented by the manager by trading in futures or contracts or entering into swaps on our behalf and *by managing the cash on our behalf.*" *Id.* (emphasis added).

At the September 6, 2005 HPOPS Board of Trustees meeting, the Trustees adopted the staff's recommendation and voted to "use the DG-AIG *index*" for a commodities strategy and to use State Street as the manager for TIPS and commodities.[13]

**D.     *HPOPS executes the IMA with State Street to invest in the TIPS Strategy in December 2005 but does not include commodities in the contract.***

HPOPS decided not to immediately proceed with a commodities investment for the System. Instead, HPOPS initially elected to proceed with only the TIPS Strategy and to wait before negotiating the details regarding, and then executing, a separately managed commodities strategy. *See* Ex. 124 (Email from D. Watkins to G. Kelly, 4/4/2006). Around December 6, 2005, the Trustees for HPOPS and State Street executed the IMA, pursuant to which the Trustees both appointed and retained State Street as Investment Manager for HPOPS with respect to the investment and management of Account Assets. Ex. 10 (IMA). And although HPOPS had neither negotiated nor agreed to the details regarding the commodities piece of the investment management relationship, Exhibit A to the IMA, which identified the Account Assets, noted that

---

[13] Wolkoff Decl. Ex. 49 (Minutes of HPOPS Board Meeting, 9/8/2005) at HPOPS031820 (emphasis added).

HPOPS intended to "place . . . approximately 2.5% of the total plan assets in a separately managed Enhanced Dow Jones-AIG Commodities Futures Strategy." *See id.* For purposes relevant to the First Amendment, which then added the particulars of the separately managed Commodities Strategy, the material provisions of the IMA included:

- State Street agreed to purchase the investment solely for HPOPS's benefit and act as the Investment Manager for HPOPS's separately managed accounts. *Id.* ¶ 1;

- State Street had full and absolute discretion to manage the Account Assets. *Id.* ¶ 5;

- State Street became a fiduciary and assumed control of the Account Assets from the Trustees. *Id.* ¶ 4;

- State Street agreed to manage the assets in accordance with the prudent expert rule. *Id.* ¶ 5(c); and

- State Street agreed to diversify the assets in its control so as to minimize the risk of loss with respect to the Account Assets. *Id.* ¶ 5(g).

**III.    HPOPS did not invest in the Commingled Strategy presented in the August 2005 Inducement Presentation.    Instead, nine months later—and after negotiating an amendment to the IMA that described and implemented the Commodities Strategy— HPOPS started investing in a separately managed Commodities Strategy that gave State Street complete discretion with respect to the selection of the cash collateral vehicle.**

HPOPS could not invest in the State Street *commingled commodities strategy*, as presented in the Inducement Presentation, because the governing documents of the commingled strategy required application of Massachusetts law and did not contain certain required special protections.[14]  The parties, therefore, had to negotiate an investment management agreement for the implementation of a separately managed commodities strategy. Ex. 125 (Email from P. Franey to C. Douglass, 10/28/2005) at HPOPS000163; *see* Ex. 11 (State Street's Answer) ¶ 16.

---

[14] Because HPOPS is a Texas statutory pension plan, Texas law required that any contract between HPOPS and State Street had to contain special provisions. State Street had to expressly agree to be bound by Section 802 of the Texas Government Code and accept the role as a "fiduciary" as defined under the Code for all assets placed under its management and control. TEX. GOV'T CODE ANN. § 802.203(d). State Street thus had to agree to manage HPOPS's separate investment solely for the benefit of HPOPS's beneficiaries and not other parties. Ex. 10 (IMA) ¶ 4.

On June 16, 2006, HPOPS and State Street entered into the First Amendment to the IMA (singularly referred to herein as the "First Amendment"). Wolkoff Decl. Ex. 5. The First Amendment added the parameters and requirements of the separately managed commodities strategy to the Investment Objective referenced in the existing IMA at Exhibit D (which prior to the amendment was focused solely on the TIPS strategy). The First Amendment expressly described the new separately managed commodities investment as follows:

> The strategy seeks to achieve its objective by investing primarily in listed futures, swaps, options and other derivative instruments (the "Investments"). It is expected that an upfront payment will be made in connection with most derivative Investments in order to comply with Texas law. Such upfront payment will be invested in a money market investment offered by the swap counterparty.
>
> . . .
>
> The strategy may invest in money market funds and other cash management funds including, but not limited to, money market mutual funds for which an affiliate of the Manager acts as an investment advisor or other funds for which the Manager serves as investment advisors.

Wolkoff Decl. Ex. 5 (First Amendment to IMA) ¶ 1.

The IMA, as amended, envisioned that HPOPS would invest $6 million into the Commodities Strategy each month from June 30, 2006 to May 31, 2007. Wolkoff Decl. Ex. 5 (1st Am. IMA) ¶ 1; Ex. 10 (IMA) ¶ 11. State Street obtained the $6 million in commodities exposure for HPOPS by investing in swaps, futures, options, or other derivatives on the DJ-AIG Index, another index, or individual commodities.[15] State Street also managed the $6 million in cash collateral deposited each month in the strategy until it was needed in the event of losses in commodities. Wolkoff Ex. 5 (1st Am. IMA) ¶ 1. Under Texas Law, HPOPS was required to maintain 25% of the total commodities exposure with the swap provider in a money market account managed by AIG. *See id.*; *see also* Ex. 12. Therefore, State Street was required to send $1.5 million of each $6 million payment (25%) to AIG for AIG to deposit in a money market account when a swap was entered each month or as renewed. Wolkoff Ex. 5 (1st Am. IMA). As set forth in the above Commodities Strategy objectives, the remaining $4.5 million cash collateral

---

[15] Ex. 157 (December 19, 2005 Email from C. Douglass to J. Tucker with attachments).

was left with State Street to be invested at its discretion in unspecified "*money market funds and other cash management funds*." Wolkoff Decl. Ex. 5 (1st Am. IMA) ¶ 1 (emphasis added); Ex. 10 (IMA) ¶ 5; *see also* R. 56.1 Opp. ¶¶ 24-26.

**IV.    As HPOPS's money was being invested in a subprime bond fund (a fact not known to HPOPS), the subprime sector deteriorated.**

John Tucker, the State Street portfolio manager in charge of HPOPS's Commodities Strategy, blindly "managed" the 75% portion of HPOPS's collateral by investing $4.5 million of each monthly payment in the LDBF and keeping it there until HPOPS's investment in the Commodities Strategy was terminated and liquidated on December 14, 2007. Ex. 119; Wolkoff Decl. Ex. 27. Tucker admitted that he focused no attention on the makeup or management of the LDBF cash fund in which he placed HPOPS's cash collateral in spite of the fact that the IMA obligated State Street, as the Investment Manager, to exercise discretion over the HPOPS's cash collateral investment. Ex. 126 (Tucker Dep., 3/11/09) at 249-51, 298-99; *see also* R. 56.1 Opp. ¶ 26; Exs. 23, 24, 26, 27, 28.

While HPOPS continued investing in the Commodities Strategy from mid-2006 through May 2007, State Street failed to disclose to HPOPS that the percentage of subprime securities in its LDBF cash collateral account—which had always been high—was ever increasing because State Street was relying on subprime securities to generate returns for the fund even as the known risks of loss were increasing. *See* Ex. 30 (Absolute Return Analytics, 6/30/06, 9/30/06, and 1/31/07, reflecting LDBF was 68.5% RMBS in June 2006, 68.5% RMBS in September 2006, and 92.9% RMBS in January 2007); Ex. 56 (reflecting 81.3% RMBS in June 2007); Ex. 35 (reflecting 100% RMBS in August 2007); Ex. 158 (Lindner Ex. 46). State Street also continued to fail to disclose to HPOPS that State Street was using leverage to increase returns in the LDBF and that it was increasing leverage as the subprime market shuddered in early 2007 and crumbled in mid-2007. *See* Ex. 54 (reflecting 3.5*x* leverage as of 6/29/07 and 3.29*x* leverage as of 7/31/2007); Ex.

59. The LDBF's exposure to subprime securities was at least 90% by January 2007. Ex. 30 (reflecting 92.9% RMBS versus 0% ABS in January 2007).

State Street's nondisclosures to HPOPS were made worse by State Street's decision to invest not only in subprime securities, but also complex derivative investments related to those securities—many of which were unrated, involved leverage, and had no ready market (including swaps with a single counterparty). Ex. 24. One of the largest of such investments was known as the BBB-ABX, and in February and March of 2007, the value of LDBF's investment in this risky derivative collapsed dramatically, causing the LDBF to lose 88 basis points—38 basis points more than its represented aspirational profit target. Exs. 24, 41.

On February 28, 2007, Jim Hopkins, a State Street product engineer, prepared a Client at Risk (CAR) Alert.[16]   Ex. 24.   The purpose of the CAR Alert was to warn State Street's relationship managers of the serious underperformance of the LDBF as a result of the BBB-ABX investments. *Id.* State Street's top management, including its CIO Sean Flannery, was informed of the LDBF's underperformance related to the BBB-ABX investment. Ex. 127 (Flannery Ex. 14). HPOPS never received this CAR Alert, and State Street never explained the basis of the underperformance of the LDBF in February and March 2007 to HPOPS until it was too late. R. 56.1 Opp. ¶ 31; Ex. 24; Ex. 2 (Franey Aff.) ¶ 5.

By March 2007, the subprime market was getting worse as contagion spread to higher-rated tranches of securities. Ex. 159. State Street's management was on notice of the potential for a complete collapse in the subprime market. Ex. 60; Ex. 62; Ex. 61; R. 56.1 Opp. ¶ 41. But instead of treating the events of February and March 2007 as a wake-up call—i.e., by rethinking the prudence of high subprime exposure and taking the opportunity to scale back—State Street *increased* its reliance on subprime securities (i.e., "doubled down") in a desperate effort to make

---

[16] Internally at State Street, "Client at Risk" meant a client *who was at risk of leaving State Street and taking their business elsewhere.* Ex. 129 (Reardon Dep., 8/13/09) at 64-65. It did not indicate a client that State Street identified as at risk of losing some or all of its investment. This was a theme at State Street, to focus on increasing and retaining business rather than protecting clients.

up for prior underperformance.  Ex. 128.  State Street also increased its **leverage**, effectively multiplying its reliance on and exposure to subprime by investing in "reverse repo" instruments and other derivatives that could not be traded and that were not backed by any collateral.  Ex. 73 (Bay Rpt at pp. 21-23); Ex. 54 (leveraged to 3.5*x*).

In April 2007, State Street instructed its relationship managers to give their clients some information regarding the impact of the BBB-ABX investment.  State Street sent a pre-approved form letter to some of its clients.  Ex. 41.  But the letter was incomplete and misleading.  It mentioned the BBB-ABX investment, but it did not disclose that the LDBF was composed almost exclusively of subprime MBS or that the LDBF was employing leverage.  Ex. 108 (Thorsen Dep., 6/11/09) at 209-12.  Even worse, for reasons State Street has never explained, HPOPS (unlike other State Street clients) never received the April letter or any of the information contained in it. Ex. 2 (Franey Aff.) ¶ 5.

Throughout April and May 2007, State Street generated numerous internal documents regarding the risks and problems in the subprime sector.  Ex. 62; Ex. 33.  Indeed, in the halls of State Street, subprime securities were literally the subject of cartoon jesting.  Ex. 131.

However, others at State Street took the risks of subprime more seriously.  In April and May, State Street's risk management personnel warned its portfolio managers of the LDBF's lack of diversification.  Ex. 132 (LDBF Portfolio Review, 4/23/07, "Risk Management brought up the issue of portfolio diversification . . ."); Ex. 133.  These warnings were ignored by State Street and never communicated to HPOPS.[17]  On May 14, 2007, State Street product engineer Jim Hopkins

---

[17] In fact, State Street had known of the deteriorating fundamentals as early as 2006.  The Cash Management department that managed other enhanced cash funds of State Street, quit buying subprime in mid- 2006 (*see* Ex. 135); *see also* Ex. 160 (Steinaway Dep., 4/29/09) at 273), and State Street Bank stopped purchasing subprime securities for its own account in 2006 (its existing holdings even then were almost all AAA).  Sean Flannery, State Street's CIO and head of its fixed-income department, received a presentation in June 2006 showing severe deterioration of a number of fundamental factors related to subprime.  *See* Ex. 59.  These deteriorating fundamentals were widely known before July 2007, even as admitted by State Street's expert NERA Consulting, in an article published on June 15, 2007 entitled "The Subprime Meltdown: A Primer."  Ex. 134.  It is patently false for State Street to claim these events were undisputedly unforeseeable given the large

told Michael Dirstine, one of State Street's salesmen, in regard to his "Salesman of the Millennium" efforts to sell Delta Airlines on investing in the LDBF: *"Isn't there some rule that states that you can't sell an investment to an entity that has recently come out of bankruptcy that might send it back into bankruptcy?"* Ex. 61 (emphasis added).

Because HPOPS was not directly invested in the LDBF, but was instead invested in the Commodities Strategy (for which the LDBF was a cash collateral account), State Street did not even send HPOPS monthly performance reports or other information regarding the performance of the LDBF until the later part of July 2007. As such, until August 8/9, 2007, HPOPS was unaware of the mounting and extreme subprime danger to which its commodities investment was exposed. Ex. 2 (Franey Aff.) ¶ 9.

Amazingly, by the summer of 2007, HPOPS's $72 million commodities investment had, unbeknownst to HPOPS, turned into a $150 million subprime play (representing 3.5x leverage on $54 million invested). Ex. 44; Ex. 54. During the entire spring and summer of 2007, State Street made no effort whatsoever to move *any part* of HPOPS's cash collateral investment out of the LDBF, and State Street did not express even a hint of concern to HPOPS regarding the growing exposure of HPOPS's cash to these ever-riskier subprime securities. Exs. 25-28. Indeed, John Tucker (the State Street manager in charge) had no idea during this time that the LDBF was essentially a subprime mortgage-backed security fund. Ex. 126 (Tucker Dep.) at 114-15. In fact, the only "substantive" communication HPOPS received during this time period (when it was investing $6 million per month with State Street) was a grossly misleading LDBF fact sheet on January 5, 2007. That fact sheet described the LDBF as an enhanced cash strategy that "seeks to maximize income while *preserving capital* by investing in a diversified portfolio of highly rated fixed income securities . . . utiliz[ing] an expanded universe of securities that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable

volume of information to the contrary.

12

rate mortgages, fixed rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps[.]" Ex. 7 (LDBF Fact Sheet); R. 56.1 Opp. ¶¶ 27-30. State Street also represented that the LDBF had higher "sector diversification" than typical 2A-2 Money Market Funds. Ex. 7. The truth: the LDBF had not invested in corporate bonds in years, if ever, and was an undiversified fund invested almost entirely in subprime securities. Ex. 20. The Fact Sheet was not only affirmatively misleading, but it misled by omission as well—never disclosing that the fund was nearly all subprime and employed substantial leverage; facts which, if disclosed, would have directly contradicted State Street's August 2005 presentation to HPOPS, which indicated that the Commodities Strategy would be unleveraged. R. 56.1 Opp. ¶¶ 27-30.

**V.     As the subprime sector completely collapsed (taking the LDBF with it), State Street got its own funds and those of its favored clients out of the LDBF and left HPOPS's cash in it.**

By July, the LDBF was literally collapsing. *See* Ex. 46 ("We are getting killed this month (July 2007) as well."); Ex. 136 ("Same old story. Market is crushing us . . . . Almost game over."). Beginning in mid-July 2007, State Street could not tell its outside investors anything until the legal department "vetted" it. Ex. 138. This resulted in the nondisclosure of very material information to HPOPS,[18] as well as delays in communicating other material information for several weeks.[19] Ex. 77.

By no later than the week of July 23, 2007, State Street knew there were fatal problems with the LDBF, including that it was impossible to manage the fund because there was no liquidity in AA and lower rated bonds and because the lack of liquidity made it "virtually impossible" to price the securities,[20] which in turn made it impossible to provide accurate

---

[18] Ex. 78 at SS-SEC 000261134 (July 24, 2007 email asking whether State Street can prevent redemptions by external clients before the internal funds redeemed at the end of the month).

[19] Ex. 43 (July 2, 2007 CAR Alert); Ex. 47; Ex. 48; Ex. 137; Wolkoff Decl. Ex. 17.

[20] The LDBF's subprime securities are required to be marked to market each day to reflect the funds' Net Asset Value (NAV); subprime securities are not traded on an exchange, and there is not an actively secondary sales market even in normal times. Instead, to buy or sell a subprime security there has to be a trade between "two consenting adults" who negotiate a price. Wolkoff

performance data or calculate the risks of the fund.  Accordingly, State Street secretly planned a

mass exodus of its own funds from the LDBF in order to reduce its internal funds' risk, thereby

putting its own interests (and those of its internal funds) ahead of HPOPS's.  Ex. 78, 70.  That

same week, State Street also encouraged favored clients (but not HPOPS) to redeem their interests

in the LDBF, which allowed them to receive more than the true value of their units because of the

pricing issues, with which State Street was well familiar.  Exs. 75, 79; Ex. 95 (Dempsey Dep.,

9/10/09) at 48-49, 76-77, 97; Exs. 82-90.  Other examples of malfeasance, which was not

discovered by HPOPS until after it sued State Street, include the following:

- As early as July 2, 2007, State Street was working on a draft letter to external clients, informing them of mounting problems with subprime and future expedited declines and increased risks in the subprime market, but a watered-down version of the letter was not sent to HPOPS until July 30, nearly four weeks later.  This "Dear Valued Client" letter provided no information specific to the LDBF and gave false and misleading information about State Street's actions regarding the LDBF and subprime securities.  Exs. 43, 47, 48; Wolkoff Decl. Ex. 17; R. 56.1 Opp. ¶¶ 42-43.

- On July 24, 2007, State Street drafted an internal letter in a purported effort to let existing outside clients in the two LDBFs[21] know that *"given the unsettled and increasingly illiquid nature of the US Subprime Market," State Street's internal funds would be reducing their exposure in the LDBF's (CMY1 and CMZ5) by July 31, 2007, "which could potentially negatively impact the market and remaining clients."*  Ex. 78 (emphasis added).  When considering the draft letter, senior management specifically discussed ways to prevent external clients from redeeming prior to the State Street funds.  *Id.*  The answer was simple: The letter was never sent.

- On July 25, 2007, State Street's Investment Committee specifically considered the LDBF's subprime concentration, the subprime market, the internal State Street funds' plan for immediate redemption, the illiquidity of the AA securities, and the difficulty in pricing these bonds.  Exs. 75, 15.  Several members of the Investment Committee, including its CIO Sean Flannery, noted that the LDBF could *not* sell only its most highly rated "AAA" securities to meet the State Street redemptions, while leaving the remaining clients in a fund with illiquid AA and A subprime securities.  As noted during the Investment Committee by its counsel Mark Duggan: "worst case scenario other strategies get out of the LDBF then clients get screwed."  Exs. 75.

- The next day, July 26, 2007, Robert Pickett, manager of the LDBF, took action to "screw[]" the clients, selling $900 million in triple AAA cash bonds, thereby leaving the LDBF with mostly illiquid AA and below rated securities, as well as worthless out-of-the-money TRS swaps.  Ex. 52 (Pickett Dep.) at 418-21.

---

Decl. Ex. 25 (HPOPS006676)

[21] There were two almost identical LDBF funds: CMZ5, known as the non-ERISA, and CMY1, known as the ERISA fund.  HPOPS was invested in the latter.

- On July 27, 2007, State Street commenced a meeting of its Impaired Asset Valuation Committee (IAVC), which included HPOPS's Commodities Strategy Portfolio Manager John Tucker, to discuss the problems with illiquidity and pricing of the subprime securities that remained in the LDBF. Ex. 77. The IAVC found: (1) its pricing service "IDC" was significantly overstating the prices reflected in the custody prices on State Street's books, which were used to calculate NAV for purposes of determining the amount received upon redemption; (2) broker bid pricing was unreliable; and (3) even sales of similar securities, although the most reliable indicator of value, would not be used. State Street's top management in fixed income, including the LDBF's portfolio manager, concluded that there was "*very little liquidity*" and that it was "*virtually impossible*" to price subprime securities where there are no trades. *Id.* (emphasis added).

- During July 25 through 31, 2007, numerous clients of State Street's Office of Fiduciary Advisors, Charitable Asset Management, and Global Asset Allocation were either moved out of the LDBF (if the client's IMA permitted State Street to take that action) or were told to liquidate from the LDBF because of risks. Exs. 82-86.

- Beginning in early 2007, the LDBF's risk budget, which was used by State Street to evaluate the LDBF's risk, exceeded 100% for several months. Ex. 54. By the end of July 2007, the budget was over 200%, and by the end of August, it was over 400%. Exs. 35, 56, 68. At the same time, HPOPS received misleading communications to the effect that State Street was taking action to "reduce risk." Wolkoff Decl. Exs. 13, 17, 19; R. 56.1 Opp. ¶ 43.

VI.    **By the time HPOPS learned that its cash had been invested in a subprime bond fund, the damage had already been done. And while HPOPS struggled to make the best of a horrible situation, State Street—which kept serving as Investment Manager— continued breaching fiduciary duties it owed to HPOPS.**

On August 8, 2007, State Street's Meggan Gibber wrote one of the most misleading communications to HPOPS, an email stating that "certain" State Street funds were redeeming out of the LDBF by taking "in kind" a pro-rata share of a "perfect slice" of the LDBF (materially omitting that all but 5 of the 17 internal State Street funds owning the vast majority of the fund *already* had exited—some redeeming for millions in cash based on inside information not shared with HPOPS—or that the remaining investors had executed their liquidation orders earlier that day). Wolkoff Decl. Ex. 19; R. 56.1 Opp. ¶ 59. State Street comforted HPOPS by claiming that these internal State Street funds were taking securities "in kind" solely because they wanted to be protected from temporary technical and liquidity issues, but that the "fundamentals" of the subprime market remained sound (fundamentals State Street did not and could not reasonably

believe, given rising foreclosures and delinquencies, falling home prices and new home sales, and rising interest rates). *Id.*

Megan Gibber's email of August 8, 2007 also did not offer HPOPS the chance to take its subprime securities in kind as had the State Street funds. Rather, HPOPS was only offered the chance to ***maintain*** its exposure to subprime securities in a new State Street Limited Duration Bond Fund called LDBF II. *Id.* However, the LDBF II would not open until August 15, 2007 and would lock up any liquidity for HPOPS until October 31, 2007 (and after that, HPOPS could only redeem from the LDBF II on a monthly basis). *Id.* In its summary judgment motion, State Street takes the absurd position that HPOPS did not take reasonable mitigation steps to exit subprime in mid-August 2007, when at the same time, State Street encouraged HPOPS to move to an investment composed of the same subprime securities, with even *less* liquidity that would have kept HPOPS locked in until at least October 31, 2007. *Id.*; R. 56.1 Opp. ¶ 49.

Meggan Gibber also represented that because "certain" State Street internal funds would be taking a "perfect slice" of the LDBF's holdings, HPOPS liquidity in the remaining securities would not be affected. *Id.* However, she failed to inform HPOPS that if it did not sell its interest in the LDBF immediately (i.e., within two days), HPOPS would be left owning almost 90% of the LDBF as one of only two remaining investors, along with Alaska Electrical Pension Fund ("Alaska"), or that HPOPS would own mostly hard-to-sell odd and small lots of subprime securities (which, as State Street had already determined, but not revealed to HPOPS, were virtually impossible to price or sell). Ex. 79; Wolkoff Decl. Ex. 25 at HPOPS 006673; Wolkoff Decl. Ex 52. In addition, the offer of the LDBF II to HPOPS was a distraction that confused HPOPS for a length of time because it suggested that HPOPS should remain invested in subprime like State Street's other internal funds allegedly were doing. State Street made no mention that many of the internal funds had redeemed either completely or partially for cash in the past few months or that the mass exodus had been planned back on July 24, 2007. Ex. 73

Bay Rpt at Sch. C-19. On August 9, 2007, immediately after being told that the LDBF held 80-90% AAA and AA subprime securities (when it did not),[22] HPOPS asked for a written list of the LDBF's portfolio holdings in order to evaluate them. Ex. 139 at HPOPS 003795. In response, at the end of the day on Friday, August 10, 2007, State Street provided another completely misleading communication. Ex. 99. Specifically, State Street gave HPOPS a report showing a fraudulent NAV value, which totaled nearly $1 billion in securities. Ex. 73 (Bayley Affidavit attaching his March 19, 2007 rebuttal report as Ex. 10 at p. 43) hereinafter cited as Ex. 73 "Bay Reb Rpt at __." Yet again, State Street failed to warn HPOPS that these securities could not be sold or accurately priced after the subprime meltdown or, more importantly, that the only five remaining internal State Street funds—obliquely referenced in the August 8, 2007 email as "certain" State Street funds—*had already executed all of their liquidation orders earlier that same day! Id.*; *see also* Ex. 73 Bay Reb Rpt at 33-34. Thus, by the first time that HPOPS could open and review the August 10, 2007 holdings report so it could evaluate the LDBF securities, the report was wholly false and misleading. R. 56.1 Opp. ¶ 60. Indeed, what was once a $2.6 billion fund with substantial interests held by internal State Street funds (in June 2007) was now composed of two outside clients who together had less than $43 million invested—a number that itself was fraudulently overstated. Ex. 79; R. 56.1 Opp. ¶ 43.

From Monday, August 13 forward, there was nothing HPOPS could have done to protect itself better than it did. The securities that remained in the LDBF could not be priced or sold,[23] and as HPOPS would later learn, they could not be taken in kind.[24] All the while, State Street, as HPOPS's trusted fiduciary and Investment Manager, continued to tout the notion that

---

[22] Ex. 5 at 442; Ex. 45 at Answers 1(b), 5, 6.

[23] Ex. 77.

[24] State Street offered an in-kind redemption option to HPOPS in September/October 2007 and later reneged when HPOPS actually considered it, ostensibly because State Street could not prejudice the other participant, Alaska,who held around 10% of value of the fund. R. 56.1 Opp. ¶ 63.

*"judicious" investors would continue to hold these securities* because the decline was due to technical events and the allegedly good fundamentals would reassert themselves. Exs. 103, 106.

The dire conditions of the subprime meltdown continued unabated through the relevant time frame, including HPOPS's termination of State Street (on November 13, 2007),[25] as well as from November 13, 2007 to December 14, 2007, during which State Street imposed a "controlled redemption" procedure preventing HPOPS from promptly receiving cash or securities in kind. Ex. 121; Wolkoff Decl. Ex. 53. State Street tried to, but could not, sell the remaining illiquid securities. In fact, after weeks of futility, State Street finally admitted to HPOPS that it would have to wait until at least March 2008 for State Street to sell them. Wolkoff Decl. Ex. 55 ("Goal of liquidating the portfolio no later than March 31, 2008."); R. 56.1 Opp. ¶ 65.

State Street suggests in its MSJ that HPOPS should have at least mitigated before it actually terminated State Street on November 14, 2007. But HPOPS was reasonable in not pulling the plug earlier. Indeed, State Street itself waited until *the day after* HPOPS fired it before divesting the *commingled* commodities strategy from the LDBF. Ex. 22; R. 56.1 Opp. ¶ 65. As such, it is nothing short of hypocrisy to say that HPOPS failed to take reasonable steps to mitigate by waiting until November 14, 2007, when State Street waited a day later to do the same thing for the commingled version of the commodities strategy it was managing.

Finally, on December 14, 2007, State Street distributed to HPOPS a total of $14,270,970 in cash along with a collection of small and odd lot, illiquid subprime securities, whose value State Street misrepresented (as it had for many months) as $13,647,974. Ex. 119; Wolkoff Decl. Ex. 28. This misrepresentation about the value of securities, like all of its representations of performance pricing and risks after July 27, 2007, was intentional because State Street knew it

---

[25] Wolkoff Decl. Ex. 27.

could not sell or accurately price the securities, and its own data established that the securities were significantly overpriced.[26] R. 56.1 Opp. ¶ 43.

On November 14, 2007, when State Street's Investment Committee decided to close the LDBF because it could no longer be managed without any liquidity, Robert Pickett, the LDBF's portfolio manager, predicted that the subprime market would not have any liquidity until at least after the first of the year—meaning securities could not be sold anywhere near "NAV value" if they could be sold at all. Ex. 22. So it clearly came as no surprise to State Street that HPOPS, like State Street, had difficulty in selling the in kind securities distributed by State Street in December 2007. Moreover, because HPOPS had no experience in evaluating, pricing, or trading such securities (or even the systems to do so), HPOPS prudently evaluated numerous offers by third parties and ultimately sold the illiquid securities State Street misrepresented as worth $13.3 million for only $6.5 million in February 2008. Ex. 120; R. 56.1 Opp. ¶ 67. Total losses to HPOPS as a result of State Street's wrongful action now exceeds $35 million, not counting interest and exemplary damages.[27]

**STANDARDS OF REVIEW**

## I.    Summary Judgment

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In reviewing the record on a summary judgment motion, the district court must assess the evidence in "the light most favorable to the non-moving party" and resolve all ambiguities and "draw all reasonable

---

[26] See Ex. 73 (Bay Rpt at Sch. G-1). State Street's records reflect that when the LDBF subprime securities were sold, they fetched less (and often far less) than the "value" carried on the fund's books, which meant that fund's value, prior to the sales, had been overstated. State Street's own sales records prove this conclusion. So do many anecdotal exhibits and testimony. For example, Andrew Tenczar, State Street's head trader called State Street's NAV "mark to make believe" and agreed Bayley's analysis of actual sales backed up his "mark to make believe" comment. Ex. 93; Ex. 94 (Tenczar Dep.) at 258-59.

[27] Ex. 2 (Franey Aff.) ¶ 13; Ex. 73 (Bay Rpt at Sch. H-1)

inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994).

The moving party must demonstrate that no genuine issue exists as to any material fact. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

## II.    Substantive Law

In an MDL proceeding, a transferee court sitting in diversity must apply the choice-of-law

rules of the forum state of the transferor court (Texas). *See In re Rezulin Prods. Liab. Litig.*, 390

F. Supp. 2d 319, 329 (S.D.N.Y. 2005).[28] Here, the parties do not dispute that Texas substantive

law applies to HPOPS's claims. *See also* Ex. 10 (IMA) ¶ 13 ("This Agreement shall be governed

by the laws of the State of Texas[.]").

ARGUMENT

## I.    HPOPS has presented sufficient evidence of State Street's fraudulent inducement of the First Amendment of the IMA executed June 14, 2006 to at least create a fact question.

The only fraud State Street has put at issue is fraud in the inducement of the First

Amendment of the IMA.[29] *See* MSJ at 20-24. However, HPOPS has alleged that State Street

committed many fraudulent misrepresentations and omissions throughout the relevant time, prior

to June 16, 2006, the date the First Amendment the IMA was executed ("The Inducement

Period").[30] State Street ignores most of these allegations in its MSJ and, instead, addresses only

five alleged points of fraud in the inducement.

---

[28] *See also In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F. Supp. 2d 717, 723 (S.D.N.Y. 2003) ("A district court sitting in diversity applies the law of the forum state.").

[29] And even there, State Street only moved on no-evidence grounds with respect to issues of materiality, falsity, and proximate cause. *See* MSJ at 20.

[30] *See* Complaint at III (incorporating all prior allegations, including material nondisclosures, such as State Street misrepresenting that the LDBF would be diversified, ¶ 78(b)(g); the LDBF was a short-term cash vehicle, ¶78(c); it was suitable to meet liquidity capital preservation needs of HPOPS's separately managed account, ¶78(b); that leverage would not be used, ¶¶ 78(d) & 96, 97; that the objective to the LDBF was conservative with target of 50 bps over US 1-month LIBOR ¶ 78 (d); and many other misrepresentations and omissions).

*A.     Legal Standard*

*1.     Fraudulent Inducement by Misrepresentation of Material Fact*

Under Texas law, the elements of common law fraud (including fraud in the inducement) are that State Street (1) made a material misrepresentation that was false; (2) knowing the representation was false, or reckless, as a positive assertion, without knowledge of its truth; (3) with the intent that HPOPS act upon it; (4) upon which HPOPS relied to enter into the First Amendment to the IMA; and (5) that caused it injury. *In re Int'l Profit Assocs.*, 274 S.W.2d 672, 678 (Tex. 2009); *Hasse v. Glazner*, 62 SW 3d 795, 797-98 (Tex. 2001).

*2.     State Street's Fraudulent Omissions and Duties to Disclose*

Under Texas law, the most obvious basis for State Street's duty to disclose is that State Street owed fiduciary duties to HPOPS during part of the Inducement Period. Those duties arose when the parties executed the original IMA on December 6, 2005, as that agreement specifically imposed fiduciary obligations on State Street for the "Account Assets,"[31] and as a fiduciary, State Street had a duty to fully and completely disclose material information. *See Ins. Co. of N.A. v. Morris*, 981 S.W.2d 667, 674-75 (Tex. 1986). In addition, a fiduciary duty to make a disclosure of all material facts also gives rise to a fraud claim for failure to disclose. *Spoljaric v. Percivol Tours*, 708 S.W.2d 432, 435 (Tex. 1986). As such, for fraud by omission, an elevated duty of disclosure began on December 6, 2005.

Moreover, apart from State Street's fiduciary obligations to HPOPS, Texas courts separately hold that a duty to disclose will also arise in at least three additional scenarios:

(1) when one voluntarily discloses information, he has a duty to disclose *the whole truth*;

(2) when one makes a representation, he has a duty to disclose *new* information when he knows the new information makes the earlier representation misleading or false; and

---

[31] "Account Assets" are defined under Exhibit A, which refers to HPOPS's intent to invest approximately 2.5% of HPOPS's assets in separately managed TIPS and approximately 10% of HPOPS's assets in a separately managed Enhanced Dow Jones-AIG Commodities Futures Strategy. Ex. 10 (IMA) at Ex. A.

(3) when one makes a ***partial*** disclosure that conveys a false impression, he has a duty to speak.

*See Hoggett v. Brown*, 971 S.W.2d 472 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).

3.      *HPOPS had no duty to take actions to discover State Street's misrepresentations or discover its omissions.*

Under Texas law, HPOPS had no duty to investigate, or to use due diligence to discover, whether State Street's representations were fraudulent or whether it failed to disclose material facts. *Knoll Indus. v. Sec. Comm. Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990). In other words, it is not a defense that HPOPS allegedly lacked care or due diligence in evaluating the alleged fraud. *Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex. 1983); *Plains Cotton Coop. Assoc. v. Wolf*, 553 S.W.2d 800 (Tex. App.—Amarillo 1977, writ ref'd n.r.e.). HPOPS does not even have a duty to ask questions. *Id.*

**B.      *The truth regarding HPOPS's investments in the LDBF and Commodities Strategy.***

State Street fraudulently induced HPOPS both by affirmative misrepresentations and by omissions of material fact, some of which were even more misleading because of information that was provided to HPOPS.[32] The following list reflects the truth about certain material facts supporting HPOPS's claims:

1.      The LDBF was listed as part of the commingled version of the Enhanced Dow Jones-AIG Futures Strategy in the Inducement Presentation (Wolkoff Decl. Ex. 7 at HPOPS 004248) and was represented as a suitable cash management fund to hold collateral for commodities exposure. The LDBF was actually concentrated heavily in subprime from the outset, the concentration was deliberate, and State Street increased its concentration over time. Ex. 20; Ex. 142 (Weiner Decl.) ¶ 11; Exs. 30, 35, 56, 68.

2.      The LDBF was a "portable alpha" vehicle whose purpose was to generate excess returns for State Street's other funds, but its concentration in subprime was so undiversified that State Street investors could not invest more than 25% of their investments in the LDBF. Ex. 20; Ex. 140 (Wands Dep., 8/3/09) at 687; Ex. 141 (Riegel Dep., 11/18/09) at 372.

---

[32] It is well known that "a half-truth is sometimes more misleading than an outright lie." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 702 (5th Cir. 2005). This is particularly true here, both with respect to pre-contract statements as well as statements and omissions during the July through mid-December 2007 timeframe when the subprime meltdown's devastating effect had manifested itself to State Street, but was not revealed to HPOPS because of State Street's self-dealing and a requirement that the legal department had to vet any communications because of the fear of lawsuits.

3. The Inducement Presentation states that the commingled version of the Commodities Strategy, with the LDBF as its cash collateral fund, will be unleveraged at all times. Wolkoff Decl. Ex. 7 at HPOPS 004248.

4. HPOPS's Commodities Strategy was actually leveraged because the LDBF was leveraged to a high of $3.5x$ in June 2007. Ex. 54 at SS 009150876.

5. The Inducement Presentation states that the LDBF "seeks to match or exceed the returns on the one-month US Libor Index by 50 bps." Wolkoff Decl. Ex. 7 at HPOPS 004248. The LDBF was actually managed as an "Absolute Return Fund," with a required target of 75 bps. Ex. 20.

6. In the first half of 2006 (even before HPOPS executed the First Amendment, State Street had internally become very concerned about the fundamentals of subprime, which were shown at that point to be deteriorating. Ex. 33, 57-64. The Cash Management Section of State Street quit investing in subprime completely by the end of 2005. Ex. 18 (Stachel Dep.) at 70-71 (expressing he was skeptical of ratings agency methodologies for all RMBS, stating he warned Flannery and that he questioned housing market throughout 2006); Ex. 135 (Cash Management section of State Street was not buying into subprime after mid-2006). The LDBF meanwhile increased its concentration in subprime until, in June 2007, it was essentially 100% in subprime. Ex. 68 (Absolute Return Analytics 7/31/07) (94% subprime as 7/31/07);

7. The individual portfolio managers of State Street funds that were invested in the LDBF had unrestricted access to shared hard drive information regarding the LDBF's portfolio holdings, performance, and other information used to manage the LDBF, which gave them a grossly unfair information advantage over other investors, like HPOPS, that had no such access. Ex. 141 (Reigel Dep., 11/18/09) at 465-70; Ex. 161 (Thornton Dep.) at 40-41; Ex. 52 (Pickett Dep.) at 84-85.

8. State Street automatically put HPOPS's cash in the LDBF as it was invested each month without any analysis of suitability. Ex. 126 (Tucker Dep.) at 298-99. State Street never exercised any discretion, as it was required to do under the IMA to select, monitor, and move if needed, HPOPS money out of the LDBF—even during the subprime "meltdown." Exs. 23-28.

9. LDBF invested in complex, unproven, new subprime derivatives such as the ABX-BBB-02 securities that led to losses of 88 bps in early 2007. Ex. 24.

**C. HPOPS alleges and presents substantial evidence of affirmative material misrepresentations to support its fraudulent inducement claims.**

*1.    The Inducement Presentation was misleading because it failed to disclose material information regarding subprime exposure.*

State Street's internal documents show that the LDBF was actually made up of 79.6%

subprime securities as of September 30, 2005.[33] The Inducement Presentation does not mention

---

[33] Ex. 142 (Weiner Decl.) ¶ 11.

the word "subprime" anywhere. Wolkoff Decl. Ex. 7. And this concentration in subprime was not by accident, as virtually since its inception, the LDBF has been by design heavily backed by subprime mortgages. Ex. 20.

The Inducement Presentation included a bar chart, purporting to show the composition of the LDBF as of June 30, 2005: 75.8% Asset Backed Securities (ABS), 11.1% Commercial Mortgage Backed Securities (CMBS), 5.7% Cash, 5.3% Mortgage Backed Securities (MBS) and 2.0% Agency Investments. Wolkoff Decl. Ex. 7 at HPOPS 004251. A subprime mortgage-backed security, which is a security backed by a subprime mortgage, can be classified as ABS or MBS because a mortgage is an asset. But because the Inducement Presentation displayed *both* categories of securities (MBS and ABS) side by side, one would reasonably expect subprime (if any) to be contained in the MBS category. Accordingly, State Street did not place HPOPS on notice that there was significant exposure to subprime in the LDBF as the entire category of MBS (which is broader than subprime) constituted only 5.3% of the LDBF.[34] Thus, this graph was affirmatively misleading because it led HPOPS to believe that any subprime securities, if they were held by the LDBF, would be in the 5.3% MBS sector.[35] Ex. 5 at 36, 116; *see also* R. 56.1 Opp. ¶ 29. And Franey was not alone: many other investors in the LDBF were also misled about the LDBF's concentration in subprime. Ex. 162.

---

[34] State Street contends that Pat Franey thought otherwise—that subprime would fall in the ABS category, not the MBS category. State Street is incorrect. *See* R. 56.1 Opp. ¶ 29.

[35] State Street's effort to rebut this understanding runs headlong into its own public SEC filings. As reported in State Street's filings with respect to an institutional version of the LDBF, ABS includes a variety of subsectors that "are securities whose principal and interest payments are collateralized by pools of assets such as auto loans, credit card receivables, leases, installment contracts and personal property." Ex. 143 at 6-7. No reference is made to subprime being included in ABS. *Id.*

In the same filing, MBS securities are described as securities backed by pools of mortgages issued by private issuers, which are not guaranteed or backed by the credit of the U.S. government or by an agency or instrumentality of the U.S. government. Mortgages backed by *private issuers* include bonds backed by subprime mortgages. Ex. 143 at 6-7.

State Street's post-litigation position that subprime securities can only be reasonably classified as ABS rather than MBS is directly contradicted by many of State Street's personnel, who believed subprime securities were properly classified as MBS. Robert Pickett was the portfolio manager of the LDBF, and he managed the LDBF using Excel spreadsheets that showed the sector characteristics of the LDBF. Exs. 30, 35, 56, 68. In managing the LDBF, Pickett always classified subprime related securities as RMBS (or Residential MBS). *Id.* Susan Reigel who was also charged at one time with managing the LDBF was also "confused" about as to which sector category subprime securities would be properly classified. Ex. 41 (Reigel Dep.) at 590-92. Others at State Street who believed subprime to be a type of MBS included John Tucker, the portfolio manager of HPOPS Commodities Strategy (Ex. 126 (Tucker Dep.) at 80-81); Lawrence Carlson, the head of State Street's relationship management department, who swore emphatically that subprime was MBS, not ABS (Ex. 67 (Carlson Dep.) at 133-34); and Robert Dempsey, State Street's Vice President of Operations. Ex. 95 (Dempsey Dep.) at 30-31. Similarly, the real-time State Street internal documents, and later communications with HPOPS, reflected that subprime fell within the MBS category. Exs. 30, 37, 56, 68. For example, see State Street's written confirmation to HPOPS on October 4, 2007 regarding the sector composition of CMY1 at July 31, 2007, which reflected "94% subprime RMBS." Ex. 130 at HPOPS 002116.

State Street advances the absurd argument that it should have been obvious that the LDBF was comprised almost exclusively of subprime, despite the fact that numerous State Street personnel testified that they did not know of the LDBF's high concentration in subprime securities and therefore certainly did not apprise HPOPS that the LDBF was primarily invested in subprime. Eric Roberts, who sent the presentation, did not know. Donna Watkins, who conducted later negotiations with HPOPS, did not know.[36] Ex. 144 (Roberts Dep.) at 136-37, 141. At least twelve other State Street professionals also confirmed they did not know that the LDBF was

---

[36] Ex. 145 (Watkins Dep.) at 37, 42-45, 53-56.

concentrated heavily in subprime until the summer of 2007, even though they either received or had access to the LDBF "Fact Sheets" that were likewise distributed to State Street's clients.[37]

2.      *The Inducement Presentation is misleading even if subprime securities can only be categorized in the ABS sector.*

Moreover, even if subprime was known to be included in the ABS sector (rather than the MBS sector), the Inducement Presentation was still misleading because ABS is a sector that includes many subsectors backed by a multitude of assets, including auto loans, credit card receivables, leases, installment contracts, manufactured housing, and a variety of other assets. Ex. 53. In fact, in the summer of 2005, even if subprime were considered to be ABS, the total of subprime securities as a percent of the total ABS market was relatively small. In light of the prior discussion, the Inducement Presentation would be misleading even if ABS, rather than MBS, was thought of as including subprime.

3.      *The Inducement Presentation misrepresented that the Commodities Strategy and the LDBF were not leveraged.*

The Inducement Presentation affirmatively represented that the Commodities Strategy, and therefore the LDBF, would be unleveraged, with residual cash invested in high-quality money market securities or pooled funds. Wolkoff Decl. Ex. 7 at HPOPS 004248. State Street's witnesses admit leverage is a material fact and that its use should be disclosed. For example, Patrick Armstrong admitted it should be disclosed to investors:

> As an investor, there's a number of exposures that one would want to have an understanding of, and I would think whether or not the fund uses leverage to gain exposure would be among those.

Ex. 146 (Armstrong Dep.) at 477.

According to State Street's own calculations, the LDBF was not leveraged in September 2005, but it *was* leveraged when the First Amendment to the IMA was executed in June 2006 and

---

[37] Ex. 67 (Carlson Dep.) at 61; Ex. 150 (DeGiacomo Dep.) at 245; Ex. 151 (DuPont Dep.) at 18-19; Ex. 92 (Guy Dep.) at 38; Ex. 152 (Johnson Dep.) at 87, 90; Ex. 153 (Kohler Dep.) at 46; Ex. 154 (Shea Dep.) at 294-95; Ex. 18 (Stachel Dep.) at 200-01; Ex. 94 (Tenczar Dep.) at 62; Ex. 108 (Thornsen Dep.) at 125-27, 227; Ex. 155 (Shegog Dep.) at 30-31; Ex. 156 (Ed Armstrong Dep.) at 65; Ex. 126 (Tucker Dep.) at 113-15.

when the first payment of $6 million was made on June 30, 2006. Ex. 147 at SS000195513. This use of leverage meant that if the LDBF was leveraged 1.8$x$ on June 30, 2006, the date of HPOPS first payment, that each HPOPS dollar was exposed to the risk/reward returns of nearly $1.80 of assets in subprime securities. In 2007, however, the managers ramped up leverage significantly to all time highs. *See* Ex. 54; Ex. 147 at SS000195516.

And there can be no doubt that this misrepresentation was intentional, as employees discussed whether leverage should be shown in portfolio characteristics either by showing negative cash or by showing sector exposure greater than 100% of the notional value of the sector holdings. Patrick Armstrong, the head of risk management, admitted it would be indefensible not to show one of those, while not stating the fund was leveraged. Ex. 148. But, as candidly admitted by an email exchange among senior management—"we can both sleep better at night . . . now that we are hiding leverage." Ex. 149.

4.      *The Inducement Presentation and other communications falsely portray the aspirational "target" of the LDBF as seeking 50 basis points (bps).*

The Inducement Presentation falsely stated that the LDBF "seeks to match or exceed the returns of the one-month US Dollar LIBOR index by 50 bps." Wolkoff Decl. Ex. 7 at HPOPS 004248. The return target of a fund is related to the amount of risks that the fund is willing to take, which State Street measures using Var and Cvar techniques to track the volatility of a fund's holdings. The greater the target return, the more risks are being tolerated by the risk measurement system. The risk/return profile of the LDBF as having "a 50 bps target over the J.P. Morgan U.S. Libor Index" was later affirmed in an email from Craig DeGiacomo, of State Street, to Stacey Ables, of HPOPS, on January 5, 2007. Ex. 7.

The Inducement Presentation and the later January 5, 2007 letter to Ables were both materially misleading, because in reality Robert Pickett, the LDBF's portfolio manager, managed the LDBF's risk by using a target of 75 bps over the benchmark. *See, e.g.*, Exs. 30 & 56. That meant the allowable risk associated with the LDBF was approximately 50% greater than the

27

amount represented to HPOPS. In addition, contrary to being merely an "aspirational goal," it was managed as an "absolute return fund," with a mandated target return of 75 bps.[38]  *Id.*  This also exposed HPOPS to greater risks, as Pickett sought those returns by making reckless investments such as the ABX-BBB Securities. This willingness on State Street's part to take greater risk to meet what was fraudulently misrepresented as only an aspirational goal is proven by the LDBF's dramatic increase in leverage in the LDBF in April through June 2007, solely to make up underperformance of the previous two months.

5.   *State Street made omissions of material fact about the Commodities Strategy and the LDBF during the Inducement Period.*

In sum, State Street never told HPOPS about many of the material truthful facts about subprime before the First Amendment to the IMA was signed.  State Street did not disclose:

1.  The LDBF was essentially a subprime fund from its inception. Ex. 20.

2.  The LDBF was not diversified—despite the fact that State Street contractually agreed that it would manage HPOPS's commodities strategy (including its cash account) in a diversified manner in order to reduce risk. Ex. 10 (IMA) § 5(g).

3.  The LDBF was a portable alpha vehicle for State Street's funds that could invest no more than 25% of their capital into the fund in order to maintain diversity. Ex. 141 (Reigel Dep.) at 372; Ex. 140 (Wands Dep.) at 687.

4.  The Commodities Strategy could and would use leverage through its exposure to the LDBF, which increased to 3.5$x$ by June 2007. Ex. 98; Ex. 54.

5.  The LDBF was managed as an "Absolute Return Strategy" that was **required** to meet 75 bps over its benchmark. Ex. 68.

6.  The deteriorating fundamentals of subprime mortgages were known to State Street before HPOPS signed the First Amendment. Indeed, the Cash Management Section of the bank had already stopped buying subprime by June 16, 2006 (the date HPOPS agreed to hire State Street to manage the Commodities Strategy). Ex. 33, 57, 58, 59, 60, 61, 62, 63, 64; R. 56.1 Opp. ¶ 41.

7.  The portfolio managers of State Street's internal funds had unrestricted access to inside information about the LDBF. Ex. 161 (Thornton Dep.) at 40-41.

8.  John Tucker and State Street would not exercise any discretion over the investment of HPOPS's cash collateral, no matter what the consequences, even though the IMA vested in State Street the sole discretion to manage the cash collateral portion of the Commodities Strategy subject to the requirement that it employ the principle of diversification to minimize losses. *See* R. 56.1 Opp. ¶ 26.

---

[38] Ex. 52 at 231-34; Exs. 35, 56, 68.

9. The LDBF's ability to invest in complex, new, and unproven securities. Ex. 18 (Stachel Dep.) at 58-61 (head of credit policy concerned about housing market prior to 2007, warned Flannery of concerns, expressed that because ABX was new it was difficult to make assumptions about performance).

To put it simply, HPOPS would never have signed the First Amendment if it had been told about these material misrepresentations, either singularly or in combination. Ex. 202 (Lawson Aff.) ¶ 3.; Ex. 2 (Franey Aff.) ¶ 41.

## II. HPOPS has sufficient evidence of State Street's violations of the Texas Securities Act.

### A. State Street is a "seller" under the TSA.

HPOPS made twelve $6 million investments in State Street's Commodities Strategy from June 2006 to May 2007. Wolkoff Decl. Ex. 5 ¶ 1. State Street sold the Commodities Strategy to HPOPS, and as part of that Strategy, HPOPS's monies were invested directly into the LDBF. The Commodities Strategy and the LDBF were both securities under the Texas Securities Act (TSA),[39] and State Street—as seller—is liable to HPOPS under the TSA for damages caused by State Street's misrepresentations and omissions in connection with its sales of securities to HPOPS.

To recover under the Texas Securities Act, a plaintiff must establish State Street purchased or sold a security by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary to make the statement made not misleading. TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2), (B). The TSA does not require HPOPS, as a purchaser of securities from State Street, to prove reliance or proximate cause to establish a claim under the Act.[40] Instead, Texas courts have uniformly held that when a plaintiff sues the *actual seller* of a security and presents evidence of *some causal connection* between the challenged communication and the purchase, the TSA is satisfied. *Duperier v. Tex. State Bank*, 28 S.W.3d at 740, 753 (Tex. App.— Corpus Christi 2000, pet. dism'd by agr.); *Anheuser-Busch Co. v. Summit Coffee Co.*, 858 S.W.2d

---

[39] State Street does not dispute that it sold securities to HPOPS, which are broadly defined under the TSA. TEX. REV. CIV. STAT. ANN. art. 581-4(A).

[40] Texas courts have held that proximate cause is not an element under the TSA. *Duperier v. Tex. State Bank*, 28 S.W.3d 740, 753 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.). Likewise, Article 581-33 does not require a plaintiff to prove reliance. *Id.*

928, 936 (Tex. App.—Dallas 1993, writ denied); *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 649 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.), *abrogated on other grounds by Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349 (Tex. App.—Houston [14th Dist.] 2003, no pet.). HPOPS has fully discharged its burden of showing some causal connection through its evidence that State Street made material misrepresentations and omissions prior to each of HPOPS's twelve installment investments in State Street's Commodities Strategy.

State Street moves for summary judgment on HPOPS's TSA claims by asserting that HPOPS has no evidence of actionable misrepresentations and/or omissions by State Street. First, State Street wrongly attempts to limit HPOPS's evidence to fraud occurring months before HPOPS agreed to have State Street manage its commodities investment and before HPOPS made even the first of twelve investments in HPOPS Commodities Strategy. Next, State Street claims that HPOPS has no evidence that any of State Street's innumerable misrepresentations and omissions were material. Both of State Street's arguments fail because HPOPS—at the very least—presented evidence sufficient to create a fact question under the TSA.

**B.    *State Street's misrepresentations and omissions were material.***

For securities fraud, an omission is material "if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest[.]" *Anheuser-Busch Co., Inc.*, 858 S.W.2d at 936. Whether a particular representation or omission is material is a question of fact. *Bodovsky v. Texoma Nat'l Bank*, 584 S.W.2d 868, 873 (Tex. Civ. App.—Dallas 1979, writ ref'd n.r.e.). But "[a]n investor is not required to prove that he would have acted differently but for the omission or misrepresentation." *Weatherly*, 905 S.W.2d at 649-50. Thus, it is "no defense that the investor could have discovered the truth by exercising ordinary care." *Duperier*, 28 S.W.3d at 745.[41]

---

[41] What HPOPS could have done to discover the misleading nature of State Street's representations and omissions is of no moment. *See Harleson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1033 n.10 (5th Cir. 1990).

HPOPS's evidence of State Street's misrepresentations committed prior to June 16, 2006 (the day the First Amendment was executed) are enumerated *supra* in Part II of the Facts and create a genuine fact issue as to materiality. Additionally, misrepresentations and omissions that occurred after that date and prior to each monthly investment suffice.

In January 2007, for example, when the September 2006 LDBF Fact Sheet was sent to HPOPS, the LDBF was misrepresented as having an investment objective that "seeks to maximize income, while preserving capital" by investing in a ***diversified*** portfolio of highly rated fixed income securities. The reality was that the LDBF was anything but diversified, as its subprime concentration was 92.9%,[42] and all it did over the next several months was to continue to increase. *See* Ex. 30 (Absolute Return Analytics) (showing 92.9% RMBS on January 31, 2007). The fact sheet also failed to disclose leverage, failed to mention investments in subprime mortgages, and failed to disclose that the fund was not being managed to maintain capital.[43] The record overflows with additional material information that was not provided to HPOPS while it was sending in its monthly check to State Street. *See supra* Facts, Parts IV & V.

## C.     *State Street sold its Commodities Strategy to HPOPS by means of material misrepresentations and omissions.*

State Street says its only "sale" of securities to HPOPS was in August 2005—the time State Street claims HPOPS made its "investment decision." MSJ at 21-22. State Street's restrictive interpretation of when it made a "sale" to HPOPS is contrary to law and fact and runs afoul of both the TSA's broad statutory definition of "sale" and the express legislative purpose of the TSA.[44]

---

[42] Ex. 7 (9/30/2006 Fact Sheet, sent to HPOPS in January 2007). Robert Pickett, the LDBF's portfolio manager, testified his only investment objective in managing the LDBF was to produce ***alpha*** of at least 75 bps. Ex. 52 (Pickett Dep.) at 232-34. Nor did he manage the LDBF to maintain capital or invest in a diversified portfolio of highly rated fixed income securities. *Id.*

[43] Ex. 52 (Pickett Dep.) at 231-34.

[44] The cases upon which State Street relies merely "stand for the proposition that a statement made by the seller after *the purchase* of a security is not the "means" by which the security was sold and is thus insufficient to establish a violation of the [TSA]." *Geodyne Energy Income Prod. I-E v.*

The purpose of the TSA is to "protect investors." *See* TEX. REV. CIV. STAT. ANN. art. 581-10-1(B). As the Texas Supreme Court has observed, the TSA "should be given the widest possible scope" to protect both buyers and sellers of securities. *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 115 (Tex. 1971). Accordingly, the TSA broadly defines "sale," "offer for sale," or "sell" to "include every disposition, or attempt to dispose of a security for value." TEX. REV. CIV. STAT. ANN. art. 581-4(E). Similarly, Texas courts have applied the Act to a wide range of transactions. *See, e.g., Tex. Capital Secs., Inc. v. Sandefer*, 58 S.W.2d 760, 775 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (public transactions); *Anheuser-Busch*, 934 S.W.2d at 708 (private transactions).

Given the TSA's definition of "sale" and the legislative purpose of the Act, State Street made more than one "sale" of the Commodities Strategy to HPOPS. Yes, HPOPS's initial decision to invest in the Commodities Strategy was based on State Street's material misrepresentations and omissions; however, each of HPOPS's twelve monthly installment purchases of the Commodities Strategy was a "sale" by means of State Street's ongoing misrepresentations and omissions.

HPOPS first actual purchase—and State Street's first "sale"—of the Commodities Strategy occurred in June 2006, when HPOPS sent its first $6 million installment to State Street; HPOPS last purchase—and State Street's last "sale"—occurred in May 2007, when HPOPS sent its last $6 million installment to State Street.[45]

Under analogous federal securities laws, courts have held that when a party enters into a contract to purchase securities in the future, each such investment decision may be viewed as a new purchase or sale; therefore, a new cause of action accrues at the payment of each installment.

---

*Newton Corp.*, 97 S.W.3d 779, 784 (Tex. App.—Dallas 2003), *rev'd in part by* 161 S.W.3d 482 (Tex. 2005) (emphasis added). That principle does not support State Street's incredible position that only its representations and omissions prior to HPOPS's initial "investment decision" to hire State Street as an asset manager can be actionable under the TSA.

[45] Moreover, HPOPS was not contractually obligated to make any particular installment. *See* Ex. 10 (IMA) ¶¶ 11(b) & (c); Wolkoff Decl. Ex. 5.

*See Hill v. Equitable Bank*, 655 F. Supp. 631, 638-40, *aff'd*, 851 F.2d 691 (3d Cir. 1988);
*Goodman v. Epstein*, 582 F.2d 388, 409-14 (7th Cir. 1978).

**D.    *State Street is liable for violations of the TSA while acting as HPOPS's investment advisor.***

HPOPS also sued State Street under Article 581-33-1 of the TSA for fraud in State Street's
capacity as an investment advisor to HPOPS, which subjects State Street to liability for its
malfeasance during the securities holding period without regard to whether HPOPS was making a
purchase or a sale.  State Street claims that under Article 581-4, it is exempt from liability as an
investment advisor because it is a bank or bank holding company.  *See* MSJ at 21 n.11.  Article
581-4, provides that the term "investment advisor" does not include a "bank or bank holding
company," unless it is also "an investment company."  State Street is a bank, but it is also an
investment company; therefore, it is not exempt from liability for fraud in its capacity as HPOPS's
investment advisor.

State Street cannot legitimately claim it did not provide investment advisory services to
HPOPS.  Under the IMA, State Street had "full and absolute discretion and power to buy, sell and
generally deal in securities," including the right to choose investments for HPOPS's Commodities
Strategy and cash collateral account.  Ex. 10 (IMA) at Ex. D.  In fact, the IMA expressly *required*
State Street to give investment advice to HPOPS.  *Id.* ¶ 6.  Further, the LDBF Fact Sheet states
that State Street provides investment advisor services:

> All SSgA commingled funds pay State Street Bank and Trust Company for
> services as custodian, transfer agent, and shareholder servicing company and may
> pay affiliates of State Street Bank and Trust Company for investment advisor
> services.

Ex. 7 (LDBF Fact Sheet, 9/30/06) at SS 3620714.

State Street fits the common meaning of "investment company."  For example, as used by
the Securities and Exchange Committee:

> Generally, an "investment company" is a company . . . that issues securities and is
> primarily engaged in the business of investing in securities.

33

http://www.sec.gov/answers/mfinvco.htm (last visited July 2, 2010). State Street's unincorporated subdivision, State Street Global Advisors (SSgA), also is indisputably is an investment company. According to State Street's public filings:

> Our investment management division, State Street Global Advisors . . . acts as an investment advisor . . . However, a major portion of our investment management activities are conducted by State Street Bank[.]

Ex. 163 (State Street 2009 10-K) at 3. Likewise, many of State Street's other departments provide investment advisory services, including the Office of Fiduciary Advisors (OFA), the Global Asset Allocation Group (GAA), and the Charitable Asset Management Group (CAM). Ex. 36 at 16-19.

There is at least a fact issue whether State Street provided investment advice to HPOPS and was an investment company within the meaning of the TSA.

**III.    State Street is not entitled to summary judgment on its mitigation defense.**

State Street bears the burden of proof on its defense of mitigation and can only prevail on summary judgment if it establishes these defenses as a matter of law. State Street cannot meet that burden.

*A.    For the reasons set forth in HPOPS's June 2, 2010 summary judgment motion, State Street's mitigation defense is without merit.*

HPOPS filed its motion for summary judgment on June 2, 2010. See Dkt. 138. In the memorandum supporting its Motion, HPOPS moved on, inter alia, State Street's affirmative defense of mitigation. Specifically, HPOPS advanced the following arguments in support of its Motion—all of which similarly defeat State Street's Motion for Summary Judgment on mitigation as a matter of law:

- State Street's mitigation defense fails because under the Texas Government Code, the Trustees, and therefore the System, are absolved from any and all liability stemming from State Street's acts or omissions. TEX. GOV'T CODE ANN. § 802.203(c).

- State Street's mitigation defense fails because, as an equitable affirmative defense, it does not apply against a governmental entity in a case involving governmental functions such as those involved here. *See, e.g., City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 773 (Tex. 2006).

- Mitigation is not a defense to a breach of fiduciary duty claim.

- Mitigation is not a defense to a claim of fraud. State Street's fraudulent conduct permeates the entire timeline at issue—including the period when HPOPS was, according to State Street, obligated to take actions to mitigate its losses. Indeed, throughout the entire "mitigation" time period, State Street withheld from HPOPS myriad material facts, any or all of which would have caused HPOPS to immediately terminate State Street as its Investment Manager. *See infra* Part III.C.

- Mitigation cannot defeat HPOPS's TSA claims.

- Because State Street, which at all times relevant hereto was the Investment Manager, had an equal (and, in fact, superior) opportunity to mitigate HPOPS's damages, the affirmative defense of mitigation is unavailable.[46]

**B.    State Street's failure to repudiate the IMA bars it from prevailing on its mitigation defense.**

A plaintiff's duty to mitigate damages from breach of contract arises only when (1) a contract is breached and (2) it appears that the breaching party has abandoned or repudiated his obligations under the contract. *United States v. Russell Elec. Co.*, 250 F. Supp. 2, 20 (S.D.N.Y. 1965) (citing *Watts v. Camors*, 115 U.S. 353 (1885) & *Am. Sur. Co. v. Franciscus*, 127 F.2d 810 (8th Cir. 1942)). If negotiations between the parties are pending, if assurances are made that performance will be forthcoming, or if other circumstances indicate that the breaching party intends to perform, then no duty to mitigate arises even though the contract has been breached. *Id.* The IMA between HPOPS and State Street remained in effect throughout the relevant time period. It was not until November 13, 2007 that HPOPS terminated State Street as its Investment Manager. *See* Wolkoff Ex. 27 (Termination Letter, 11/13/2007). Even then, State Street remained under contract as HPOPS's Investment Manager until it liquidated HPOPS's investment on December 14, 2007. *See* Ex. 119 (Houston Police In kind Detail, 12/14/2007). Not once did State Street repudiate its contractual obligations under the IMA. To the contrary, it repeatedly assured HPOPS that it had "weathered other storms" and *was performing* (by "reducing risk"). Ex. 164 (Franey Ex. 114). As such, HPOPS's duty to mitigate, if any, could not have arisen before

---

[46] State Street was HPOPS's Investment Manager until it was terminated and the liquidation was complete on December 14, 2007. As noted above, State Street had the absolute discretion over the strategy, including the cash fund. By definition, it had at least an equal opportunity to mitigate HPOPS's damages.

December 14, 2007. By December 14, 2007, even under State Street's view of the facts, there was nothing left to mitigate.

**C.** ***There is ample evidence in the record to raise a fact issue regarding whether HPOPS took reasonable steps to mitigate its damages.***

*1.*     *Under Texas law, mitigation is inherently fact specific and is focused on the reasonableness of the actions taken in light of what was known at the time.*

Mitigation is an affirmative defense, and the party asserting the defense of failure to mitigate must prove both (1) lack of diligence on the part of the plaintiff (i.e., what an ordinary prudent person would have done under the same or similar circumstances),[47] and (2) the amount by which the damages were increased by the failure to mitigate. *Geotech Energy Corp. v. Gulf States Telecomms. & Info. Sys., Inc.*, 788 S.W.2d 386, 390 (Tex. App.—Houston [14th Dist.] 1990, no writ); *Town E. Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 806 (Tex. App.—Dallas 1987, no writ); *R.A. Corbett Transp., Inc. v. Oden*, 678 S.W.2d 172, 176-77 (Tex. App.—Tyler 1984, no writ).

If it were determined that HPOPS had a duty to mitigate damages, State Street bears the burden to prove that the HPOPS failed to act reasonably as a matter of law. *See Novelty Textile Mills, Inc. v. C.T. E., Inc.*, 743 F. Supp. 212, 219 (S.D.N.Y. 1990).

State Street, therefore, would have the burden to prove that HPOPS's failure to fire State Street and exit the Commodities Strategy in mid-August 2007 was ***unreasonable as a matter of law****. See Hall v. Huff*, 957 S.W.2d 90, 97 (Tex.App.—Texarkana 1997, pet. denied). If the course of conduct chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have further lessened its damages. *Id.* (citation omitted). The reasonableness of mitigation efforts "is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented." *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950).

---

[47]    *Moulton v. Alamo Ambulance Serv.*, 414 S.W.2d 444, 447 (Tex. 1967); *Pinson v. Red Arrow Freight Lines, Inc.*, 801 S.W.2d 14 (Tex. App.—Austin 1990, no writ).

The mitigation doctrine merely requires that an injured party exercise reasonable care to minimize his damages. *Geotech Energy*, 788 S.W.2d at 390 ("ordinary care" and "reasonable diligence"); *Pulaski Bank & Trust Co. v. Tex. Am. Bank/Fort Worth*, 759 S.W.2d 723, 735-36 (Tex. App.—Dallas 1988, writ denied) ("reasonable efforts and ordinary care"). Additionally, the duty to mitigate is not immediate upon discovery of harm—a party has a reasonable time to mitigate its damages. *See Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990) ("All that is required is that the government act reasonably and promptly given the circumstances."); *Cole Chem. & Distrib., Inc. v. Gowing*, 228 S.W.3d 684, 688 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (landlord had reasonable time to mitigate damages by finding new tenant); *see also City of San Antonio v. Guidry*, 801 S.W.2d 142, 151 (Tex. App.—San Antonio 1990, no writ) (rejecting defendant's mitigation defense when defendant argued plaintiff should have moved his business, but failed to offer evidence of "how long it would have taken [plaintiff] to relocate, what the move would have cost, or how successful he might have been in another location").

Given the intensely factual nature of the inquiry, whether a plaintiff acted properly to mitigate its damages ordinarily presents a fact question for the jury. *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220 (Tex. App.—San Antonio 1999, no pet.); *Hardison v. Beard*, 430 S.W.2d 53, 57 (Tex. Civ. App.—Dallas 1968, writ ref'd n.r.e.).[48] Likewise, the quantum of damages and the question whether a party under a duty to mitigate has done so usually are fact questions. *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231, 233 (Tex. 1936). Summary judgment is thus rarely, if ever, proper for mitigation or the amount of damages. *Carruth v. Alien*, 368 S.W.2d 672, 680 (Tex. Civ. App.—Austin 1963, no writ). What constitutes a reasonable time to mitigate

---

[48] *See also Sorbus, Inc. v. UHW Corp.*, 855 S.W.2d 771, 775 (Tex. App.—El Paso 1993, writ denied) ("Mitigation . . . if properly raised by the evidence, should be a fact question for the jury."); *Am. W. Airlines, Inc. v. Tope*, 935 S.W.2d 908, 915 (Tex. App.—El Paso 1996, no writ) (the reasonableness of a party's conduct in rejecting an offer that might make the party substantially whole is a fact question for the jury); *Pacesetter Corp. v. Barrickman*, 885 S.W.2d 256, 263 (Tex. App.—Tyler 1994, no writ) (same); *Azar Nut Co. v. Caille*, 720 S.W.2d 685, 688 (Tex. App.—El Paso 1986) (same), *aff'd*, 734 S.W.2d 667 (Tex. 1987).

is likewise a fact question, which depends on the particular circumstances of each case. *See Nye v. Blyth Eastman Dillon & Co., Inc.*, 588 F.2d 1189, 1198 (8th Cir. 1978) (remanding to trial court for determination of reasonable time within which plaintiffs could mitigate). For example, where the defendant makes assurances to the plaintiff or promises to take proper steps to reduce or prevent damages when the injury is impending or has actually begun, such facts may be considered in connection with the plaintiff's attempts to mitigate. *See Van Syckle v. C.L. King & Assoc., Inc.*, 822 F. Supp. 98 (N.D.N.Y. 1993) (fact issue existed on whether plaintiffs took reasonable steps to mitigate when defendant told them to "place trust in [his] abilities as an asset manager" and plaintiffs said they were "overwhelmed, shocked and confused by Defendants' breach of trust and the whirlwind of transactions"); *see also Wilson v. Snider*, 274 S.W.2d 569 (Tex. Civ. App.—San Antonio 1954, writ ref'd n.r.e.). Difficulty in selling securities is also a factor.[49] *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986) (summary judgment on mitigation improper where issues existed as to plaintiff's ability to resell).

2.     *State Street's recitation of the facts concerning what HPOPS allegedly knew is disputed.*

State Street advances what it terms as undisputed facts regarding what HPOPS allegedly knew regarding its LDBF investment during the summer of 2007 and beyond. HPOPS begs to differ—the "facts" are indeed disputed: State Street presented the facts in an out-of-context, misleading manner. HPOPS respectfully refers the Court to its Counter-Statement to State Street's Rule 56.1 Statement. *See* R. 56.1 Opp. ¶¶ 34-69.

3.     *There is a large volume of evidence proving that in light of what HPOPS in fact knew, it took reasonable steps to mitigate its losses.*

State Street takes the incredible position that HPOPS failed to act reasonably to mitigate its losses as a matter of law by not firing State Street and exiting the Commodities Strategy in mid-August 2007 and that HPOPS instead made a "second investment decision" to remain

---

[49]     *See also, e.g., Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 589 (6th Cir. 2000) (holding that "the mitigation rule does not require parties to unload *junk stock* on unwitting investors." (emphasis added)).

invested in the Commodities Strategy. As noted above, State Street bears the burden of establishing its allegations as a matter of law, and the factual record reveals a slew of fact questions that preclude summary judgment.

### a. State Street's management of the commingled commodities strategy is strong evidence that HPOPS acted reasonably.

Perhaps the best evidence establishing the futility of State Street's mitigation defense is the fact that State Street, as the manager of the commingled DJ-AIG fund commodities strategy, did not pull the commingled strategy out of the LDBF until November 14, 2007, the day after HPOPS terminated State Street as its investment advisor, along with its investment in the LDBF.[50] If State Street did not see fit to get out of the subprime-laden LDBF in its capacity as the investment manager of the commingled commodities fund, how can it in good faith argue that HPOPS should have pulled the "LDBF plug" in its separately managed analog to the commingled fund any earlier?[51]

### b. The early to middle August time period.

State Street focuses much of its attention on the August 8-9, 2007 time period because it admits that it was only then that HPOPS, for the first time, became aware that the LDBF was essentially a subprime bond fund. But there are a lot of good reasons why HPOPS did not make a decision to liquidate its commodities investment with State Street and, along with it, its cash collateral investment in the LDBF.[52] To begin with, Franey was not in charge—State Street, the

---

[50] Ex. 166. State Street's Investment Committee minutes demonstrate that State Street took until November 14, 2007 to realize that the LDBF would not enable its commingled commodities strategy to meet its goals. The minutes indicate Pickett's belief that there would be no liquidity until at least the new year and that it would be very challenging to meet the goals of the commingled commodities strategy. Ex. 22. On that basis, State Street liquidated the commingled strategy's units in the LDBF and reinvested in LIBOR Plus. Id.

[51] Even posing the question is absurd because State Street was the manager for both funds—the commingled DJ-AIG commodities strategy and the separately managed (by State Street) HPOPS DG-AIG Commodities Strategy.

[52] As noted in HPOPS's Counter-Statement pursuant to Local Rule 56.1, the information HPOPS (and its consultant Jerry Woodham) received on August 8–9 was not all doom and gloom. For example, Woodham was told that State Street "believed in the sector," that State Street "thought the sector will recover," and that State Street "believe[d] in [the] fundamentals." R. 56.1 Opp. ¶ 56.

investment manager, was. Franey was not a securitized investment expert, let alone an expert in subprime mortgage-backed bonds. Ex. 2 (Franey Aff.) ¶ 6; Ex. 3 (Woodham Dep.) at 135-36 (testimony of Jerry Woodham, HPOPS's consultant, confirming that from his vantage point, he certainly did not believe that HPOPS had the necessary information to make a recommendation to the HPOPS Board of Trustees regarding what steps to take to salvage the already impaired investment). But of course, that was State Street's role, not merely to make a recommendation, but to take action as the Investment Manager. Moreover, Franey did not have any listing or identification of the bonds and other investments that were held by the LDBF.[53] The first listing HPOPS received was provided to HPOPS at the close of business on August 10,[54] but it was fraudulent in that it listed $ 1 billion worth of assets that did not account for the fact that almost all of the fund had already been redeemed by the remaining five internal State Street funds.[55] HPOPS did not receive a purportedly accurate listing of the actual LDBF investments until August 16, although the $43 million valuation was inflated because State Street (unbeknownst to HPOPS) could not price the securities. Ex. 100; Ex. 101 (adjusted holdings sent again on 8/24/07).

While HPOPS was waiting for the August securities listings, on August 14, 2007, State Street wrote HPOPS a letter authored by Sean Flannery, which painted a picture of a market affected more by "technical" events—such as hedge fund manipulation, etc.—than by any fundamental problems with the subprime investments themselves. Ex. 103. Importantly, Flannery—State Street's CIO—suggested that holding, and not selling, the securities was the prudent thing to do: "While we will continue to liquidate assets for our clients when they demand

---

[53] Ex. 2 (Franey Aff.) ¶ 10; Ex. 99 (first time received holdings, though incorrect, was 8/10/2007).
[54] Ex. 99.
[55] Ex. 73 (Bay Reb Rpt at 33-34; Bay Rpt at Sch. G-1).

it, we believe that many judicious investors will hold the positions in anticipation of greater liquidity in the months to come." *Id.*[56]

From August 10 through August 16, Franey struggled with what steps to advise HPOPS's Trustees to take in light of the confusing and conflicting information he was receiving. He wrote John Grybauskas of Black Rock, Inc. on August 13, asking his advice and stating "I want to preserve value. I want a proposal on how to salvage this (i.e. hold to maturity, dump it, manage it, and if so, why . . .)." Ex. 102. That same day, Franey wrote to Grant Johnsey of Northern Trust Corporation, asking "Why not hold to maturity?" Ex. 167.

On August 13, Stacy Ables of HPOPS asked State Street to provide information as to the amount of daily leverage in HPOPS's account. Ex. 168. However, State Street could not provide the information HPOPS requested, because State Street did not even bother to keep track of daily leverage within the LDBF. Ex. 171.

On August 14, Mr. Franey continued gathering information and evaluating options. Franey had a call with DeGiacomo and Hopkins, during which Mr. Franey asked questions regarding (1) what HPOPS would get if it took its allocation in kind, (2) the costs of taking in kind, (3) the costs of liquidation, (4) whether State Street could continue to manage HPOPS on a separate basis, and (5) State Street's opinions on market conditions going forward. Ex. 169. Clearly, as of mid-August, HPOPS had not made a "second investment decision" to remain invested in the Commodities Strategy. Rather, HPOPS was prudently evaluating its options.

On August 15, State Street suggested to HPOPS that in kind redemption was possible, recognizing that the remaining securities were listed at inflated prices. Ex. 170. However, State Street did not inform HPOPS that the prices were inflated.[57]

---

[56] Flannery's letter was consistent with State Street's ongoing mantra that subprime securities were fundamentally good investments and judicious investors, recognizing those fundamentals, would hold the securities.

[57] Ex. 94 (Tenczar Dep.) at 258-59 (agreeing that Bayley's schedule confirmed that State Street's pricing was "mark to make believe"); Ex. 172; Ex. 73 (Bay Rpt at Sch. G-1).

### c.   The mitigation window was closed by August 10-13.

Importantly, by August 10 (or at the latest, August 13), HPOPS could no longer mitigate by cashing out of the LDBF for any dollar value—let alone the values listed by State Street's expert, Dr. Carron.[58]  On Friday, August 10, as noted above and unbeknownst to HPOPS, the five remaining internal State Street funds that held an interest in the LDBF issued instructions to redeem their interests in kind—leaving only HPOPS and Alaska as investors in the LDBF.[59] Subsequently, there was no way for HPOPS to "cash out," because there was no cash--all that was left was the subprime bonds and derivative investments, many in odd lots and difficult to sell. Plus, since HPOPS literally owned 88% of the remaining assets in the LDBF, if it had made a decision to liquidate then, it would have thrown the LDBF into a controlled redemption, which is in fact what happened when HPOPS made the decision to exit in November 2007.[60]

### d.   The end-of-August to September time period.

Through the end of August, State Street continued to provide HPOPS with new information regarding its LDBF's holdings.[61]  Meanwhile, Franey continued to evaluate HPOPS's

---

[58] As explained *infra* in Part III.D, Dr. Carron's pricing is an inflated fiction because State Street could not price the securities, as there was no market for them.

[59] Ex. 73 (Bay Rpt at C-19). As noted in HPOPS's Counter-Statement pursuant to Local Rule 56.1, the information HPOPS (and its consultant Jerry Wodham) received on August 8–9 was not all doom and gloom. For example, Woodham was told that State Street "believed in the sector," that State Street "thought the sector will recover," and that State Street "believe[d] in [the] fundamentals." *See* R. 56.1 Opp. ¶ 56.

[59] State Street's failure to tell HPOPS on August 8 that within 2 days, that every internal fund that had not already exited would depart the fund and that HPOPS and Alaska would be the only two investors remaining in the LDBF was fraudulent in and of itself. R. 56.1 Opp. ¶ 49.

[60] State Street told Woodham that the LDBF still had **$421 *million*** in investments—but failed to tell him that in two days that amount would be reduced to **$40 *million*** (even then, based on an overstated NAV) and that HPOPS would own an astonishing 90% of the fund. Ex. 79. Woodham was also told of the option to move HPOPS cash-collateral to the LDBF II fund (which did not yet exist), but was presented no other options—such as moving HPOPS's collateral to a different cash fund as part of the Commodities Strategy. State Street gave Woodham bits of information, targeted to keep HPOPS invested in the Commodities Strategy, and State Street made no effort to move HPOPS out of the LDBF. R. 56.1 Opp. ¶¶ 52-53.

[61] Ex. 173; Ex. 138.

investment options,[62] and State Street continued to assure him with comfort language aimed at keeping HPOPS as a customer. For example, on August 28, Messrs. DeGiacomo, Hopkins, and Tucker met with Franey and made a presentation to him regarding, among other things, what allegedly had happened to HPOPS's investment in the Commodities Strategy and, in particular, the investment of HPOPS's cash collateral in the LDBF. In the presentation, State Street again advanced its argument that the subprime issues were technical in nature and not related to fundamentals. Ex. 105. Importantly, HPOPS's investment manager—John Tucker—still made no effort to move HPOPS out of the LDBF and did not suggest that HPOPS take such action. And at this meeting, HPOPS was again told that the subprime bonds were "money good." Ex. 91.

In an August 28, 2007 memorandum to HPOPS's Board of Trustees, Franey noted that there was no easy solution to salvage HPOPS's commodities investment and that even liquidation would be fraught with difficulties in "that the bond fund has been reduced to a relatively small size so the underlying positions will be difficult to sell and, the portfolio consists of a significant number of 'odd lots' which will further depress any proceeds . . . further complicated by the fact that the underlying portfolio contains six interest rate swaps which are also difficult and costly to unwind other than on the applicable quarterly or monthly reset date." Ex. 91.[63] The next day, State Street sent HPOPS another letter reiterating its belief that the issues with subprime were technical, not fundamental. Ex. 175. Again, State Street falsely claimed it had taken steps to reduce risk. *Id.*

In September 2007, Franey focused on trying to understand how State Street had managed HPOPS's investment such that it was left with essentially a 90% ownership interest in an odd-lot collection of subprime securities.[64] Of particular importance was a question Franey asked

---

[62] Wolkoff Decl. Ex. 24; Ex. 103; Ex. 174.

[63] Mitigation does not require a party to incur more than a trifling expense. *Pulaski Bank & Trust Co. v. Tex. Am. Bank/Fort Worth, N.A.*, 759 S.W.2d 723, 735 (Tex. App.—Dallas 1988, writ denied).

[64] Ex. 109.

repeatedly, and for which he would have to answer to HPOPS's Board—how and why HPOPS's $54 million investment was now valued at $30 million, because when he backed in the pre-collapse valuations for the securities that remained, he calculated an $11 million loss, not a $24 million loss.[65] State Street knew the answer: other investors (including State Street's own funds) had been cashed out at inflated values.[66] Ex. 177. State Street kept the true answer from HPOPS and denies it for litigation purposes even today.[67]

In fact, State Street did everything it could to keep HPOPS invested in the Commodities Strategy, as it gave yet another presentation to HPOPS—now to its Board of Trustees—on September 11, 2007. Ex. 107; R. 56.1 Opp. ¶ 62. State Street again did not move HPOPS's cash out of the LDBF, nor advise HPOPS to make such a move. State Street's presentation—like State Street's August 28 presentation to Franey—omitted a tremendous amount of material information. *Id.*; R. 56.1 Opp. ¶ 62.

State Street's internal correspondence shows it was "getting A LOT of heat" from Franey to answer HPOPS's questions, but State Street was less than forthcoming with information. Ex. 179; Ex. 183. On September 12, Franey asked State Street for help valuing the securities, but State Street refused. Ex. 180. It took State Street more than two weeks to respond to his requests. Ex. 181. Franey also asked State Street for information about liquidations by State Street's funds, but was told that State Street's legal department would not let HPOPS have the information. Ex. 182.

---

[65] The $24 million lost was, of course, not accurate but was understated because it was based upon fictitious values State Street knew it could not obtain on the market, after redeeming its own funds out of the LDBF with the only liquid securities. Ex. 177.

[66] Ex. 73 (Bay Rpt at Sch. G-1).

[67] Franey had earlier asked a similar question—"What leads to the most significant write-downs in the account being on the days that liquidations occurred and on Mondays?" Ex. 178. The answer, of course, was that the liquidations were at inflated NAVs, but State Street never provided this important disclosure to HPOPS.

### e.     The October-to-November time period.

On October 1, 2007, HPOPS informed State Street that it wanted to exit the Commodities Strategy and liquidate the portfolio. HPOPS asked State Street to promptly provide an estimate of what it could receive if it liquidated rather than taking an in kind distribution. Ex. 112. On October 8, DeGiacomo finally admitted to Franey, off the record, that State Street could not price HPOPS's securities and could not tell HPOPS what prices they would get on liquidation. Ex. 113. State Street took eight days to officially get back to HPOPS and then insisted that HPOPS could not receive an in kind distribution; instead, State Street would have to sell all of the securities and distribute the funds to the sole remaining investors, HPOPS and Alaska. Ex. 113.[68]

On October 5, 2007, in between HPOPS's request and State Street's response, State Street's President and CEO, William Hunt, sent yet another "comfort letter" to HPOPS. Ex. 106. In the letter, Mr. Hunt blamed forced panic selling for client losses (despite the fact that State Street's internal funds led the panic and contrary to State Street's litigation position that HPOPS should have joined the "panic") and repeated the State Street company line that "many judicious investors will hold the positions in anticipation of greater liquidity in the months to come[.]" *Id.* State Street's burden on summary judgment is to show that no reasonable investor would have followed Mr. Hunt's recommendation and that HPOPS was imprudent by even pausing to fully understand and evaluate its options.

---

[68] A defendant is not entitled to a mitigation defense when the defendant's own conduct, including representations to the plaintiff, interfere with the plaintiff's attempts or ability to mitigate. *See, e.g., Urico v. Parnell Oil Co.*, 708 F.2d 852, 854-55 (1st Cir.1983) (court let plaintiffs introduce settlement discussions to show insurer wrongfully refused to make a reasonable settlement offer to rebut defendant's argument that plaintiff failed to mitigate); *see also Valencia v. Shell Oil Co.*, 147 P.2d 558 (Cal. App. 1944) (plaintiff's delay in mitigating damages reasonable where defendant promised but failed to pay for repairs and plaintiff was unable to do so); *Boston Sea Party Restaurants, Inc. v. Luiggi's of Schaumburg, Inc.*, No. 90 C 269, 1990 WL 207442, *5 (N.D. Ill. Dec. 1, 1990) (court let plaintiff admit evidence of settlement discussions where defendants had given assurances of their performance to demonstrate that plaintiffs did not unreasonably delay in mitigating damages). Throughout the fall of 2007, State Street interfered with HPOPS's ability to mitigate in myriad ways—by assuring HPOPS that the securities were "money good," by reneging on promises to make in kind distributions, and by forcing HPOPS into a delayed and painful controlled redemption.

On November 13, HPOPS fired State Street. HPOPS asked State Street to liquidate its positions and give it <u>cash proceeds</u>. Ex. 184. As noted above, State Street made the same decision with respect to the commingled funds the next day.[69]

State Street did not follow HPOPS's instructions to immediately liquidate HPOPS's investments. Instead, State Street delayed the process for over four weeks. Wolkoff Decl. Ex. 57. Indeed, State Street took almost two weeks to tell HPOPS that it was going into a controlled liquidation and that there would be additional delay. R. 56.1 Opp. ¶ 65; Wolkoff Decl. Ex. 53.

On November 26, State Street closed the LDBF because its portfolio manager was struggling to trade in the illiquid subprime bond market. Ex. 187. State Street continued to withhold information from HPOPS. Internally, State Street acknowledged that it was "[u]nacceptable not to tell client how redemption will work[.]" Ex. 185. However, State Street personnel felt they were "not in a position to answer" HPOPS's reasonable questions. Ex. Wolkoff Decl. Ex. 55.

On December 11, State Street contacted Franey regarding how HPOPS could liquidate— either (a) cash by no later than March 31, 2008, (b) HPOPS manage its own securities and sell when and if they could, or (c) take securities in kind with "no assurance you can sell or market will exist." Ex. 119.

On December 17, HPOPS received securities in kind valued by State Street at $13.6 million along with $14.3 million in cash for a total of $27.9 million. Ex. 119. Presumably, State

---

[69] Ex. 22 (Investment Committee decided that commingled DJ-AIG should switch to LIBOR Plus). State Street's Investment Committee minutes demonstrate that State Street took until November 14, 2007 to realize that the LDBF would not its commingled commodities strategy to meet its goals. The minutes indicate Pickett's belief there would be no liquidity until at least the new year and that it would be very challenging to meet the goals of the commingled commodities strategy. *Id.* On that basis, State Street liquidated the commingled strategy's units in the LDBF and reinvested in LIBOR Plus. *Id.*

Street distributed HPOPS's portion of the liquidated LDBF part in kind and part in cash because State Street could not sell the final batch of odd-lot securities.[70]

Even the $13.6 million "value" of securities HPOPS received in kind was overstated. HPOPS asked for several bids and ultimately chose one of the few bidders that could even make an offer of around $6 million. R. 56.1 Opp. ¶¶ 66-68. On February 21, 2008, at Franey's recommendation, HPOPS's Board of Trustees agreed to liquidate the securities for cash and obtained approximately $6.5 for them. R. 56.1 Opp. ¶ 67; Ex. 120; Ex. 188. The difference between State Street's $13.6 million figure and the $6 million price fetched in the market reflects the fact that the $13.6 million was "make believe." Ex. 93.

In light of these circumstances, whether HPOPS acted reasonably to mitigate its damages presents numerous fact questions precluding summary judgment.

**D.    Assuming, arguendo, that HPOPS had a duty to mitigate and that it failed to do so, there is ample evidence in the record to raise a fact issue regarding the quantum of damages HPOPS allegedly could have avoided by mitigating.**

Even if State Street could establish as a matter of law that HPOPS had a duty to mitigate and that HPOPS acted unreasonably in carrying out that duty, fact issues prevent a determination of the amount by which HPOPS's damages were increased by its alleged failure to mitigate. *Geotech Energy*, 788 S.W.2d at 390; *Town E. Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 806 (Tex. App.—Dallas 1987, no writ); *R.A. Corbett Transp., Inc. v. Oden*, 678 S.W.2d 172, 176-77 (Tex. App.—Tyler 1984, no writ). State Street cannot prove the amount of increased damages due to HPOPS's alleged failure to mitigate as a matter of law, because State Street could not accurately price the securities in the LDBF after June of 2007.

By no later than the week of July 23, 2007, State Street knew and concluded that it was "virtually impossible" to determine the accurate price of LDBF illiquid securities by any means where trading was extremely thin to nonexistent. R. 56.1 Opp. ¶ 43. Despite the conclusion on

---

[70] Ex. 73 (Bay Rpt at Sch. G-1) (showing that, when State Street started trying to liquidate the LDBF, it could not sell at NAV value and, after 12/5/07, only sold ones it could sell without a loss).

its inability to obtain reliable prices for CMY1's securities and the NAV was overstated, State Street continued to partially redeem or liquidate its internal funds, at least partly in cash. HPOPS was not advised of the inaccuracy of pricing, nor of the constantly changing methods of pricing until discovery in this litigation.[71]  *See* R. 56.1 Opp., Issues for Trial (IFT) No. 1.[72]  The inability to price makes the calculation of savings by mitigation impossible to calculate.

On July 25, 2007, State Street's Investment Committee met to discuss the LDBF's severe problems, pricing, illiquidity, and planned redemptions and how to handle them. Ex. 15; Ex. 75. The Investment Committee also ordered the Impaired Asset Valuation Committee (IAVC) to meet to determine the pricing problems because IDC pricing, used for NAV, was not correct. Ex. 77. When the IAVC met a few days later, it concluded that the securities could not accurately be priced. *See* R. 56.1 Opp., IFT No. 2.

Scott Bayley, HPOPS's forensic accountant, confirmed that all the way through the date HPOPS terminated State Street, the NAV value pricing, upon which Dr. Carron and State Street calculate the mitigation figures, are wrong and are overstated (in favor of State Street). *See* R. 56.1 Opp., IFT 3.[73]  His testimony is supported by a wealth of evidence obtained from State Street's own witness. *See* R. 56.1 Opp., IFT Nos. 4-17.

In conclusion, State Street cannot meet its burden to prove the amount HPOPS would have saved money at any time after mid-July 2007 had it acted more promptly to terminate State Street. And certainly, for purposes of summary judgment, there is at a minimum a fact issue with respect to whether HPOPS has been fully compensated—assuming that it had a duty to mitigate by some undetermined date, which it did not.

---

[71] Ex. 2 (Franey Aff.) ¶ 11.

[72] HPOPS sets forth in its R. 56.1 Opp., additional genuine issues regarding State Street's mitigation defense for trial that are referenced herein as "IFT."

[73] Ex. 73 (Bay Rpt at Sch. G-1).

**IV.     State Street is not entitled to summary judgment on its superseding cause defense.**

Superseding cause, also referred to as "new and independent cause," is an inferential rebuttal defense.  Such a theory seeks to rebut an essential element of the plaintiff's case by proving certain other facts.  *See Dallas Ry. & Terminal Co. v. Bailey*, 250 S.W.2d 379, 383 (Tex. 1952).  A superseding cause is an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, thus becoming the immediate cause of the injury.  *See Rodriguez v. Moerbe*, 963 S.W.2d 808, 820 (Tex. App.—San Antonio 1998, pet. denied).  The defendant bears the burden of establishing superseding cause.  *See Benitz v. Gould Group*, 27 S.W.3d 109, 116-17 (Tex. App.—San Antonio 2000, no pet.).  As with mitigation,[74] superseding cause is not a defense to HPOP's TSA claims because the only available defense is the one provided by statute.  *See Duperier*, 28 S.W.3d at 753-54.[75]  Likewise, as with mitigation, superseding cause does not apply to HPOPS's claims under Texas Government Code § 802.203(c).  *See* HPOPS's MSJ (Dkt. 138) at 50.  State Street's superseding-cause defense also fails for two additional legal reasons:

*A.     Under Texas law, a plaintiff's own conduct cannot be a superseding cause.*

The Texas Proportionate Responsibility Act (TPRA) applies to all actions based on a defendant's tortious conduct.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001, *et seq.*  Under the TPRA, a plaintiff's contributory negligence does not bar a plaintiff's claim.  Instead, courts reduce a claimant's damages recovery by the "percentage of responsibility" attributed to him by the trier of fact.  *Id.* § 33.003.  A plaintiff is not barred from recovering unless the fact finder determines the plaintiff was more than fifty percent responsible for the harm.  *Id.* § 33.001; *see also, e.g., Cruthirds v. RCI, Inc.*, 624 F.2d 632 (5th Cir. 1980) (under TPRA, plaintiff was entitled to a verdict if parties were found equally at fault).  Thus, "under Texas law, a new and independent cause that extinguishes the liability of a party cannot arise out of an affirmative act of

---

[74] State Street concedes that mitigation is not a defense to HPOPS's TSA claims.  *See* MSJ 17 n.8.

[75] *See also Riggs v. Riggs*, 322 S.W.2d 571, 574 (Tex. Civ. App.—Dallas 1959, no writ).

negligence by either the plaintiff or the defendant." *Biaggi v. Patrizio Rest., Inc.*, 149 S.W.3d 300, 305 (Tex. App.—Dallas 2004, pet. denied). Instead, the issue of superseding cause can be raised and attributed only to some outside agency operating to cause the complained-of injury. *Id.* The TPRA thus eliminates the defense of superseding cause based on the plaintiff's acts or omissions. State Street ignores this directly applicable law and instead cites cases applying federal securities laws.[76] But HPOPS does not assert a violation of federal securities laws, and so the defense of superseding cause does not apply to HPOPS's claims. State Street simply got the law wrong.

**B.      *Superseding cause is not a defense to State Street's breaches of its fiduciary duties.***

As with mitigation, any alleged act or omission by HPOPS cannot absolve State Street of liability or bar HPOPS from recovering for breach of fiduciary duty. *See Openshaw v. Cohen, Klingenstein & Marks, Inc.*, 320 F. Supp. 2d 357, 364-65 (D. Md. 2004); *Williams v. Provident Inv. Counsel, Inc.*, 279 F. Supp. 2d 894, 909 (N.D. Ohio 2003); *Compton Press, Inc. v. Granada Invs., Inc.*, Civ. A. No. 91-1256, 1992 WL 566329, at *9 (D. N.J. Nov. 23, 1992). Indeed, any fiduciary duties the Trustees owed with respect to the management of Plan assets were owed to HPOPS and its beneficiaries, ***not*** State Street. *See Compton Press, Inc.*, 1992 WL 566329, at *9. Rather, any recovery for State Street's breaches of fiduciary duty goes to the System, and "the Plan's participants should not be punished for the [purported] acts of the trustees." *Williams*, 279 F. Supp. 2d at 909. Accordingly, State Street "is not allowed to reduce or eliminate its liability to the [System] on the defense that other fiduciaries [allegedly] breached their fiduciary duties." *Id.* Thus, whether HPOPS (through its Trustees or agents) engaged in conduct that would reduce State Street's liability to the plan on an issue where State Street bears the burden, such as superseding cause, has no bearing on State Street's fiduciary obligations to HPOPS or its right to recover on behalf of its beneficiaries for State Street's breach of fiduciary duties.

### CONCLUSION

For the above reasons, State Street's motion should be denied.

---

[76] *See* MSJ at 19-22 (citing federal cases from Eighth and Ninth Circuits and this District).

Respectfully submitted,

**BURFORD & MANEY, L.L.P.**

By:    */s/ Robert R. Burford*
Robert R. Burford
TBA No. 03258500
Andrew Meade
TBA No. 24032854
1221 McKinney, Ste. 3150
Houston, Texas 77010
Telephone: (713) 658-9001
Facsimile: (713) 658-9011

**GIBBS & BRUNS, L.L.P.**

By:    */s/ Grant J. Harvey*
Grant J. Harvey
TBA No. 09177700
Caren S. Sweetland
TBA No. 24001333
Laura Carlock
TBA No. 24027221
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713)650-8805
Facsimile:  (713)750-0903

ATTORNEYS FOR PLAINTIFF HOUSTON
POLICE OFFICERS' PENSION SYSTEM

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record via electronic mail on July 2, 2010 as set forth below:

Harvey J. Wolkoff
Robert A. Skinner
Olivia S. Choe
Lila A. Palmer
**Ropes & Gray LLP**
One International Place
Boston, MA 02110
Tel: 617.951.7000
Fax: 617.951.7050
Harvey.Wolkoff@ropesgray.com
Robert.Skinner@ropesgray.com
Olivia.Choe@ropesgray.com
lila.palmer@ropesgray.com

Jerome C. Katz
**Ropes & Gray LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Tel: 212.841.5700
Fax: 212.841.5725
Jerome.Katz@ropesgray.com

***Attorneys for Defendant State Street Bank and Trust Company***

John D. Donovan, Jr.
**Ropes & Gray LLP**
One International Place
Boston, MA 02110
Tel: 617.951.7000
Fax: 617.951.7050
jdonovan@ropesgray.com

***Attorneys for Defendant SSGA Funds***

Edwin G. Schallert
Steven Klugman
Matthew D. Siegel
**DeBevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
Tel: 212.909.6000
Fax: 212.909.6836
egschall@debevoise.comsklugman@debevoise.commdsiegel@debevoise.com

***Counsel for Plaintiff Prudential Retirement Insurance and Annuity Company***

William C. Fredericks
Jerald D. Bien-Willner

Avi Josefson
**Bernstein Litowitz Berger & Grossman LLP**
1285 Avenue of the Americas
New York, NY 1019
Tel: 212.554.1400
Fax: 212.554.1444
avi@blbglaw.comWfredericks@blbglaw.comJerryB@blbglaw.com

*Counsel for Lead Plaintiff Warren Cohen, Trustee of the Unisystems Plan, and Interim Lead Counsel for the Class*

George M. Gowen III
**Cozen O'Connor**
1900 Market Street, Fourth Floor
Philadelphia, PA 19103
Tel: 215.665.2000
Fax: 215.665.2013
ggowen@cozen.com

*Counsel for Defendants Cambridge Financial Services, Inc. and Ernest A. Liebre*

Jeffrey C. Block
Patrick T. Egan
Kristen D. Tremble
Abigail A. Romero
**Berman Devalerio Pease Tabacco Burt & Pucillo**
One Liberty Square
Boston, MA 02109
Tel: 617.542.3800
Fax: 617.542.1194
jblock@bermanesq.compegan@bermanesq.comktremble@bermanesq.comaromeo@bermanesq.com

*Counsel for Plaintiffs Nashua Corporation Plan Committee, John L. Patenaude, Margaret Callan, and Karen Adams*

Anne F. O'Berry
**Berman Devalerio Pease Tabacco Burt & Pucillo**
Esperante Building
222 Lakeview Avenue, Ste. 900
West Palm Beach, FL 33401
Tel: 561.835.9400
Fax: 561.835.0322
aoberry@bermanesq.com

*Counsel for Lead Plaintiffs John L. Patenaude and Margaret Callan, Fiduciaries of the Nashua Plan and Interim Lead Counsel for the Class*

Clinton Krislov
Jeffrey Salas
Krislov & Associates, Ltd.
20 North Wacker Drive
Chicago, IL 60606

Tel: 312.606.0500
Fax: 312.606.0207
clint@krislovlaw.comjeff@krislovlaw.com

**Counsel for Sisters of Charity of the Blessed Virgin Mary**

William F. Lee
John J. Butts
Felicia H. Ellsworth
Kevin S. Prussia
**Wilmer Cutler Pickering Hale and Dorr LLP**
60 State Street
Boston, MA 02109
617.526.6000
william.lee@wilmerhale.comjohn.butts@wilmerhale.comfelicia.ellsworth@wilmerhale.comkevin
.prussia@wilmerhale.com
Steven F. Cherry
**Wilmer Cutler Pickering Hale and Dorr LLP**
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
202.663.6000
steven.cherry@wilmerhale.com

**Counsel for ING Institutional Plan Services LLC f/k/a CitiStreet, LLC**

David E. Lurie
Thomas E. Lent
Sara A. Laroche
**Lurie & Krupp, LLP**
One McKinley Square
Boston, MA 02109
Telephone: 617.367.1970
Facsimile: 617.367.1971
dlurie@luriekrupp.comtlent@luriekrupp.comslaroche@luriekrupp.com

**Counsel for Plaintiffs F.W. Webb, Robert A. Mucciaarone, Charles Slattery III and Edward
Welch, as Members of the F.W. Webb Company Savings & Profit Sharing Plan Committee, and
the F.W. Webb Company Savings and Profit Sharing Plan, on Behalf of the Plan and the
Participants Thereof**

Leif T. Simonson
**Faegre & Benson LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Tel: 612.766.7000
Fax: 612.766.160
lsimonson@faegre.com

**Counsel for Apogee Enterprises, Inc.**

Michele Bryant
Thomas J. Kimpel

**Bamberger, Foreman, Oswald & Hahn LLP**
20 N.W. 4th Street, Seventh Floor
P.O. Box 657
Evansville, IN 47707-0657
Tel: 812.425.1591
Fax: 812.421.4936
mbryant@bamberger.comtkimpel@bamberger.com

Richard B. Walsh, Jr.
David B. Helms
R. Bradley Ziegler
**Lewis, Rice, Fingersh, L.C.**
500 N. Broadway, Suite 2000
St. Louis, MO 63102
Tel: 314.444.7600
rwalsh@lewisrice.comdhelms@lewisrice.combziegler@lewisrice.com

*Counsel for Plaintiff Welborn Baptist Foundation, Inc.*

Lynn Sarko
Derek W. Loeser
Karin B. Swope
Gretchen Freeman Cappio
Laura R. Gerber
**Keller Rohrback LLP**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: 206.623.1900
Fax: 206.623.3384
lsarko@kellerrohrback.comdloeser@kellerrohrback.comkswope@kellerrohrback.comgcappio@kellerrohrback.comlgerber@kellerrohrback.com

*Counsel for Lead Plaintiff Alan Kober, Trustee of the Andover Plan, and Interim Lead Counsel for the Class*

David Avi Rosenfeld
Evan Jay Kaufman
Samuel Howard Rudman
**Coughlin, Stoia, Geller, Rudman & Robbins, LLP**
58 South Service Road, Suite 200
Melville, NY 11747
drosenfeld@csgrr.comekaufman@csgrr.comsrudman@csgrr.com

*Counsel for Plumbers and Steamfitters Union Local No. 10 Health & Welfare Fund*

Jeffrey A. Berens
Darby Kennedy
**Dyer & Berens LLP**
303 East 17th Avenue, Suite 300
Denver, CO 80203
Tel: 303.861.1764
Fax: 303.395.0393
Jeff@dyerberens.comdarby@dyerberens.com

***Counsel for Securities Class Plaintiffs***

Geoff Gannaway
**Beck, Redden & Secrest**
One Houston Center
1221 McKinney Street, Suite 5400
Houston, TX 77010-2010
Tel: 713.951.3700
Fax: 713.951.3720
ggannaway@brsfirm.com

Charles R. Parker
**Locke Lord Bissel & Liddell LLP**
600 Travis, Suite 3400
Houston, TX 77002-2095
Tel: 713.226.1200
Fax: 713.223.3717
cparker@lockelord.com

John R. Nelson
**Locke Lord Bissel & Liddell LLP**
100 Congress Avenue, Suite 300
Austin, TX 78701
Tel: 512.305.4700
Fax: 512.305.4800
jnelson@lockelord.com

***Counsel for Plaintiffs Memorial Hermann Healthcare System and the Health Professionals Insurance Co., Ltd.***

Douglas Spaulding
**Reed Smith LLP**
1301 K Street NW
Suite 1100 - East Tower
Washington, D.C. 20005
Tel: 202.414.9200
Fax: 202.414.9299
dspaulding@reedsmith.com

***Counsel for Defendant Yanni Partners, Inc.***

_____ /s/Caren Sweetland _____
Caren Sweetland

56